```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF IDAHO

 3   - - - - - - - - - - - - - - - - - - - - - x

 4   TB HOLDING COMPANY LLC,      :

 5   a Colorado limited           :

 6   liability company,           : '

 7             Plaintiff,          :

 8      v                         : Case No. 4:22-CV-00307 BLW

 9   J & S SIDING COMPANY,        :

10   LLC, an Idaho limited        :

11   liability company,           :

12             Defendant.         :

13   - - - - - - - - - - - - - - - - - - - - - x

14

15         Deposition of JAMES HARRINGTON

16        Conducted virtually via Zoom

17         Friday, November 8, 2024

18              10:26 a.m. CST

19

20

21

22   Job No.:  559915

23   Pages:  1 - 140

24   Reported by:  THERESA A. VORKAPIC,

25              CSR, RMR, CRR, RPR
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    2

1

2           Deposition of James Harrington, conducted

3    virtually via Zoom, pursuant to notice before

4    Theresa A. Vorkapic, a Certified Shorthand

5    Reporter, Registered Merit Reporter, Certified

6    Realtime Reporter, Registered Professional

7    Reporter and a Notary Public in and for the State

8    of Illinois.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ex. A, p. 2 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    3

```
 1              A P P E A R A N C E S

 2    ON BEHALF OF THE PLAINTIFF:

 3         JESSE CAMACHO, ESQUIRE

 4         PRACTUS LLP

 5         11300 Tomahawk Creek Parkway

 6         Suite 310

 7         Leawood, Kansas 66211

 8         816-343-4301

 9         jesse.camacho@practus.com

10

11    ON BEHALF OF THE DEFENDANT:

12         ELIZABETH (LIZ) G.H. RANKS, ESQUIRE

13         FISH & RICHARDSON PC

14         One Marina Park Drive

15         Suite 1700

16         Boston, Massachusetts 02210

17         617-368-2175

18         ranks@fr.com

19

20    ALSO PRESENT:

21          Jaylon Carr, Law Clerk, Fish & Richardson

22

23

24

25
```

Ex. A, p. 3 (to the Camacho Decl.)

```
1                   C O N T E N T S

2    EXAMINATION OF JAMES HARRINGTON              PAGE

3         Examination By Ms. Ranks                 5

4         Further Examination By Mr. Camacho      115

5         Further Examination By Ms. Ranks        131

6

7                   E X H I B I T S

8              (Attached to transcript.)

9

10   HARRINGTON DEPOSITION EXHIBITS               PAGE

11

12    Exhibit 1     US Patent 9,283,604            11

13    Exhibit 2     US Patent 9,732,529            13

14    Exhibit 3     J&S 0008                       17

15    Exhibit 4     TB Holding 00088               21

16    Exhibit 5     Docket No. 42-2                38

17    Exhibit 6     opening Harrington report      60

18    Exhibit 7     September 8, 2024 rebuttal     94

19                  report

20    Exhibit 8     User License Agreement        127

21

22

23

24

25
```

Ex. A, p. 4 (to the Camacho Decl.)

J and S Designated Information Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    5

```
 1                P R O C E E D I N G S
 2          THE REPORTER:  Would you raise your right
 3    hand, please.
 4          (The witness was duly sworn.)
 5                    JAMES HARRINGTON,
 6    called as a witness herein, having been first duly
 7    sworn, was examined and testified as follows:
 8                    EXAMINATION
 9    BY MS. RANKS:
10       Q  Good morning, Mr. Harrington.
11       A  Good morning.
12       Q  Can you please state your full name for
13    the record.
14       A  Yes.  It is James John Harrington.
15       Q  I'm going to go through some ground rules
16    for the deposition with you.
17          You understand that you are under oath?
18       A  Yes.
19       Q  And you understand that you must tell the
20    truth, the whole truth and nothing but the truth?
21       A  Yes.
22       Q  And you'll do that, right?
23       A  I will.
24       Q  If you ever don't understand a question
25    that I ask, please just let me know, okay?
```

Ex. A, p. 5 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                                    6

```
1        A  Yes.
2        Q  If you answer a question, everyone knows
3    that you understood the question, okay?
4        A  Correct.
5        Q  If you ever want to take back, add to,
6    modify or change in any way any answer that you've
7    already given, just let me know and I'll let you
8    do that, okay?
9        A  Okay, I will.
10       Q  Is there any reason, medical or otherwise,
11   why you cannot give complete, accurate and
12   truthful testimony today?
13       A  No.
14       Q  If that ever changes in the deposition,
15   just let me know right away, okay?
16       A  Will do.
17       Q  Thank you.  We're doing a remote video
18   deposition today, right?
19       A  Yes.
20       Q  And where are you located?
21       A  I am in my office in Troy, Michigan.
22       Q  Are you alone today?
23       A  Yes.
24       Q  If that changes, just let me know.
25       A  Will do.
```

Ex. A, p. 6 (to the Camacho Decl.)

J and S Designated Information Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    7

1        Q  Are you relying on any notes today,

2    written or electronic?

3        A  No.

4        Q  If that changes, please let me know.

5        A  I'll do that.

6        Q  And are you texting or instant messaging

7    with anyone today?

8        A  No.

9        Q  And if that changes, you know, with regard

10   to the deposition, substance, just let me know,

11   please.

12       A  Will do.

13       Q  Thank you.

14          Can you describe how you were engaged as

15   an expert for this case?

16       A  Yes.  Back in March of this year, I was

17   contacted by Mr. Camacho regarding being engaged

18   in this matter.

19       Q  And prior to being engaged in this matter,

20   were you familiar with the plaintiff TB Holdings?

21       A  I was not.

22       Q  Had you worked with Mr. Camacho before?

23       A  I had not.

24       Q  Where are you currently employed?

25       A  With Matson, Driscoll & Damico, known as

Ex. A, p. 7 (to the Camacho Decl.)

J and S Designated Information Redacted
HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    8

1    MDD.  We are a forensic accounting firm.

2         Q   What is your title there?

3         A   Director.

4         Q   What are your general responsibilities?

5         A   Marketing the firm and our practice and

6    taking on the lead in economic damages engagements

7    and other forensic accounting matters.

8         Q   What is your educational background post

9    high school?

10        A   I have a bachelor's of science degree in

11   accounting from Oakland University in Rochester,

12   Michigan.

13        Q   Any further schooling?

14        A   No.

15        Q   How long have you been serving as an

16   expert with regard to patent damages?

17        A   Can you define what you mean by serving as

18   an expert?

19        Q   Sure.  I'm trying to understand from your

20   point of view how long you've been engaged in

21   working on intellectual property disputes?

22        A   Over 25 years.

23        Q   Do you have experience in the construction

24   industry?

25        A   It depends on what you mean by "experience

Ex. A, p. 8 (to the Camacho Decl.)

J and S Designated Information Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    9

1    in the construction industry."

2        Q   What's the holdup there?  What do you

3    mean?  I guess what do you mean?

4        A   Well, if you're asking me if I've worked

5    in construction is one thing.

6        Q   Have you provided opinions with regard to

7    clients that work in the construction industry?

8        A   Yes.

9        Q   And what kind of work or subject matter

10   has that been related to?

11       A   One that comes to mind immediately was a

12   retention on behalf of an owner of a franchise who

13   had hired a general contractor to build his

14   restaurant, and there were disputes between the

15   owner and the general contractor.  I worked on

16   that.  I would have to think back over my career.

17   There have been other engagements that were with

18   clients who were involved in construction in one

19   way or another whether they were a restoration

20   business or other pure construction clients.

21       Q   Have you ever worked on a case where the

22   subject matter related to siding?

23       A   I don't recall that I have.

24       Q   Have you ever worked on any cases or been

25   involved with any disputes in Idaho?

Ex. A, p. 9 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    10

```
1        A   I worked on behalf of clients who were

2   active in Idaho.

3        Q   Have you ever been to Idaho?

4        A   I believe that I have.  I don't recall.  I

5   may have driven through Idaho.

6        Q   You issued two reports in this case; is

7   that right?

8        A   That's correct.

9        Q   Thinking about your first report, the

10  report that was issued on August 9, 2024, I'll

11  refer to that as your opening report if that's

12  okay with you.

13       A   That's fine.

14       Q   Thinking about your opening report, who

15  wrote that report?

16       A   I did.

17       Q   Did you write every single word?

18       A   Yes.

19       Q   Who helped you with the content in the

20  report?

21       A   My colleagues here in Detroit, staff

22  accountants I have working with me on the

23  analysis.

24       Q   Anyone else?

25       A   There was a second testifying review
```

Ex. A, p. 10 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY

Transcript of James Harrington
Conducted on November 8, 2024                    11

1    performed by the partner in the office, but that

2    was minimal.

3        Q  Any feedback from the attorneys on your

4    report?

5        A  I shared a draft with Mr. Camacho who

6    reviewed it and identified different items and

7    edits that he suggested.

8        Q  With regard to your second report, I'll

9    refer to that as your rebuttal report; is that

10   okay?

11       A  Yes.

12       Q  And with regard to your rebuttal report,

13   was the process for drafting the report the same

14   as the opening report?

15       A  On my end, yes.  I'm not -- I don't

16   specifically recall if I shared a draft with

17   Mr. Camacho on that one or not.

18           MS. RANKS:  I'm going to mark as Exhibit 1

19   the '604 patent, and I'll drop it in the chat for

20   you.  Please just let me know when you're able to

21   open it.

22           (A certain document was marked Harrington

23           Deposition Exhibit 1 for identification,

24           as of 11/08/2024

25           MS. RANKS:  For the record, this is patent

Ex. A, p. 11 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    12

1    No. 9,283,604.

2    BY THE WITNESS:

3        A   Should I be able to open it in the chat.

4    BY MS. RANKS:

5        Q   If you click on it and download it, and

6    once it's downloaded if you go back and click on

7    it in the chat it should open.

8        A   Okay.  Thank you.  Okay.  I have it.

9        Q   And if you look at the '604 patent, you

10   see in field No. 21 it has the application number,

11   12-329336.

12           Do you see that?

13       A   I do.

14       Q   It was filed on December 5, 2008.  Do you

15   see that?

16       A   Yes.

17       Q   And then the next line down it has the

18   prior publication data of June 10, 2010?

19       A   Yes.

20       Q   Do you see that?

21       A   I do.

22       Q   And the prior publication, that

23   application is listed as US 2010/0139080 A1.

24           Do you see that?

25       A   I do.

Ex. A, p. 12 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    13

```
 1        Q   Are you familiar with publication --
 2   patent publication numbers?
 3        A   Generally, yes.
 4        Q   So essentially would you agree that this
 5   is just the number that the US Patent Office will
 6   refer to as the date that this patent was
 7   published, the application was published?
 8        A   I don't know that.  The ins and outs of
 9   specific filing data I'm not well versed on.
10        Q   Okay.  Understood.  No problem.
11            I will refer to this publication as the
12   '080 publication, and that's the last three
13   numbers of that.
14            Is that okay with you?
15        A   That's fine.
16        Q   So the '604 patent was filed on December 5
17   of 2008 and it was published or issued as a patent
18   on March 15, 206, correct?
19        A   Yes.
20            MS. RANKS:  I'm going to mark as Exhibit 2
21   the '529 patent.  I'll put it in the chat for you.
22   Let me know when you can open it.  And this is
23   patent No. 9,732,529.  And this will be Exhibit 2.
24            (A certain document was marked Harrington
25            Deposition Exhibit 2 for identification,
```

Ex. A, p. 13 (to the Camacho Decl.)

Transcript of James Harrington
Conducted on November 8, 2024      14

1       as of 11/08/2024.)

2  BY THE WITNESS:

3     A  Okay, I'm there.

4  BY MS. RANKS:

5     Q  The '529 patent this was filed on

6  February 6, 2016.

7       Do you see that?

8     A  I do.

9     Q  If we look at the related US application

10  data, it says that it was a division of

11  application No. 12/329,336 filed on December 5,

12  2008, right?

13     A  Yes.

14     Q  And that is the patent, the 336

15  application became the '604 patent which was

16  Exhibit 1, right?

17     A  It appears so, yes.

18     Q  The '529 patent stems from and is a

19  division of the '604 patent, right?

20     A  Yes.

21     Q  We can put that aside for now.

22     A  Okay.

23     Q  I'd like to ask you about your experience

24  with IP evaluation.

25       Have you done any IP evaluation?

Ex. A, p. 14 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    15

1        A   What do you mean by IP evaluation?

2        Q   Whether someone has asked you to help them

3    value their intellectual property assets or if

4    you've been involved in licensing negotiations

5    where you discussed the value of IP assets?

6        A   Well, in my world, there is a difference

7    between IP valuation and damages study where IP

8    evaluation is nuanced, generally an accounting

9    exercise or a sale exercise as opposed to a

10   dispute in a damages analysis.

11           So if you could clarify your question in

12   sort of with that thinking, I'd appreciate it.

13       Q   Sure, I'm not talking about the damages

14   analysis as far as like a litigation over a

15   damages analysis.

16           I'm wondering about your experience in you

17   can call them disputes or negotiations outside of

18   the litigation context.

19       A   I have not done pure intellectual property

20   valuation work.  That's outside of my practice.  I

21   believe through my career there have been

22   different times where people I've worked with have

23   been engaged to negotiate a license, and I've

24   assisted in that regard, but that was few and far

25   between.

Ex. A, p. 15 (to the Camacho Decl.)

1     Q   Would you say, though, you are familiar in

2  general with patent licensing negotiations?

3     A   Outside of the context of a hypothetical

4  negotiation, is that what we're referring to?

5     Q   Yes.

6     A   Generally.

7     Q   Have you ever actually been at the table

8  during a licensing negotiation?

9     A   No, I have not.

10     Q   You agree that a patent license

11  negotiation can include a license of an issued

12  patent as well as a patent application, correct?

13        MR. CAMACHO:  Objection.  Form.

14  BY THE WITNESS:

15     A   Again, are we talking about the

16  hypothetical or an actual licensing agreement.

17  BY MS. RANKS:

18     Q   Actual licensing negotiation for now.

19     A   I believe the parties can structure a

20  license in any way they see fit whether it's an

21  initial, say, single patent that's licensed, and

22  then any subsequent patents that cover that same

23  product may be included in the license agreement.

24     Q   You agree that if the parties choose to,

25  they can agree to license appending application

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    17

1    which would, therefore, assign rights to any

2    future patent that stems from or issues from that

3    application, right?

4            MR. CAMACHO:  Objection.  Outside the

5    scope.

6    BY THE WITNESS:

7        A  It's possible.  It's possible.

8    BY MS. RANKS:

9        Q  Turning to this case and your analysis of

10    the damages in this case, did you consider the

11    fact that J&S paid over $10,000 to TBH for the log

12    attachment?

13            MR. CAMACHO:  Objection.  Form, calls for

14    facts not in evidence.

15    BY THE WITNESS:

16        A  That is true.  I was not -- I don't know

17    that I was aware of that, but it is not -- it's

18    not considered in my analysis.

19            MS. RANKS:  I'm going to mark as Exhibit 3

20    a document labeled as J&S 0008.  If you can just

21    let me know when you can see Exhibit 3.

22            (A certain document was marked Harrington

23            Deposition Exhibit 3 for identification,

24            as of 11/08/2024.)

25    BY THE WITNESS:

Ex. A, p. 17 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                                    18

1        A  I have it.

2    BY MS. RANKS:

3        Q  So this is a receipt from Ted Baum to J&S

4    Siding for a total of $10,925 that J&S paid,

5    right?  Do you see that?

6        A  I do.

7        Q  And that was for the TruLog kit, the

8    standard ButtKicker and training and mousing of

9    the kit, right?

10        MR. CAMACHO:  Objection.  Authentication,

11    Counsel is testifying.

12    BY THE WITNESS:

13        A  That's what it says on this invoice.

14    BY MS. RANKS:

15        Q  And prior to seeing this document today,

16    you've not seen this document before?

17        A  I don't recall the specific document.

18        Q  Are you saying that you didn't know that

19    J&S paid $10,925 for the attachment?

20        MR. CAMACHO:  Objection.

21    Mischaracterizes.

22    BY THE WITNESS:

23        A  I don't recall specifically that I was

24    aware of this, however, I don't -- I don't see how

25    it would have a bearing on my analysis.

Ex. A, p. 18 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    19

1    BY MS. RANKS:

2        Q   You see that it's dated as October 6,

3    2009, right?

4        A   Yes.

5        Q   And October 6, 2009 was prior to the

6    issuance of the '604 patent, right?

7        A   I'd have to look at the patent.  I don't

8    recall the issue date off the top of my head.

9        Q   We can look.  Exhibit 1 is the '604

10   patent.

11       A   Oh, okay.  Yes, '604 patent issued

12   March 15, 2016.

13       Q   And while the application was filed on

14   December 5 of 2008, patent published until

15   June 10, 2010, right?

16       A   That's what's shown on the patent, yes.

17       Q   So when J&S purchased the log attachment

18   from Ted Baum, the '604 patent had been published,

19   right?

20           MR. CAMACHO:  Objection.  Calls for facts

21   not in evidence.  There's no indication of

22   purchase.

23           MS. RANKS:  I'm sorry.  I misspoke.  Let

24   me restate that question, Mr. Harrington.

25   BY MS. RANKS:

Ex. A, p. 19 (to the Camacho Decl.)

J and S Designated Information Redacted
HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    20

1      Q  We have -- in Exhibit 3 we have a receipt

2  of October 6, 2009, right?

3      A  Yes.

4      Q  And we have the patent in Exhibit 1 the

5  '604 patent as being published on June 10, 2010,

6  right?

7      A  Yes.

8      Q  So J&S paid Ted Baum over $10,000, the

9  '604 patent had not yet issued -- had not yet been

10  published, right?

11         MR. CAMACHO:  Objection.

12  Mischaracterizes, form.

13  BY THE WITNESS:

14      A  That's how the dates follow, yes.

15  BY MS. RANKS:

16      Q  And it's your opinion that the fact that

17  J&S paid Ted Baum over $10,000 is not relevant to

18  your damages analysis in this case?

19         MR. CAMACHO:  Objection.

20  Mischaracterizes.

21  BY THE WITNESS:

22      A  It has no influence in the conclusions I

23  present in my report.

24  BY MS. RANKS:

25      Q  Why not?

Ex. A, p. 20 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    21

```
1        A   The treatment of this payment if it

2    occurred would be left to the court.  I have not

3    addressed this invoice or this amount in my

4    report.

5            MS. RANKS:  I'm going to mark as Exhibit 4

6    a document with the Bates label of 00088 TB

7    Holding.

8            (A certain document was marked Harrington

9            Deposition Exhibit 4 for identification,

10           as of 11/08/2024.)

11   BY MS. RANKS:

12       Q   If you can let me know when you can see

13   Exhibit 4.

14       A   Okay.

15       Q   Have you seen this document before?

16       A   I believe so, yes.

17       Q   And this is a letter from Ted Baum's

18   attorney to J&S Siding's attorney, correct?

19           MR. CAMACHO:  Objection.  Form, also

20   authentication and speculation.

21   BY THE WITNESS:

22       A   Mr. Ley refers in the letter that he's

23   been authorized by Mr. Baum, but I don't know who

24   David Alexander is and whether or not he did

25   represent J&S.
```

Ex. A, p. 21 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                          22

```
1    BY MS. RANKS:
2        Q   Sure.  Understood.  The subject line of
3    the letter says Ted Baum/Joe and Stephanie
4    Walraths J&S Siding Company TruLog trademark,
5    right?
6        A   It does, yes.
7        Q   If we scroll down to the second page of
8    the letter, the second paragraph on the second
9    page, it says:  "Despite these discrepancies, and
10   Mr. Baum's firm conviction that your clients are
11   liable for damages for trademark and copyright
12   infringement..."
13          Do you see that?
14       A   Yes.
15       Q   And it says:  "Mr. Baum is willing to
16   resolve this conflict on the following basis so
17   that both parties may move on."
18          Do you see that?
19       A   I do.
20       Q   And then below that statement there's a
21   list of paragraphs, right?
22       A   Yes.
23       Q   If we scroll down to the last paragraph on
24   Page 2 that starts with:  "This is to advise you
25   and your client"...
```

Ex. A, p. 22 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    23

1          Do you see that paragraph?

2       A   Yes.

3       Q   And it states that:  "Mr. Baum is the

4   owner of the design patent" and then it goes on

5   and says:  "Mr. Baum has also filed one United

6   States utility patent application US

7   2010-0139080."

8          Do you see that?

9       A   I do.

10       Q   And that's that same '080 patent

11   application that was the printed publication from

12   the '604 patent, right?

13       A   I believe so, yes.

14       Q   And the letter in Exhibit 4 states that a

15   copy of the '080 application is attached and then

16   expects to file more in the near future, right?

17       A   Yes.

18       Q   And then it says:  "While the Walraths

19   have the right to make simulated log siding panels

20   using the log forming attachment that they

21   purchased in 2009, they have no right to

22   reconstruct or remanufacture that log forming

23   attachment or to make simulated log siding panels

24   using a reconstructed or remanufactured machine."

25          Do you see that?

Ex. A, p. 23 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    24

```
1        A   I do.
2        Q   What does that statement mean to you?
3            MR. CAMACHO:  Objection.  Form.
4    BY THE WITNESS:
5        A   That's a legal argument or presentation by
6    the attorney.  I don't know what his -- I don't
7    know what the situation was surrounding this, and
8    I would just say that this document says what it
9    says.  I have no opinion on what Mr. Ley was
10   stating there.
11   BY MS. RANKS:
12       Q   We read earlier in the letter that this
13   was an attempt to resolve a dispute between the
14   parties, right?
15       A   Yes.
16       Q   As part of the dispute resolution, Mr. Ley
17   is confirming that Mr. Baum has a patent on the
18   log siding attachment and panels, right?
19           MR. CAMACHO:  Objection.  Form,
20   speculation.
21           MS. RANKS:  I'll restate the question.
22   BY MS. RANKS:
23       Q   The last paragraph in Exhibit 4 is stating
24   that Mr. Baum has file the patent application
25   ending in '080, correct?
```

Ex. A, p. 24 (to the Camacho Decl.)

1     A   Correct.

2     Q   It goes on to say that the Walraths have a

3   right to make log siding panels using the log

4   forming attachment that they purchased in 2009,

5   right?

6     A   That's what the letter says, yes.

7     Q   Mr. Baum contends that the '080 patent

8   covers the log attachment, the log forming

9   attachment and the siding made using the

10   attachment, correct?

11     MR. CAMACHO:  Objection.  Form,

12   mischaracterizes.

13   BY THE WITNESS:

14     A   Could you ask that again?  I'm not sure I

15   agree with it.

16   BY MS. RANKS:

17     Q   We established that the '080 application

18   is the application that gave rise to both the '604

19   and the '529 patents, right?  Not in this letter

20   but when we were talking about Exhibits 1 and

21   Exhibit 2.

22     A   I believe so, yes.

23     Q   And so in this letter in Exhibit 4, the

24   last paragraph on Page 2 is stating that Mr. Baum

25   has a patent application on the log forming

Ex. A, p. 25 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY

Transcript of James Harrington
Conducted on November 8, 2024                    26

```
1    attachment and the log side siding panels using

2    the attachment, right?

3         A  Yes.

4         Q  It goes on to say that the Walraths also

5    have the right to make log siding panels using the

6    log forming attachment that they purchased in

7    2009?

8         A  Okay.

9         Q  We saw proof of that purchase in

10   Exhibit 3, right?

11        MR. CAMACHO:  Objection calls for

12   speculation, lack of foundation.

13   BY THE WITNESS:

14        A  You showed a receipt.

15   BY MS. RANKS:

16        Q  It was dated in 2009, right?

17        A  Yes.

18        Q  In your opinion, is this an offer to

19   license the '080 patent to the Walraths in light

20   of their $10,000 payment in 2009?

21        MR. CAMACHO:  Objection.  Beyond the

22   scope, calls for speculation.

23   BY THE WITNESS:

24        A  That's not how I read this.

25   BY MS. RANKS:
```

Ex. A, p. 26 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    27

1       Q  How do you read it?

2       A  I read this as he's presenting what he

3  views as the position of Mr. Baum whether it's

4  Mr. Baum's position or not.

5       Q  What's that position?

6          MR. CAMACHO:  Objection.  Calls for

7  speculation.

8  BY THE WITNESS:

9       A  That J&S has infringed their patents.

10 BY MS. RANKS:

11      Q  Well, doesn't it say that the Walraths

12 have the right to make log siding panels using the

13 log forming attachment that they purchased in

14 2009?

15      A  That's what this letter says, yes.

16      Q  So how is that an accusation of

17 infringement?

18         MR. CAMACHO:  Objection.  Outside the

19 scope calls for speculation.

20 BY THE WITNESS:

21      A  I'm talking about the current matter.

22 BY MS. RANKS:

23      Q  So am I.

24      A  There is a lawsuit pending, infringement

25 suit pending against J&S for these patents.

Ex. A, p. 27 (to the Camacho Decl.)

1      Q  It's your professional opinion that this

2   letter is not an offer or agreement by Mr. Baum --

3   let me restate that question.

4          It's your professional opinion that the

5   last paragraph on Page 2 of Exhibit 4, Mr. Baum is

6   not acknowledging that the Walraths have a right

7   to use any patents that stem from the '080

8   application?

9          MR. CAMACHO:  Objection.  Calls for

10   speculation and form.

11   BY THE WITNESS:

12      A  This letter is the attorney's statement,

13   not Mr. Baum's.  I've never heard Mr. Baum say or

14   anything in his testimony or any of the records

15   where Mr. Baum has said, well, yeah, they were

16   certainly licensed.  We offered them a license --

17   they were licensed under these patents.

18   BY MS. RANKS:

19      Q  You would agree taking out that was

20   Mr. Baum's opinion the letter written by

21   Mr. Baum's attorney clearly states that the

22   Walraths have a right to make and use articles

23   under the '080 patent application, correct?

24          MR. CAMACHO:  Objection.  Speculation.

25   BY THE WITNESS:

Ex. A, p. 28 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                29

1        A   I haven't studied this letter.  If it's

2    J&S's position that this is some sort of an

3    authorization to use the apparatus and the log

4    siding, then that's their position.  I haven't

5    evaluated that in my work.

6    BY MS. RANKS:

7        Q   You didn't consider this under the GP

8    factors?

9        A   No.

10       Q   Why not?

11       A   Because it's not something I've -- it is a

12   letter from an attorney that I haven't -- I don't

13   view as being particularly telling.

14       Q   You don't see it as grant of a license to

15   use a patent application?

16       A   I don't.

17       Q   Why not?

18       A   If I'm recalling correctly, I believe

19   Mr. Reed-Baum testified, and I'd have to look back

20   at the testimony, that this was a letter that was

21   sent without complete authorization of TBH.

22       Q   So you think that TBH's counsel was acting

23   without permission when they sent this letter?

24       A   I don't know.

25       Q   If TBH's counsel was not acting without

Ex. A, p. 29 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY

Transcript of James Harrington

Conducted on November 8, 2024                              30

1   permission, does that change your opinion?

2        MR. CAMACHO:  Objection.  Calls for

3   speculation.

4   BY THE WITNESS:

5        A  I haven't really considered this.  It's

6   not something that I can review now and provide an

7   opinion on.

8   BY MS. RANKS:

9        Q  Oh, I thought you had said you had seen

10  this before?

11       A  I have seen this letter before, but it

12  wasn't part of my report and the opinions outlined

13  in my report.

14       Q  You agree that the '080 patent application

15  is the application that gave rise to both the '604

16  and the '529 patent, right?

17       A  Yes.

18       Q  You provided a damages analysis on alleged

19  infringement of the '604 and the '529 patent,

20  right?

21       A  Yes.

22       Q  And you did not consider a letter that

23  gives rights to J&S to use the '080 patent

24  application; is that your testimony?

25       MR. CAMACHO:  Objection.

Ex. A, p. 30 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    31

1    Mischaracterizes.

2    BY THE WITNESS:

3        A   If you want to take this letter at its

4    face value, then there's no infringement.  If

5    there's no infringement, there is no damages.

6    I've assumed valid and infringed and my report

7    lays out the damages under that assumption.

8    BY MS. RANKS:

9        Q   Even if you assume that the patents are

10   valid and infringed, isn't this a data point that

11   you should have considered under the GP factors as

12   a license for $0 or at least a license for the

13   $10,000 payment?

14       A   I don't necessarily agree with that.

15       Q   Why not?

16       A   There was an existing license on the

17   table, that would have been the starting point in

18   the hypothetical negotiation, not necessarily a

19   zero royalty fee letter.

20       Q   Do you see a reference to any prior

21   license in this letter?

22       A   It doesn't appear so, no.

23       Q   Is it surprising to you that an offer to

24   license the '080 application doesn't mention a

25   prior license agreement that the parties

Ex. A, p. 31 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    32

1    apparently had agreed to?

2         MR. CAMACHO:  Objection.

3    Mischaracterizes, calls for speculation.

4    BY THE WITNESS:

5         A  Does it surprise me, no.

6    BY MS. RANKS:

7         Q  What evidence have you seen that J&S

8    agreed to enter into a license agreement?

9         A  They didn't agree to enter into a license

10   agreement.

11        Q  What evidence did you see that they ever

12   discussed a license agreement?

13        A  Testimony by Mr. Reed-Baum and Ted Baum.

14        Q  Do you know when that license agreement

15   was first presented to J&S?

16        A  Not off the top of my head, no.

17        Q  Was it prior to or after the sale of the

18   log attachment?

19        MR. CAMACHO:  Objection.

20   Mischaracterizes.

21   BY THE WITNESS:

22        A  I don't know.

23   BY MS. RANKS:

24        Q  If Mr. Baum provided a draft license

25   agreement to J&S after October 6, 2009, which is

Ex. A, p. 32 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    33

```
1    the date of the receipt in Exhibit 4, does that
2    change your opinion -- let me restate that
3    question.  Sorry.  I'll set it up better.  My
4    apologies.
5         It's my understanding that your position
6    is that J&S refused to enter into a license
7    agreement for the asserted patents, right?
8       A   Refused -- they did not enter into a
9    license agreement.
10      Q   Would it impact your analysis if that
11   potential license agreement was provided to J&S
12   prior to or after October 6, 2009, the date of the
13   Exhibit 4?
14      A   I'm sorry.  You've lost me a little bit.
15   If you could reask that.
16      Q   No, sir.  I'm sorry.  You're right.
17        So what I'm trying to understand is we
18   have the -- Exhibit 4 we have the invoice from Ted
19   Baum to J&S Siding for 10,925, right?
20        MR. CAMACHO:  Objection.
21   Mischaracterizes, lacks foundation.
22   BY THE WITNESS:
23      A   We have a document that says that, yes.
24   BY MS. RANKS:
25      Q   And that document is dated October 6,
```

Ex. A, p. 33 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                              34

1    2009?

2         A   Yes.

3         Q   We also have an allegation that TBH

4    offered a license agreement for the asserted

5    patents, right?

6             MR. CAMACHO:   Objection.

7    Mischaracterizes.

8    BY THE WITNESS:

9         A   Are you referring to the letter or are you

10   referring to the initial licensing agreement that

11   was put on the label.

12   BY MS. RANKS:

13        Q   I'm referring to the alleged initial

14   licensing agreement that was put on the table.

15        A   Yes, we have that as well.

16        Q   What I'm trying to understand is what came

17   first, the invoice from Ted Baum to J&S, Exhibit 4

18   or the alleged license agreement?

19        A   I don't know.  I would have to refer to

20   the documents and the testimony in the file.

21        Q   In your professional opinion, does it

22   matter?

23        A   I would have to think about that.  I'm not

24   sure it would have an impact one way or another.

25        Q   So if someone purchased something in

Ex. A, p. 34 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    35

1    October and then eight months later in July of the

2    next year they were offered a license agreement

3    for that thing they purchased, you would treat

4    that offer of the license agreement the same way

5    as if that license agreement was presented on the

6    day they made the purchase?

7         MR. CAMACHO:  Objection.  Form.

8    Speculation.

9    BY THE WITNESS:

10       A  The license to offer provide a starting

11   point in the hypothetical negotiation.  The timing

12   was close to the hypothetical negotiation dates

13   and I think it's a relevant starting point.

14       How it plays and compares to the data

15   presented in this letter from the attorney, I

16   haven't analyzed that or considered it.

17   BY MS. RANKS:

18       Q  You haven't analyzed or considered whether

19   the license agreement was presented at the time of

20   sale, either, right?

21        MR. CAMACHO:  Objection.

22   Mischaracterizes.

23   BY THE WITNESS:

24       A  The license to offer and I'm not -- since

25   I don't have my report here, I'm not entirely

Ex. A, p. 35 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    36

1    clear on dates and timing.  It was all in that

2    2009, 2010 timeframe, but there were five other

3    licensees that had that same license structure

4    that was subsequently offered to J&S.  So that

5    seemed to be a valid starting point in the

6    hypothetical negotiation and that's what I've

7    relied on is that licensing history back in that

8    time.

9    BY MS. RANKS:

10       Q  Is it relevant or not that that license

11   agreement was presented to J&S after they had

12   purchased the log attachment?

13       A  If it's relevant, I would leave it to the

14   court to say that that was -- this is an offer to

15   license.  I haven't treated it as such.  I've

16   treated the offer to license by TB Holdings in

17   that same timeframe as the other licensees.

18       Q  Let's not -- I don't want you thinking

19   about the Ley letter.  I just want to think about

20   the 2009 purchase.

21       A  Okay.

22          MR. CAMACHO:  Objection.

23   BY MS. RANKS:

24       Q  And the 2010 offer to license.

25          MR. CAMACHO:  Objection.  Mischaracterizes

Ex. A, p. 36 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    37

1    both.

2           MS. RANKS:  I haven't asked the question,

3    Jesse.

4    BY THE WITNESS:

5        A  Okay.

6    BY MS. RANKS:

7        Q  Does it impact your analysis the fact that

8    J&S purchased the log attachment in 2009 and the

9    offer to license that same attachment was

10   presented in 2010?

11          MR. CAMACHO:  Same objections.

12   BY THE WITNESS:

13       A  I am not sure how it would affect my

14   analysis, if any, that timing difference.

15   BY MS. RANKS:

16       Q  Why is that?

17       A  Because right now I feel like you're

18   pointing to an infringement or existing license

19   agreement argument rather than my base assumption

20   of valid and infringed and then quantifying the

21   damages.

22       Q  Well, you agree that it's a fact that J&S

23   purchased the log siding attachment in 2009,

24   right?

25          MR. CAMACHO:  Objection.  Form,

Ex. A, p. 37 (to the Camacho Decl.)

1  mischaracterizes.

2  BY THE WITNESS:

3      A  If that's what that receipt indicates,

4  then that may be.

5         MS. RANKS:  Let's go ahead and mark as

6  Exhibit 5 Docket No. 42-2 from this case and let

7  me know when you can open that.

8         (A certain document was marked Harrington

9         Deposition Exhibit 5 for identification,

10        as of 11/08/2024.)

11  BY THE WITNESS:

12      A  Okay.

13  BY MS. RANKS:

14      Q  This is the plaintiff which is TBH

15  Statement of Material Facts Submitted Under Local

16  Rule 7.1 B, right?

17      A  Yes.

18      Q  If we scroll down to the bottom of this

19  document, we see that it was submitted by

20  Mr. Camacho who is TBH's attorney, right?

21      A  Yes.

22      Q  And if we turn to Page 4 of Exhibit 5 and

23  we look at Paragraph 10...

24      A  Okay.

25      Q  ...it says:  "In 2009, before either

Ex. A, p. 38 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    39

1    utility patent had issued, Joe Walrath and J&S

2    purchased a log siding machine attachment from Ted

3    Baum or a company affiliated with Ted Baum."

4         Do you see that?

5         A  I do.

6         Q  You do not dispute that J&S purchased a

7    log siding attachment from Ted Baum in 2009?

8         MR. CAMACHO:  Objection.  No foundation,

9    calls for speculation.

10   BY THE WITNESS:

11        A  That's what it says in this document, yes.

12   BY MS. RANKS:

13        Q  You cited this document in your expert

14   report, right?

15        A  I believe so.

16        Q  So you do not dispute that J&S purchased

17   the log siding attachment, correct?

18        MR. CAMACHO:  Objection.  Foundation,

19   speculation.

20   BY THE WITNESS:

21        A  Based on what it says in this document,

22   yes.

23   BY MS. RANKS:

24        Q  And yet you did not consider in your

25   analysis the fact that J&S had purchased the

Ex. A, p. 39 (to the Camacho Decl.)

1    attachment?

2        A   It isn't necessarily relevant in my

3    analysis.  My understanding is they purchased the

4    attachment as shown here, then they were offered a

5    license to use that attachment going forward.  J&S

6    decided not to use the -- or take up that

7    licensing offer and chose to infringe on the

8    patents.

9        Q   If you purchase something, do you own it?

10       MR. CAMACHO:  Objection.  Speculation.

11   BY THE WITNESS:

12       A   Sometimes.  I guess it depends on what the

13   product is and what the agreement is with the

14   seller.

15   BY MS. RANKS:

16       Q   If I go down to Lowes and I buy an oven,

17   do I own that oven?

18       MR. CAMACHO:  Objection.  Speculation,

19   incomplete hypothetical.

20   BY THE WITNESS:

21       A   Presumably, yes.

22   BY MS. RANKS:

23       Q   Can I use that oven to make turkey?

24       A   Certainly.

25       Q   Can Lowes come six months later after I

Ex. A, p. 40 (to the Camacho Decl.)

```
 1   bought the oven and say, hold on, you can't make
 2   anything in that oven unless you license it from
 3   us?
 4         MR. CAMACHO:  Objection.  Incomplete
 5   hypothetical, speculation.
 6   BY THE WITNESS:
 7      A  I would agree with that.
 8   BY MS. RANKS:
 9      Q  Is there any difference in this situation?
10      A  This is, again, your argument that somehow
11   they are licensed or authorized to use it
12   without -- under a license agreement is different
13   than my assumption that this is -- these are
14   patents that are infringed and valid and J&S does
15   not have the authorization to use those patents.
16      Q  I understand that's your position.
17         What I'm trying to understand is we agree
18   that J&S purchased the log attachment in 2009,
19   right?
20         MR. CAMACHO:  Objection.
21   Mischaracterizes.
22   BY THE WITNESS:
23      A  Yes.
24   BY MS. RANKS:
25      Q  In the example that I used, I purchased an
```

Ex. A, p. 41 (to the Camacho Decl.)

1    oven from Lowes.  I have the right to use that

2    oven, right?

3        A  Yes.

4        Q  So why does J&S not have the right to use

5    the log siding attachment?

6        A  You're asking me for a legal opinions on

7    whether they are authorized or able to use it or

8    what they've done does or does not constitute

9    infringement.  That's not my area.

10       Q  Did you consider the fact as part of your

11   analysis that J&S had purchased the log siding

12   attachment?

13       A  I was aware of it.  Is it affirmatively

14   presented in my report?  I don't believe it is.

15       Q  Don't you think you should have considered

16   it at least under the GP factors?

17       A  I'm not sure how that would fit into the

18   consideration of the Georgia Pacific factors.

19       Q  At the time that TBH sold -- I'll use TBH

20   and Ted Baum kind of synonymously because it's a

21   little bit confusing.

22          We both agree that TBH and Ted Baum sold

23   J&S the log siding attachment in 2009, correct?

24          MR. CAMACHO:  Objection.

25   Mischaracterizes.

Ex. A, p. 42 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    43

```
 1    BY THE WITNESS:

 2        A   That's what the documents say, yes.

 3    BY MS. RANKS:

 4        Q   We know that prior to selling the

 5    attachment, Ted Baum had filed for a patent?

 6        A   I believe so, yes.

 7        Q   We saw that in Exhibit 1, the '604 patent

 8    was filed in 2008.

 9        A   Yes.

10        Q   So at the time TBH sold the attachment to

11    J&S, TBH knew it had a pending patent application,

12    right?

13            MR. CAMACHO:  Objection.

14    Mischaracterizes.

15    BY THE WITNESS:

16        A   I believe so, yes.

17    BY MS. RANKS:

18        Q   So is that not the same as agreeing to

19    allow J&S to use the potentially patented device

20    for the payment of $10,000?

21            MR. CAMACHO:  Objection.  Calls for

22    speculation and legal conclusion.

23    BY THE WITNESS:

24        A   I don't agree with that.

25    BY MS. RANKS:
```

Ex. A, p. 43 (to the Camacho Decl.)

1      Q   Why not?

2      A   You're presenting me with a letter from an

3    attorney that claims to present Mr. Baum's

4    position.  I don't know that it does or does not

5    and so I haven't looked at it in that regard.

6          Again, you're asking me to form a legal

7    conclusion based on a letter from an attorney.

8      Q   Okay.  So let's set aside the letter from

9    the attorney, okay?

10     A   Okay.

11     Q   Let's just agree on the facts that we have

12   as presented to us in the documents that TBH's own

13   attorney submitted to the court and that's

14   Exhibit 5, right?

15     A   Okay.

16     Q   And then we also have the patent

17   Exhibit 1.

18         So you agree that the patent was filed in

19   2008, correct?

20         MR. CAMACHO:  Objection.

21   Mischaracterizes.

22   BY THE WITNESS:

23     A   Yes.

24   BY MS. RANKS:

25     Q   So in 2008 as the named inventor,

Ex. A, p. 44 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    45

1    Mr. Baum, was aware that he had a pending patent

2    application, correct?

3        A  In 2008, yes.

4        Q  In 2009, Mr. Baum sold the log siding

5    attachment to J&S, correct?

6            MR. CAMACHO:  Objection.

7    Mischaracterizes, also calls for a legal

8    conclusion.

9    BY THE WITNESS:

10       A  Yes.

11   BY MS. RANKS:

12       Q  And when he made that sale, he was aware

13   that the log siding attachment was covered by his

14   pending patent application, correct?

15           MR. CAMACHO:  Objection.  Calls for

16   speculation and a legal conclusion.

17   BY THE WITNESS:

18       A  He may have been, yes.

19   BY MS. RANKS:

20       Q  Is that not an agreement to license the

21   pending patent application for the payment of the

22   device?

23           MR. CAMACHO:  Objection.  Calls for a

24   legal conclusion and speculation.

25

Ex. A, p. 45 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    46

```
1    BY THE WITNESS:
2        A  Well, again, you are asking me to form a
3    legal opinion, but I would also say that if this
4    were an offer to license, I would have expected
5    some sort of a license agreement that's signed in
6    the record that would indicate that this was a
7    license and agreed to.
8    BY MS. RANKS:
9        Q  And proof of payment like an invoice for
10   the attachment for $10,000, what do you consider
11   that to be?
12       A  Purchase of an apparatus.  Mr. Baum may
13   have sold him the apparatus and, again, all of
14   this seems like it's familiar, and then we're
15   going to sell you that, but to use it there's an
16   ongoing fee.
17       Q  So let's look again at Exhibit 5 and we
18   have in Paragraph 10 -- we have the note that the
19   log siding attachment was sold in 2009, right?
20       A  Yes.
21       Q  And then in Paragraph 11 it says:  "After
22   the sale, Joe Walrath requested to be the
23   exclusive provider of the TruLog type log siding
24   in his area."
25           Do you see that?
```

Ex. A, p. 46 (to the Camacho Decl.)

J and S Designated Information Redacted
HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    47

1        A  Yes.

2        Q  And then it says:  "Based on Joe Walrath's

3  inquiry, Mr. Baum presented a proposed license

4  agreement to J&S."

5            Do you see that?

6        A  Yes.

7        Q  Does that indicate to you that at the time

8  of the sale, there was no agreement or decision to

9  enter into a user license agreement?

10           MR. CAMACHO:  Objection.  Calls for

11  speculation.

12  BY THE WITNESS:

13       A  Could you ask that again, please.

14  BY MS. RANKS:

15       Q  Sure.  So in Exhibit 5, we agree this is

16  the plaintiff TBH's statement to the court, right?

17       A  Yes.

18       Q  And in this factual statement to the

19  court, TBH acknowledged that in 2009 it sold J&S

20  the, log siding attachment, right?

21           MR. CAMACHO:  Objection mischaracterizes.

22  BY THE WITNESS:

23       A  Yes.

24  BY MS. RANKS:

25       Q  Exhibit 5 goes on in Paragraph 11 to say:

Ex. A, p. 47 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                48

1   "After the sale Mr. Walrath requested to be the

2   exclusive provider of the TruLog-type simulated

3   log siding in his area."  Right?

4       A   That's what it says, yes.

5       Q   And then Paragraph 12 says:  "Based on Joe

6   Walrath's inquiry, Mr. Baum presented a proposed

7   user license agreement to J&S."  Right?

8       A   Yes.

9       Q   So at the time of the sale, there was no

10  proposed license agreement, correct?

11      MR. CAMACHO:  Objection to the form of the

12  question, calls for speculation, mischaracterizes.

13  BY THE WITNESS:

14      A   You asked -- your question was there is no

15  license prior to to the sale, is that what you're

16  saying?

17  BY MS. RANKS:

18      Q   At the time of the sale, Mr. Baum had not

19  yet presented to J&S a proposed license agreement?

20      A   I don't know that's true.

21      Q   Well, didn't we just read that in

22  Paragraph 10, 11 and 12 of Exhibit 5 that the

23  discussion of the license agreement came after the

24  sale?

25      A   This specific user license agreement, but

Ex. A, p. 48 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    49

1    you asked if there was any discussions prior to

2    the sale.  I'm not aware of that and it doesn't

3    address it in this letter or in this document.

4        Q  But the proposed user license agreement

5    referenced in Paragraph 12 is the proposed user

6    license agreement that Ted Baum and TB Holdings

7    alleges existed -- it's the only one, right?  I

8    mean, are you aware of another one?

9        MR. CAMACHO:  Objection.  Calls for

10   speculation.

11   BY THE WITNESS:

12       A  My statement was that I don't know that

13   there were or were not discussions prior to this

14   between Mr. Baum and Mr. Walrath.

15   BY MS. RANKS:

16       Q  And you don't think it's clear from

17   Paragraphs 10, 11 and 12 that the discussion of

18   the user license agreement came after the sale

19   based on Mr. Walrath's inquiry?

20       A  This specific license agreement, that's

21   how this reads, yes.

22       Q  So understanding this specific license

23   agreement referred to in Paragraph 12 of Exhibit 5

24   came into existence after J&S purchased the

25   attachment for $10,000, how does that impact your

Ex. A, p. 49 (to the Camacho Decl.)

J and S Designated Information Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    50

1    analysis?

2            MR. CAMACHO:  Objection.

3    Mischaracterizes.

4    BY THE WITNESS:

5        A  Again, it does not.

6    BY MS. RANKS:

7        Q  Why not?

8        A  Because for me to accept this as a valid

9    offer to license, I would have to assume that

10   there's no infringement.

11       Q  Well, isn't it proof that in 2009 Ted Baum

12   agreed to sell his patented products for $10,000?

13   Isn't that the agreement?

14           MR. CAMACHO:  Objection.  Calls for

15   speculation.

16   BY MS. RANKS:

17       Q  And with the sale comes the right to use

18   the patent?

19           MR. CAMACHO:  Objection.  Calls for a

20   legal conclusion.

21   BY THE WITNESS:

22       A  You keep asking -- the letter from Mr. Ley

23   and this appears to relate to the '604 and the

24   '529 patent and not necessarily the design patent.

25   I don't see that in Mr. Ley's letter so we have to

Ex. A, p. 50 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    51

1    contend with as well.

2    BY MS. RANKS:

3        Q   Okay.  But you agree that it appears that

4    in 2009 Mr. Baum sold J&S the log attachment

5    understanding that there was a patent pending and

6    he sold the product to them anyway without any

7    additional agreement?

8        MR. CAMACHO:  Objection.

9    Mischaracterizes, calls for a legal conclusion.

10   BY THE WITNESS:

11       A   I was not there at the time with

12   Mr. Walrath or Mr. Baum.  I would contend that if

13   you're designing an apparatus to make a patented

14   product, you have the time and energy related to

15   the development and building of the machine,

16   however, continued use may be well within your

17   rights to demand a license for.

18   BY MS. RANKS:

19       Q   After you've sold it?

20       A   Yes.

21       Q   So Lowes could come at me for my oven and

22   say I need to license it in order to continue

23   using it?

24       A   I don't know.  What Lowes does is what

25   they do.  It's almost an apples and oranges

Ex. A, p. 51 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    52

1    comparison, yeah.

2        Q   Why?  How is it different?

3        MR. CAMACHO:  Objection.  Calls for

4    speculation and legal conclusions.

5    BY THE WITNESS:

6        A   This was an agreement between two parties

7    that took place for a brand new product and

8    covering three different patents.

9    BY MS. RANKS:

10       Q   So it's relevant to you that the design

11   patent -- we haven't discussed the design patent

12   with regard to the sale?

13       MR. CAMACHO:  Objection.

14   Mischaracterizes.

15   BY THE WITNESS:

16       A   That's a consideration here.  Again, my

17   position on this would be if the court ruled that

18   it was a fully paid-up license when this bought

19   the apparatus for two of the three patents, then

20   I'm not going to be the one to argue that.  That

21   would be the court's decision.  Please, let me

22   finish.  You're asking me to make a legal

23   conclusion here based on this information, and

24   that's not my role.

25   BY MS. RANKS:

Ex. A, p. 52 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    53

1       Q  But why didn't you at least consider it as
2   part of the GP factors as an example of a
3   potential license between the parties?
4       A  It's not an actual license.  When I think
5   of a license, I think of a document that has been
6   signed by both parties that is related to the
7   patented products at issue.
8       Q  And in your 25 years of experience, it's
9   your opinion that if someone purchases a product,
10  they can then be forced to license after the fact,
11  after they purchased it?
12          MR. CAMACHO:  Objection.  Calls for
13  speculation and asked and answered probably 10
14  times.
15  BY THE WITNESS:
16      A  We go back to the earlier discussion on
17  parties in a real negotiation.  They can structure
18  a license in any way they see fit.
19  BY MS. RANKS:
20      Q  Right.  So that's not my question.
21          My question is you have 25 years of
22  experience dealing with intellectual property
23  rights, right?
24      A  Yes.
25      Q  And in that time, have you ever seen

Ex. A, p. 53 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                54

1    someone be forced to license something that they

2    have purchased after the fact?

3        MR. CAMACHO:  Objection.

4    Mischaracterizes.

5    BY THE WITNESS:

6        A   That's an interesting question.  I assume

7    that I've seen that where the patentholder

8    manufactures and then the use follows with a per

9    unit license based on the article manufactured

10   with it.

11   BY MS. RANKS:

12       Q   That would be agreed to at the time of

13   sale or you're saying you've seen that after the

14   purchase, the seller will come back to the

15   purchaser and say, hey, you also have to pay me

16   additional money now?

17       A   Well, in your hypothetical is that there

18   were no discussions prior to the purchase of the

19   apparatus.  I don't know that to be true.

20   BY MS. RANKS:

21       Q   Right.  Because that's -- well, so,

22   Exhibit 5 was TBH's opportunity to sell the court

23   about the negotiation, this is TBH's explanation

24   to the court about the sale and subsequent license

25   discussion, right?

Ex. A, p. 54 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024      55

1      MR. CAMACHO:  Objection.

2   Mischaracterizes.

3   BY THE WITNESS:

4      A   Well, I guess looking at Exhibit 5,

5   Mr. Walrath requested to be the exclusive

6   provider, that may have been the triggering point

7   to discuss a different licensing agreement than

8   that had initially been on the table.

9   BY MS. RANKS:

10      Q   Uh-huh.

11      A   However, again, if this were an actual

12   license agreement, then where is that license

13   agreement?

14      Q   Well, they did purchase it, though, right?

15   There's no dispute there.

16      MR. CAMACHO:  Objection.

17   Mischaracterizes.  That's not been determined.

18   BY THE WITNESS:

19      A   Well, that's what the documents show that

20   he --

21      MR. CAMACHO:  Mr. Camacho, your speaking

22   objections are entirely inappropriate and if you

23   continue to do that, I will pause this deposition

24   and call the court.  He's an expert witness.  He

25   does not need to be coached by you during the

Ex. A, p. 55 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    56

1    deposition.

2    BY MS. RANKS:

3        Q   Mr. Harrington, just to confirm, it's an

4    established fact that in 2009 J&S purchased the

5    log siding machine attachment from Mr. Baum,

6    correct?

7            MR. CAMACHO:   Objection.

8    Mischaracterizes, calls for facts not in evidence.

9    BY THE WITNESS:

10       A   That's what this document would indicate,

11   yes.

12   BY MS. RANKS:

13       Q   And it was only after the sale that

14   Mr. Baum proposed a user license agreement to J&S,

15   correct?

16       A   Not only.  You're saying -- you want me to

17   assume that nothing occurred, there were no

18   discussions prior to this, and that's the problem

19   I have with your statement.

20   BY MS. RANKS:

21       Q   Do you see anything in Exhibit 5 to

22   suggest that there were any licensing discussions

23   prior to the purchase in 2009?

24       A   I'm doing a quick review.  I don't see

25   anything to that effect, no.

Ex. A, p. 56 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    57

1      Q   And it would make sense this is TBH's

2   opportunity to sell their story to the court that

3   if there had been license agreement discussions

4   prior to the purchase, they would have documented

5   that in Exhibit 5, right?

6          MR. CAMACHO:  Objection.  Calls for

7   speculation.

8   BY THE WITNESS:

9      A   I don't know what they felt was necessary

10  to include in this document.

11  BY MS. RANKS:

12     Q   How many years can a patentee claim patent

13  damages for when they file litigation in federal

14  court?

15     A   Going back or going forward?

16     Q   Back.

17     A   I know this gets into a whole notice issue

18  that I'm not an attorney, but I believe it's six

19  years prior.

20     Q   It is a maximum of six years, right?

21     A   That's a general rule it's my

22  understanding, yes.

23     Q   It cannot be more than six years, right?

24     A   I don't know that to be true.  I'm not an

25  attorney.

Ex. A, p. 57 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    58

1       Q   You said you wrote your expert report

2   yourself, right?

3       A   Correct.

4       Q   And your expert report says that the

5   patent damages are limited to six years prior to

6   the date, right, of the complaint?

7       A   I also have included all sales back to the

8   issuance date.

9       Q   Right.  Why did you do that?

10      A   I was asked to include it.

11      Q   Why?

12      A   In the event that that six-year limit is

13  incorrect.

14      Q   So if the six-year statutory limit is

15  incorrect, you've provided additional data?

16      A   Yes.

17      Q   You didn't just include it to have a

18  really high number to scare J&S?

19      A   No.

20          MR. CAMACHO:  Objection.  Argumentative.

21  BY MS. RANKS:

22      Q   Have you ever seen patent damages go back

23  further than six years from the date of the

24  complaint?

25      A   I don't recall.

Ex. A, p. 58 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    59

1       Q  You don't recall?

2       A  I don't.

3       Q  Have you ever provided an opinion where

4   you included patent damages for further back than

5   six years from the date of the complaint?

6       A  It seems likely that it's occurred, but I

7   don't specifically recall that.

8       Q  Sitting here today, you don't recall any

9   instances of doing that?

10      A  As I said, it wouldn't surprise me that I

11  have or have been part of the team that included

12  sales earlier, but I couldn't right now point to a

13  specific case.

14      Q  So for a patent damages analysis there is

15  something called the hypothetical negotiation,

16  right?

17      A  Correct.

18      Q  And what is the start date of the

19  hypothetical negotiation?

20      A  The date of first infringement.

21      Q  Here what's the date of first

22  infringement?

23      A  Well, it depends on which patent.

24      Q  Well, there's multiple start dates.

25      A  Yes.  There could be.

Ex. A, p. 59 (to the Camacho Decl.)

J and S Designated Information Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                     60

```
1        Q  I'm going to put your report in as
2   Exhibit 6.  Your opening report.
3            (A certain document was marked Harrington
4            Deposition Exhibit 6 for identification,
5            as of 11/08/2024.)
6   BY MS. RANKS:
7        Q  Let me drop it in the chat.  Just one
8   second.  This is the August 9, 2009, 2024 opening
9   Harrington report.  Let me know when you have that
10  open.
11       A  Okay.
12       Q  If you will turn to Page 12 of your
13  report, Paragraph 48, you say that:  "Under the
14  hypothetical negotiation framework, the date of
15  the hypothetical negotiation is assumed to occur
16  on the date of first infringement", and then you
17  go on to say that you have assumed that the
18  hypothetical negotiation takes place on
19  October 2009, right?
20       A  Yes.
21       Q  Shouldn't there be three hypothetical
22  negotiation dates?
23       A  Well, there could be.  I don't know that
24  in my view that it would have changed the
25  conclusion given any one of those dates.  We're
```

Ex. A, p. 60 (to the Camacho Decl.)

J and S Designated Information Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY

Transcript of James Harrington

Conducted on November 8, 2024                                61

1    still looking at patents that cover the product

2    sold by J&S, manufacturing or selling the product.

3        Q  So it's your opinion that the position of

4    the parties in 2009 were the same as they were in

5    2016?

6            MR. CAMACHO:  Objection.

7    Mischaracterizes.

8    BY THE WITNESS:

9        A  I think the considerations would be the

10   same in the hypotheticals which is in line with

11   what Mr. Denney has presented in his report.  He

12   stated the same.

13               (Reporter clarification).

14   BY MS. RANKS:

15       Q  Did you do any analysis of the

16   hypothetical negotiation or the GP factors

17   considering a 2016 or 2017 start date?

18       A  Again, I think the factors would be the

19   same regardless of the start date.

20           MS. RANKS:  Why don't we go ahead and go

21   off the record and take a short break.

22           (A recess was had.)

23           MS. RANKS:  We can go back on the record.

24   BY MS. RANKS:

25       Q  Mr. Harrington, if we can take a look at

Ex. A, p. 61 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    62

1    your opening report, Exhibit 6, I want to look at

2    GP factor 1 and your analysis there which I

3    believe is on PDF Page 17.

4         A  Okay.

5         Q  And GP factor one is the royalties

6    received by the licensor for the licensing of the

7    patent-in-suit proving or tending to prove an

8    established royalty, right?

9         A  Yes.

10        Q  Are you aware that TBH licensed the

11   asserted patents to NAMC, right?

12        A  Yes.

13        Q  And that license was a royalty free

14   license, right?

15        A  I believe so, yes.

16        Q  Did you consider that royalty free license

17   in your analysis?

18        A  Not in this section, no.

19        Q  Did you consider this position?

20        A  I've considered the position of Mr. Baum

21   as the owner of NAMC in my royalty analysis.

22        Q  NAMC has never actually paid any money to

23   TBH, correct?

24        A  I don't know.

25        Q  You don't think that's relevant to your

Ex. A, p. 62 (to the Camacho Decl.)

J and S Designated Information Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    63

1   analysis?

2        A   Whether they paid them or not?

3        Q   Uh-huh.

4        A   Under the terms of the license it's

5   royalty fee?

6        Q   Why are the licenses that NAMC entered the

7   sublicenses relevant to TBH's position of the

8   hypothetical negotiation?

9        A   It's Mr. Baum's consideration in the

10  hypothetical negotiation.  He has a commonly owned

11  entity that sells the patented products and he

12  would be well aware of the impact of licensing

13  another competitor in the market and the impact to

14  the monies that that he would receive, or the

15  revenues that would be generated by a commonly

16  owned company.

17       Q   So essentially at the table at the

18  hypothetical negotiation in your mind it was sort

19  of TBH and NAMC sitting across from J&S?

20           MR. CAMACHO:  Objection.

21  Mischaracterizes.

22  BY THE WITNESS:

23       A   No.

24  BY MS. RANKS:

25       Q   Why not?

Ex. A, p. 63 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    64

1        A   NAMC is not party to this suit nor the

2    hypothetical negotiation.  It's Mr. Baum and

3    Mr. Reed-Baum.

4        Q   So is it really Mr. Baum and Mr. Reed-Baum

5    or is it the TBH Holdings Corporation?

6        A   It would be TBH Holdings which is owned by

7    Mr. Baum and Mr. Reed-Baum.

8        Q   And NAMC is also held by Mr. Baum and

9    Mr. Reed-Baum, right?

10       A   Correct.

11       Q   And you're saying in your analysis you

12   don't conflate the two?

13       A   I don't what?

14       Q   Conflate the two?

15       A   No.

16       Q   Does TBH have any input into NAMC's

17   sublicenses?

18           MR. CAMACHO:  Objection.  Calls for

19   speculation.

20   BY THE WITNESS:

21       A   NAMC sublicenses, I'm not aware of any.

22   BY MS. RANKS:

23       Q   If we look at your opening report,

24   Exhibit 6, Page 17 and 18, you list agreements

25   with five licensees and you say that their

Ex. A, p. 64 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    65

1    agreement is with TBH but they're not, right?

2    They're actually agreements with NAMC?

3         A   I don't believe NAMC existed until 2018

4    and these licenses were in 2009 and 2010.

5         Q   Have you seen any of these license

6    agreements?

7         A   I don't recall.

8         Q   You don't cite them in your report.

9         A   Well, these came from the filings by TB

10   Holdings and the list of the licensees.

11        Q   Where are you seeing that?

12        A   In footnote -- my Footnote 50.

13        Q   You haven't actually seen the licenses

14   themselves, you've just seen representations made

15   by TBH?

16        MR. CAMACHO:   Objection.

17   Mischaracterizes.

18   BY THE WITNESS:

19        A   I don't recall specifically seeing the

20   licenses.  That doesn't mean I haven't seen them.

21   BY MS. RANKS:

22        Q   They're not cited in your materials

23   considered list, though, so if you had seen them

24   they would be cited there?

25        A   They would be, yes.

Ex. A, p. 65 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    66

1      Q  So you probably haven't seen them, right?

2      A  If it's not on my list then I probably

3   don't have it, yes.

4      Q  If you had seen them, I mean, they'd

5   probably be cited in this section of your report,

6   would you agree with that?

7      A  Yes.

8      Q  Even if we do assume that these are real

9   licenses, even though no one's seen them, how much

10  money have the licensees paid under the licenses?

11     A  I don't believe it's a large amount.  I

12  believe as is indicated on my chart, the majority,

13  four out of the five there, are no longer active.

14     Q  Do you know if any of these licensees paid

15  that up-front $10,000 licensing fee?

16     A  My understanding is these licensees

17  accepted the rates, presumably they paid that, but

18  I haven't seen a document that would indicate

19  that.

20     Q  And do you know how much money these

21  licensees paid per square or the royalty rates

22  that they paid under these alleged licenses?

23     A  It was $25 a square.

24     Q  Do you know how much money in total was

25  paid by these licensees?

Ex. A, p. 66 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    67

```
1        A  Not off the top of my head, no.

2        Q  So that wasn't relevant to your

3    consideration of your damages analysis?

4        A  These are licenses whether or not these

5    licensees were successful in their marketing

6    efforts is entirely different.

7        Q  Explain that to me.

8        A  Well, if you have a business and you're

9    seeking a license to install this and use this,

10   these patented products, you agree to it and

11   however your marketing efforts fail for whatever.

12       Q  So you can sign a license and that you

13   assume under GP 1 that there is a license but even

14   if they made zero dollars under the license you

15   still consider that under GP 1?

16       A  Certainly, if these are acceptable rates

17   in the market.  It's indicative of a rate that was

18   accepted by multiple entities that install siding

19   and wish to do the work that involved the

20   simulated log siding.

21       Q  But you don't know if they ever actually

22   paid any amount, right, because you haven't seen

23   the licenses?

24       A  Well, that would be two separate

25   considerations but my understanding of licenses is
```

Ex. A, p. 67 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    68

1    laid out here.  It was from the discovery

2    responses and discussions with Mr. Reed-Baum?

3         Q  This basically is describing the terms of

4    the license but you don't know whether anyone

5    actually complied with those terms, right?

6         A  Well, complied is different than actually

7    generating sales related to the patented products.

8         Q  Do you know if anyone generated sales

9    related to the patented products?

10        A  My understanding is it wasn't significant.

11        Q  And does that impact your damages

12   analysis?

13        A  That they did not sell, no, not

14   necessarily.

15        Q  Why not?

16        A  Because it doesn't indicate the value of

17   the patented technology from their perspective.

18   They -- if they didn't -- if they weren't

19   successful in marketing and selling the products

20   is separate from the value of the underlying

21   technology they've licensed.  We see --

22        Q  Sorry.

23        A  We see what the popularity of the

24   products, through the sales of the siding by NAMC

25   and by J&S.

Ex. A, p. 68 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    69

```
1        Q  But couldn't the opposite be true, too,
2   that it has nothing to do with the patented
3   products and really up to the marketing of those
4   companies, you said it's the marketing why they
5   didn't sell, couldn't the opposite be true as
6   well?
7        A  That would generate the sales?  I don't --
8        Q  In my understanding, correct me if I'm
9   wrong, you said that the sales by these licensees
10  was not significant, right?
11       A  Correct.
12       Q  And you said that potentially could have
13  nothing to do with the patents, it's probably
14  related to like their marketing or, you know,
15  other things going on with the company, right?
16       A  Possibly, yes.
17       Q  And I'm asking isn't the like opposite of
18  that also potentially true is that if there are
19  sales, that it has nothing to do with the patented
20  product then it has more to do with the marketing
21  or the company's reputation?
22       A  In part, but in a study of a reasonable
23  royalty, the royalty is aimed at compensating a
24  patentee for the technology and however allowing
25  the patentholder -- the licensee to make a profit
```

Ex. A, p. 69 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                70

1    for their efforts in selling the patented

2    products.

3        Q  I'd like you to turn to Paragraph 67 of

4    your report which is on Page 19 and you say there:

5    "TBH's efforts to license the patents-in-suit were

6    terminated in 2010".

7          Do you see that?

8        A  Yes.

9        Q  What do you mean by that?

10       A  According to Mr. Reed-Baum they decided

11   that the better way to monetize their patented

12   technology was to set up a company to manufacture

13   and sell the siding covered by the patents.

14       Q  But weren't all the license agreements you

15   referred to in GP 1 agreed to in 2001 or 2010?

16       A  Somewhere in there, yes.

17       Q  So I don't understand how you can say

18   that -- those two things don't mesh in my mind.  I

19   don't understand it.  Can you explain that?

20       A  What is there not to understand?  I mean,

21   there are 12 months in a year.  You can be

22   licensing in January of 2010 and decide in

23   September of 2010 that we're not going to offer

24   licenses anymore.

25       Q  Oh, okay.  You're not saying that they

Ex. A, p. 70 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                                    71

1    revoked the licenses.  You're just saying they

2    decided not to move forward with additional new

3    licenses?

4        A  That's my understanding, yes.

5        Q  Okay.  Got it.  That's where I was

6    confused.

7           But the resulting license that TBH granted

8    to NAMC does allow NAMC to sublicense without

9    permission from TBH, right?

10       A  I don't know, I don't have the license in

11   front of me.

12          MR. CAMACHO:  Objection.

13   Mischaracterizes.

14   BY MS. RANKS:

15       Q  If you turn to Paragraph 69 of your

16   opening report?

17       A  Yes.

18       Q  Do you note that J&S is a direct

19   competitor with NAMC?

20       A  Yes.

21       Q  Again, why is that relevant?

22       A  Because from Mr. Baum's position licensing

23   J&S would have a direct impact on his economic

24   upside he receives from NAMC.  J&S --

25       Q  NAMC -- I'm sorry.  I apologize.

Ex. A, p. 71 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                           72

```
 1        A   J&S may be taking sales from NAMC and he
 2    would be well aware of that possibility.
 3        Q   But TBH doesn't financially benefit from
 4    NAMC?
 5        A   Mr. Baum does and Mr. Reed-Baum does.
 6        Q   The corporation, the plaintiff, TBH does
 7    not financially benefit from NAMC, correct?
 8        A   Well, it's common ownership and at the
 9    date of the hypothetical negotiation they would be
10    aware of any impact of licensing a third party.
11        Q   But TBH has not received any money from
12    NAMC, correct?
13        MR. CAMACHO:   Objection, asked and
14    answered, calls for facts not in evidence.
15    BY THE WITNESS:
16        A   I don't know if they have or they have
17    not.
18    BY MS. RANKS:
19        Q   You didn't review Mr. Reed-Baum's
20    testimony about that?
21        A   I don't have it committed to memory.  I'd
22    have to look at it.
23        Q   Assume that NAMC has not paid TBH any
24    money at all since formation, does that impact
25    your analysis?
```

Ex. A, p. 72 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    73

1    A   No.

2    Q   Why is that?

3    A   Because the owners of TBH would be

4    cognizant of the impact of licensing J&S to

5    another company that they co own.

6    Q   In GP factor 6 on Page 20, you allege that

7    J&S generates an additional █ percent of revenue

8    on sales and installation of ancillary products.

9        Do you see that?

10   A   I do.

11   Q   What evidence do you have of that?

12   A   J&S sales data.

13   Q   And did you do any comparison between

14   conventional siding jobs versus log siding jobs

15   and ancillary sales?

16   A   No.

17   Q   What is the difference in J&S's revenue

18   between sales of log siding jobs and sales of

19   conventional siding jobs when it comes to

20   ancillary products?

21       MR. CAMACHO:  Objection.  Form.

22   BY THE WITNESS:

23   A   Could you repeat that one more time.  I'm

24   sorry.

25   BY MS. RANKS:

Ex. A, p. 73 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    74

1          Q   Comparing J&S's revenue of ancillary

2    products when they do a log siding job to J&S's

3    revenue on ancillary products when they do a

4    conventional siding job, what's the difference?

5          A   I don't know.

6          Q   You didn't do that analysis?

7          A   It's not relevant.

8          Q   Well, you say that J&S generates revenue

9    based on log siding, right?

10         A   Correct.

11         Q   But if J&S also generates revenue based on

12   conventional siding, doesn't that make it not

13   about the log siding at all but just about his

14   ability to perform siding jobs?

15         A   No.

16             MR. CAMACHO:  Object.

17   BY MS. RANKS:

18         Q   Why not?

19         A   Because the customers who purchased the

20   log siding products sought out the log siding

21   product.

22         Q   How do you know that?

23         A   Because that's what they purchased.  If

24   they -- that's the siding that they wanted

25   installed they would look elsewhere and J&S loses

Ex. A, p. 74 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    75

1    not only the log siding sales they also lose the

2    ancillary and additional product sales.

3        Q  Wouldn't they just makeup for it by

4    selling additional conventional siding or doing

5    additional conventional siding jobs?

6        A  I didn't see anything in the record that

7    would indicate that customers would have chosen

8    the traditional siding over the log siding if, in

9    fact, they chose the log siding product.

10       Q  What's the split of J&S's conventional

11   versus log siding jobs?

12       A  According to Mr. Denney it's ▇ percent, a

13   substantial amount of their sales.

14       Q  Do you agree with that?

15       A  I'd have to look at the data again.  I

16   don't have my schedules in front of me, but if

17   it's ▇ percent, its -- that doesn't surprise me.

18       Q  What percentage of J&S's jobs do both log

19   siding and conventional siding?

20       A  On the same -- for the same building?

21       Q  Yeah.

22       A  I don't know.

23       Q  What percentages of J&S's sales are

24   conventional siding and grizzly board siding and

25   log siding on the same building?

Ex. A, p. 75 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    76

1        A  I don't know.

2        Q  Did you do any analysis of J&S's

3    conventional siding revenues prior to the purchase

4    of the attachment versus after the purchase of the

5    attachment?

6        A  No.

7        Q  I'm going to turn to Paragraph 74 on

8    Page 20 of your opening report.

9        A  Okay.

10       Q  You say that:  From 2017 to 2023 TBH

11   experienced compound annual sales growth of

12   approximately 30 percent.

13          Do you see that?

14       A  Yes.

15       Q  You mean NAMC, right?

16       A  I do.

17       Q  TBH hasn't actually made any money at all,

18   right?

19          MR. CAMACHO:  Objection.  Calls for

20   speculation.

21   BY THE WITNESS:

22       A  They haven't made any sales during that

23   timeframe.

24   BY MS. RANKS:

25       Q  They don't sell anything, right?

Ex. A, p. 76 (to the Camacho Decl.)

J and S Designated Information Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    77

1        A   That's my understanding, yes.

2        Q   If you change Paragraph 74 to state that

3    NAMC is the one that's experienced compound annual

4    sales growth, does that impact your analysis under

5    Factor 8?

6        A   No.

7        Q   Why not?

8        A   It's measuring the success and the

9    popularity of the product and that's a strong

10   indicator of a very popular product sales growth,

11   as is the sales growth by J&S.

12       Q   In your experience working over 25 years

13   as a damages consultant, what's a typical rate of

14   growth for a company over a period of like

15   15 years?

16       MR. CAMACHO:  Objection.  Calls for

17   speculation.

18   BY THE WITNESS:

19       A   I don't know there is a typical rate of

20   growth.

21   BY MS. RANKS:

22       Q   Is 15 percent reasonable?  Is that a

23   business that's really growing?  Is that a

24   business that's growing slowly?

25       A   I have no opinion on that.  I would say

Ex. A, p. 77 (to the Camacho Decl.)

J and S Designated Information Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    78

1   that growth of -- year-over-year growth of 16 to

2   30 percent would be welcome by most companies.

3       Q   When you say compound annual growth, is

4   that year over year?

5       A   Yes.

6       Q   When you say that J&S has experienced

7   compound annual growth of over ■ percent, that's

8   considering the business as a whole, not isolated

9   to the log siding business, correct?

10      A   No.  I believe it's the log siding.

11      Q   Are you sure?

12      A   I believe it's log siding jobs.  Is this

13  my entire report?

14      Q   Yes.  So if you want to look at

15  Attachment 700 which is on PDF Page 49.

16      A   Right, and 701 is where I get the

17  ■ percent.

18      Q   What's the difference between 700 and 701?

19      A   700 is all sales on log siding jobs and

20  701 is just the revenue on the accused siding.

21      Q   Do you think it's appropriate to provide

22  an average when the values from year to year are

23  significantly different in some instances?

24      A   That timeframe is a little bit skewed

25  because of COVID, however, from 2010 to 2021, I

Ex. A, p. 78 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    79

1    think there was a fairly consistent growth pattern

2    in their sales.

3        Q   Well, what about 2018?

4        A   That's an outlier.

5        Q   How does that impact your confidence in

6    this annual growth number based from 2010 to 2021?

7        A   I'd have to understand what happened in

8    2018 for the business.

9        Q   And why didn't you include 2022 and 2023?

10       A   Because 2022 is when the suit was filed

11   and my assumption is that that impacted their

12   sales efforts in that year.

13       Q   So you ignored the, ███████ in 2022?

14       A   True, because it was a greater than

15   impacted by the filing of the suit.

16       Q   But why would it then -- if that was the

17   case, then why would it rebound in 2023 to merely

18   ██████████████████?

19       A   Well, I'd say given the pattern of revenue

20   I would say nearly ██████████████ but if I

21   were to look at 2023 from 2010, there is a

22   ███ percent growth annual growth.  I just believe

23   that 2010 to 2021 was indicative of the long term

24   growth trend of this product and sales by J&S.

25       Q   Did you do anything to determine what was

Ex. A, p. 79 (to the Camacho Decl.)

J and S Designated Information Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                              80

1  going on with J&S in 2018?

2       A  I did not.

3       Q  Did you ask the attorneys to find out that

4  information for you?

5       A  No.  This is an analysis I just showed

6  what I believed to be indicative of the popularity

7  of the products.  There is a growth trend by J&S.

8  There is a significant growth trend on NAMC's part

9  so I think that those two factors support the

10 popularity and the acceptance in the market of the

11 patented products.

12      Q  But at the time of the hypothetical in

13 2009, no one had purchased a log siding

14 attachment, right, and no one was using one?

15      A  I don't know that that's the case.

16      Q  That's not relevant to your analysis?

17      A  In the analysis we can look into the

18 future and study data that takes place after the

19 date of the hypothetical.  That's what this

20 analysis is doing.

21      Q  But shouldn't you also take into

22 consideration the current state of affairs at the

23 time of the alleged hypothetical negotiation?

24      A  So I guess your position would be let's

25 start at zero in 2010 in sales and grow it up to

Ex. A, p. 80 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    81

1  116 thousand or 1.8 million, whatever it is that

2  NAMC is -- you're comparing apples and oranges

3  with your question.

4      Q  I was just trying to understand your

5  position with regard to that.

6          With regard to the fact that at the time

7  of the hypothetical negotiation, Mr. Baum was

8  attempting to sell these log siding attachments

9  but didn't know if they would sell or not and how

10 that impacted your analysis of the hypothetical

11 negotiation?

12     A  Well, he may have had difficulty selling

13 the products or getting licensees, however, that's

14 not indicative of the long-term popularity of the

15 product.  The actual sales made in the future by

16 J&S and NAMC do provide that insight.

17     Q  If we can turn to Paragraph 83 of your

18 opening report on Page 22.

19     A  Okay.

20     Q  This is regarding GP Factor 13.  And you

21 say that:  "The earlier TBH licenses help

22 demonstrate the portion of profit attributable to

23 the patented invention adjusted for the additional

24 profit opportunity to the licensee through the

25 sales of ancillary products typically sold with

Ex. A, p. 81 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    82

1    the accused siding."

2         What does that mean?

3    A   It means we know what the base rates were

4    back in the 2010 timeframe, however, looking

5    forward, you understand that in J&S's situation if

6    they sell a dollar or a hundred dollars of siding

7    they also sell ▮ in ancillary products, windows,

8    doors, trim, gutters and the consideration on

9    J&S's part is that they lose the siding sales, the

10   likelihood of losing all of the other sales as

11   well.

12   Q   What evidence do you have that J&S would

13   actually lose sales if they didn't sell log

14   siding?

15   A   I didn't see any evidence that they

16   wouldn't have. Customers have chosen to install

17   the accused siding and then as part of the

18   purchase included sales or purchases of windows

19   and doors and gutters.

20   Q   But J&S existed before they installed log

21   siding, right?

22   A   And they would have, they could have sold

23   it traditional siding to other customers that have

24   decided to install traditional siding.

25   Q   In fact, J&S has testified that they have

Ex. A, p. 82 (to the Camacho Decl.)

1   more business that they said they can actually do,

2   they're turning down jobs, right?

3       A  I don't know.

4       Q  If J&S is turning down jobs, that supports

5   the fact that they could replace any log siding

6   jobs with a conventional siding job, right?

7       A  I don't know that that's true and I don't

8   know that it's necessarily relevant in the

9   hypothetical negotiation study.

10      Q  Well, you claim that because they're

11  selling log siding, they're selling ancillary

12  products, right?

13      A  As part of the package, yes.

14      Q  But if they could replace the log siding

15  job with a conventional siding job and sell those

16  same ancillary products, then there's not actually

17  a benefit with regard to ancillary products tied

18  to the log siding, right?

19      A  There is a benefit related to the log

20  siding.

21      Q  Explain that to me.

22      A  They have a customer that wants to install

23  log siding on their homes, as part of that

24  package, along with the siding, they install

25  windows and doors and gutters and the trim work

Ex. A, p. 83 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY

Transcript of James Harrington
Conducted on November 8, 2024                    84

1    that goes along with the siding install.  They're

2    separate and apart from other sales of non accused

3    products.

4        Q  Does J&S refuse to install log siding

5    unless the customer will also purchase these

6    ancillary products?

7        A  I don't know.

8        Q  Does J&S require the customer to purchase

9    ancillary products if they are going to purchase

10   log siding?

11       A  I think there are some trim components in

12   an are necessary for an install.

13       Q  What evidence do you have of that?

14       A  Just having seen siding on homes, there

15   are corner pieces and ancillary things that would

16   necessarily be installed is my understanding,

17   soffits.  Also the financial shows that they sell

18   ██ percent more or generate ██ percent more

19   revenue on top of the accused siding.

20       Q  Do you have any evidence that the siding,

21   the log siding is sold as a bundle with any of

22   these other ancillary products?

23       A  We're measuring the profit opportunity is

24   what we're doing here.  J&S at their hypothetical

25   would recognize and so would TB Holdings that for

Ex. A, p. 84 (to the Camacho Decl.)

1    every dollar that J&S sells of siding they

2    typically generate an additional ███ in other

3    products.  If a customer decides that they want

4    log siding and they don't have that option with

5    J&S, they go elsewhere and J&S loses not only the

6    siding sales but the ancillary product sales.

7        Q  But J&S could replace that sale a

8    conventional siding sale because they have more

9    work than they can handle, right?

10       A  Maybe they could.

11       Q  What evidence have you seen that J&S

12   bundles sales of log siding with ancillary

13   products?

14       A  It's not a bundling.  It's an additional

15   sales of products that customers demand along with

16   the install of the siding.  I haven't seen

17   anything in the record that would say that J&S

18   just exclusively goes out and sells doors and

19   soffits and all these other products unless

20   they're also doing siding work.

21       Q  Turning to Paragraph 85 of your opening

22   report on Page 23, you state that it's your

23   opinion the parties would include a reasonable

24   royalty in the form of an upfront license fee in

25   the amount of 16,500 plus a running royalty of

Ex. A, p. 85 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    86

1    16.5 percent on accused sales.  These rates

2    represent a 65 percent increase over the

3    historical licensing rates offered by TBH, right?

4         A  Yes.

5         Q  These historical licensing rates offered

6    by TBH, that is limited to the NAMC sublicenses,

7    right?

8         A  No.

9         Q  It includes the free license to NAMC?

10        A  No.  I guess you need to explain to me

11   what you mean when you say the NAMC sublicenses

12   because I'm not aware of any.  The licenses that

13   are listed in my report the five entities that

14   licensed historically that's what we're referring

15   to here in the $10,000 up front fee plus

16   10 percent based on calculating the $25 a square

17   rate that was included in those licenses.

18        Q  Those licenses that you haven't actually

19   seen?

20        A  Correct.

21        Q  So including those licenses, that's what

22   you're saying is a 65 percent increase over --

23   that's the historical licensing rate you're

24   referring to?

25        A  Yes.

Ex. A, p. 86 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                87

1      Q  You're not including in that historical

2   licensing rate the zero dollar license royalty

3   free license that TBH gave to NAMC?

4      A  Correct.

5      Q  And you're not including any consideration

6   of J&S's $10,000 payment to TBH for the purchase

7   of the attachment?

8      A  The treatment of that so-called purchase

9   would be left to the court how it's treated or if

10  it's implied -- an implied license of some sort I

11  guess.

12     Q  Why do you say so-called purchase?  Are

13  you saying that it wasn't a purchase?

14     A  Well, I think it's been throughout this

15  deposition that you call it a purchase.  I see

16  there's a receipt.  I don't know that it was a

17  purchase or what that represents.  For the

18  purposes of this discussion, I've accepted that

19  that's what that shows.

20     Q  Well, and we looked at an exhibit that you

21  cite in your report that the plaintiff filed in

22  this case that describes that 2009 transaction as

23  a purchase of the attachment, right?

24     A  Yes.

25     Q  So what basis do you have to say that it's

Ex. A, p. 87 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    88

1    not a purchase?

2        A  I didn't say it wasn't a purchase.  Maybe

3    so-called wasn't the correct term, but if we were

4    to accept that that was a purchase then the court

5    can rule how that's properly treated.

6        Q  Okay.  Understood.  I just wanted to be

7    clear on that.  Thank you.

8            Turning back to Paragraph 85 of your

9    opening report, why is it your opinion that it's

10   reasonable for the royalty to have a 65 percent

11   increase over the historical rate?

12       A  Well, there's a significant upside to

13   selling the patented product that J&S realizes

14   through the sales of additional products and

15   components that wouldn't be available to them

16   without the patented product.

17       Q  When you came -- oh, I'm sorry.  Go ahead.

18       A  That upward influences the 65 percent

19   influence in this royalty rate.

20       Q  When you came to this opinion, did you

21   consider the fact that at some point J&S is going

22   to be priced out of the log siding market and

23   instead of being able to sell the simulated log

24   siding if they have it to pay a high royalty

25   customers would instead just purchase actual log

Ex. A, p. 88 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    89

1    siding?

2        A  I haven't seen anything in the record that

3    would support that position.

4        Q  When you came to your opinion about the

5    65 percent increase being reasonable, did you

6    consider whether J&S would still be able to make a

7    profit selling log siding if they did have to pay

8    this increased royalty rate?

9        A  Well, no, they could certainly pass the

10   royalty on to the customers.

11       Q  And they would still be able to sell

12   products passing that on to the customers, that's

13   your opinion?

14       A  That would be their call, whether -- my

15   understanding is Mr. Walrath places his siding

16   whether it's the accused siding or the traditional

17   siding at the same price so by doing so he's

18   effectively stripping the value of the patented

19   features and technology out of the product so

20   there should be a premium on the patented

21   products.

22       Q  Isn't he just giving the customers what

23   they expect as far as pricing goes?

24       A  I don't know.  I don't know where his

25   pricing fits with other competitors in his market.

1    It would be entirely his decision whether he

2    passed none, some or all of that royalty on to his

3    customers.

4        Q  And isn't it reasonable to assume that

5    he's not passing on any royalty because he doesn't

6    see any benefit?

7        A  If that's his position, that's his

8    position, but in the hypothetical where we're

9    trying to reach an agreement and he would

10   recognize that, one, without the use -- the

11   ability to sell the patented product, he would

12   lose not only those sales because the customers

13   have chosen to outfit their homes with the accused

14   siding, plus the additional ▇ percent of revenue

15   that's generally generated along with the sales of

16   the patented products.

17       Q  But he would also know that he has more

18   work than he can handle, right?  So the potential

19   loss of sales, it wouldn't be of like an actual

20   loss to his business, per se, especially if it's

21   sold at the same price as conventional siding?

22       A  Well, I guess if that were true that he

23   has so much work in conventional siding, then it

24   strikes me as why would he even bother selling the

25   patented -- the accused products.  If he has that

Ex. A, p. 90 (to the Camacho Decl.)

J and S Designated Information Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    91

1    much extra work and that much business, then why

2    deal with the headache of dealing with this?  That

3    argument is circular.  I don't agree with it.

4        Q  Well, it could be because he purchased the

5    thing for $10,000 15 years ago, right, so has a

6    right to use it?

7        A  Possibly.

8        Q  I want to turn now to your rebuttal

9    report.

10          In your rebuttal report, you took into

11    account Mr. Denney, J&S's expert, expert report,

12    right?

13       A  Yes.

14       Q  And Mr. Denney's deposition was held prior

15    to your rebuttal report, right?

16       A  I believe so, yes.

17       Q  Did you review Mr. Denney's deposition

18    prior to issuing your rebuttal report?

19       A  I don't recall the timing.  I know it was

20    really close.  I did at some point read the rough

21    draft transcript.

22       Q  After reviewing Mr. Denney's report, did

23    you ask TBH's counsel to find out additional

24    information for you with regard to Mr. Denney's

25    opinion?

Ex. A, p. 91 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    92

1        A   I don't believe so, no.

2        Q   In your rebuttal report you raised a lot

3    of questions about what Mr. Denney did or didn't

4    do with his analysis, right?

5        A   Well, questions and observations.

6        Q   You didn't ask counsel to have those

7    questions answered for you?

8        MR. CAMACHO:  I'm going to caution the

9    witness to not disclose any communications between

10   counsel and himself.

11   BY THE WITNESS:

12       A   We discussed his report.

13   BY MS. RANKS:

14       Q   Did you ask for additional information to

15   clarify any questions that you had so you could

16   address them in your rebuttal report?

17       A   There may have been some areas that I

18   wasn't clear on what he was trying to do or were

19   his assumptions, but I don't have that -- those

20   notes or observations committed to memory.

21       Q   Did you see Mr. Denney's deposition as an

22   opportunity for you and counsel to understand and

23   get answers to those questions that you had?

24       A   Certainly.

25       Q   So did that happen?

Ex. A, p. 92 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    93

```
1        A   That there were areas of inquiry for
2    Mr. Denney, sure.
3        Q   Did it resolve any of the questions that
4    you have in your rebuttal report?
5        A   It confirmed my initial impression of his
6    report.
7        Q   For example, you posed questions about
8    whether or not he's going to ask certain damages
9    numbers together or not.
10           Did counsel answer those questions for
11   you?
12           MR. CAMACHO:  I'm going to caution the
13   witness to not reveal any communications between
14   counsel and himself.
15   BY THE WITNESS:
16       A   I don't know -- I don't recall the
17   specific questions I had about the -- I seem to
18   recall that he has sales of the accused -- the
19   products accused under the design patent and then
20   he's separated the sales that were alleged to have
21   been made using the replacement disks, and my view
22   is if they are accused under the patent whether or
23   not they're using the replacement disks or not
24   would be included.  It seems like he broke it out
25   into two separate assumptions, and I don't recall
```

Ex. A, p. 93 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    94

1    what the resolution was on that particular point,

2    but it seems like he didn't believe that they were

3    to be added.  I'd have to look at my report.

4    BY MS. RANKS:

5        Q  Let's mark your rebuttal report as

6    Exhibit 7.

7            (A certain document was marked Harrington

8            Deposition Exhibit 7 for identification,

9            as of 11/08/2024.)

10   BY MS. RANKS:

11       Q  This is the report that was issued on

12   September 8, 2024?

13       A  Okay.

14       Q  Is this your rebuttal report?

15       A  Yes.

16       Q  I want to bring your attention to

17   Paragraph 12.

18       A  Okay.

19       Q  You identify what you allege is additional

20   discrepancy between Mr. Denney's accused sales and

21   the summary that you have of the accused sales,

22   right?

23       A  Yes.

24       Q  Did you do any work to identify the source

25   of this alleged difference?

Ex. A, p. 94 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY

Transcript of James Harrington
Conducted on November 8, 2024                              95

1      A  I don't recall.  I may have had my staff

2   look at it to see if they could figure out what

3   the difference was, but I don't think they were

4   able to.

5      Q  Did you have counsel ask Mr. Denney at his

6   deposition about this issue?

7      A  I don't recall.

8      Q  If we turn to Paragraph 13 of your

9   rebuttal report, it's talking about how it's your

10  opinion that Mr. Denney failed to meet his burden

11  in proving J&S costs, right?  Do you see that?

12     A  Yes.

13     Q  You did no cost analysis in this case,

14  correct?

15     A  Well, that's not my burden.  I don't have

16  access to all the J&S data and the J&S owners to

17  explore and request additional information.

18  That's Mr. Denney's role in a profit disgorgement

19  analysis.

20     Q  You did no cost analysis in this case,

21  correct?

22        MR. CAMACHO:  Objection.  Asked and

23  answered.

24  BY THE WITNESS:

25     A  With regards to the disgorgement analysis,

Ex. A, p. 95 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY

Transcript of James Harrington
Conducted on November 8, 2024                    96

```
 1    I did not include any cost analysis in my report.
 2    BY MS. RANKS:
 3        Q   And, in fact, you did have access to J&S's
 4    entire QuickBooks data which includes all of their
 5    cost data, correct?
 6        A   It doesn't include all of their cost data.
 7        Q   What data is not included?
 8        A   Specific data related to the materials
 9    used to manufacture the accused products.
10        Q   What information is that?
11        A   I would assume based on what I know of the
12    product the cost of steel, that's it.
13    Mr. Denney's analysis includes costs that are over
14    and above just the cost of steel to manufacture
15    the siding.  In those costs, J&S installs windows
16    and doors that they purchase from some other
17    supplier presumably.  Those costs are included in
18    the QuickBooks data.  Other costs are included in
19    the QuickBooks data that aren't necessarily
20    related to the install of siding.  It is
21    Mr. Denney's job to dig into those costs and
22    identify the specific costs that are related to
23    the sales and marketing and installation of the
24    siding, the accused siding.
25        Q   And Mr. Denney did put forward a cost
```

Ex. A, p. 96 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    97

1   analysis, correct?  You just don't agree with it?

2       A  He hasn't met the burden.  He hasn't done

3   a granular enough review of the cost data to

4   present a supportable analysis of costs to be

5   deducted from the accused sale.

6       Q  Mr. Harrington, you're not answering my

7   question so I would appreciate if you could just

8   focus on the words of the question and answer it.

9       A  Okay.

10      Q  Mr. Denney did a cost analysis; you just

11  don't agree with it, correct?

12          MR. CAMACHO:  Objection.  Asked and

13  answered.

14  BY THE WITNESS:

15      A  It's not simply disagreeing with it.  He

16  hasn't provided sufficient detail for me to agree

17  or disagree with it.

18  BY MS. RANKS:

19      Q  But you didn't do any analysis yourself,

20  parts that you thought maybe he didn't provide

21  enough detail, you didn't confirm whether or not

22  that detail was actually available in this case,

23  right?

24      A  We've looked at the data provided, the

25  QuickBooks data provided and that level of detail

Ex. A, p. 97 (to the Camacho Decl.)

J and S Designated Information Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                              98

1    does not exist in there for us to do and rebut his

2    cost analysis.

3        Q   Right.  Do you have any evidence that that

4    level of detail exists in any way shape or form

5    J&S?

6        A   I would be shocked to find out that J&S

7    does not have either invoices for the steel used

8    to manufacture the accused product or the

9    knowledge of what the costs are for the steel to

10   manufacture the product.  Mr. Denney doesn't

11   present any of that.  He treats all of the costs

12   as homogeneous when, in fact, that is not true

13   given the variety of products that J&S sells to

14   their customers.

15       Q   Did you ask counsel to obtain any of that

16   cost information that you allege is missing?

17       A   Again, that's not my burden.  That's the

18   defendant or the infringer's burden to identify

19   those costs and support those costs as a proper

20   deduction from the accused sales.

21       Q   So, again, Mr. Harrington, I appreciate

22   that you have a position on this, but I'm asking

23   questions that I need the answer to so if you can

24   provide the answer.  You can certainly provide

25   additional context for that answer, but I just

Ex. A, p. 98 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                          99

```
 1    need an answer to the question as well, please.

 2        A   Okay.

 3        MR. CAMACHO:  I'll caution the witness to

 4    not disclose communications between Mr. Harrington

 5    and counsel.

 6    BY MS. RANKS:

 7        Q   Well, you allege that Mr. Denney didn't

 8    take into consideration specific costs.

 9        Did you ask counsel to identify where that

10    cost information was in the record?

11        MR. CAMACHO:  Please don't disclose any

12    communications between us, Mr. Harrington.

13    BY THE WITNESS:

14        A   What costs are you referring to?

15    BY MS. RANKS:

16        Q   Costs that you allege that Mr. Denney

17    didn't look at.

18        MR. CAMACHO:  Please don't disclose any --

19    even though it appears that counsel is attempting

20    to solicit privileged information, please don't

21    disclose any communications between you and I.  If

22    there's no way for you to answer the question

23    without disclosing privileged information, then

24    you should say that.

25    BY THE WITNESS:
```

Ex. A, p. 99 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    100

```
 1      A   There is no way to disclose that and

 2   answer that question.

 3         MS. RANKS:  So you're instructing the

 4   witness to not answer a question about whether or

 5   not he had access to certain material when

 6   providing an expert opinion?

 7         MR. CAMACHO:  That's a different question

 8   you just asked, what he had access to versus what

 9   he asked for.  I'm instructing him to not disclose

10   privileged communications.

11   BY MS. RANKS:

12      Q   Mr. Harrington, what did you have access

13   to as far as the cost information and did you feel

14   like anything was missing from that?

15      A   We had access to the QuickBooks data.  The

16   QuickBooks data does not provide the level of

17   detail necessary to do a proper cost analysis.

18   That is why in an engagement involving

19   disgorgement of profits, it's the defendant's

20   responsibility to get that data because they have

21   the ability to ask their clients, dig into the

22   record in greater detail than likely produced and

23   identify the costs.  So, I'm sorry, go ahead.

24      Q   Have you worked with small businesses

25   before?
```

Ex. A, p. 100 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    101

1        A   Yes.

2        Q   Have you worked with two-person companies

3    before?

4        A   Yes.

5        Q   In your experience, does the level of

6    bookkeeping and recordkeeping with a small

7    two-person business on the same level as, say, a

8    corporation that does a million dollar in sales a

9    year?

10        MR. CAMACHO:  Objection.  Relevance.

11    BY THE WITNESS:

12        A   Ms. Ranks, I would absolutely be convinced

13    that if Mr. Denney called up Mr. Walrath and said

14    what does a load of steel cost you in making the

15    accused siding and how many feet of siding does

16    that generate, you could probably get that

17    information to him within minutes.  This is what

18    that company does.  They manufacture and install

19    siding.  They are absolutely aware of what their

20    costs are for steel to manufacture the siding.

21    For Mr. Denney to not even ask that and present it

22    in his report is silly.

23    BY MS. RANKS:

24        Q   You don't make any specific allegations of

25    missing information in your rebuttal report,

Ex. A, p. 101 (to the Camacho Decl.)

J and S Designated Information Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    102

1    correct?

2        A   What missing information?

3        Q   Well, you just claimed that they didn't

4    provide the cost of steel, right?

5        A   I have not seen any data on the cost of

6    steel.

7        Q   You didn't allege that J&S did not provide

8    that information in any of your -- in your

9    rebuttal report, correct?

10       A   No, but I am certain it's available.

11       Q   But just to be clear, you did not perform

12   any cost analysis, correct?

13           MR. CAMACHO:  Objection.  Asked and

14   answered.

15   BY THE WITNESS:

16       A   Any cost analysis on what?

17   BY MS. RANKS:

18       Q   Well, for example, if we turn to

19   Paragraph 16 of your rebuttal report, you say:

20   "In my opinion, a proper analysis of cost in this

21   matter requires a category-by-category analysis to

22   disaggregate the reported costs to identify

23   specific costs incurred to directly support the

24   accused sales".

25       A   Yes.

Ex. A, p. 102 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    103

1        Q  You didn't do that analysis, right?

2        A  I don't have access to that level of

3    detail.

4        Q  So, again, Mr. Harrington, if you could

5    just answer the question.

6            Did you perform the analysis that you are

7    alleging is deficient in Mr. Denney's report?

8        A  No, and here's why.  Because that is not

9    the burden of the plaintiff expert nor do I have

10   the ability to access that data from Mr. Denney's

11   client J&S Siding.

12       Q  Are you aware that TBH filed multiple

13   motions to compel in this case?

14           MR. CAMACHO:  Objection.  Relevance.

15   BY THE WITNESS:

16       A  I wasn't aware of that.

17   BY MS. RANKS:

18       Q  During the discovery period, TBH alleged

19   that J&S wasn't providing information that it

20   should be required to provide in discovery.  You

21   didn't know that?

22       A  Not specifically, no.

23       Q  So then you wouldn't know that TBH never

24   alleged that J&S was withholding any information

25   related to any costs?

Ex. A, p. 103 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    104

```
 1          MR. CAMACHO:  Objection.  I think you
 2    might have misstated.  You might have meant J&S
 3    there.
 4    BY THE WITNESS:
 5        A  I think I know what you're getting at.
 6          In my experience, discovery is more broad.
 7    I don't know that given the knowledge of the
 8    parties meaning Mr. Camacho and TB Holdings at
 9    that time would not be aware of the detail that
10    would be required to perform the analysis that
11    Mr. Denney presented in his report, for example,
12    the cost of a roll of steel.
13          I think that generally you're requesting
14    sales data by customer and financial statements
15    and data of that nature rather than very, very
16    granular data to get to such a level that would be
17    needed by Mr. Denney in preparing a proper report.
18    BY MS. RANKS:
19        Q  You would agree that small businesses
20    don't always have the same level of bookkeeping or
21    recordkeeping that a larger entity may have,
22    correct?
23        A  That may or may not be true.  However,
24    again, I'll say this again, Mr. Denney could have
25    asked about the cost of steel.  That is akin to
```

Ex. A, p. 104 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY

Transcript of James Harrington
Conducted on November 8, 2024                    105

1   somebody who has a burger stand who doesn't know

2   the cost of hamburger meat.  It's something that's

3   part of their every day operations.  They know

4   what the cost of steel is for their siding

5   manufacturing.  They either have knowledge or

6   invoices and probably have multiple invoices so

7   Mr. Denney had access to that.  He chose not to

8   dig into the detail.

9        Q  Paragraph 16 of your rebuttal report

10  subparagraph A you state that:  "It is reasonable

11  to assume that door and window costs represent a

12  significant portion of the material costs

13  reflected and relied on by Mr. Denney".

14           Do you see that?

15       A  Yes.

16       Q  What's your evidence to support that

17  statement?

18       A  I've purchased doors and windows.

19       Q  So that's just based on your experience?

20       A  As opposed to raw steel to manufacture the

21  siding, as opposed to, hey, come on put up the

22  siding and also I've got 15 windows in my home I'd

23  like to be replaced and five doors.

24       Q  Have you purchased raw steel before?  Do

25  you know how much it is?

Ex. A, p. 105 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    106

1        A  I don't.

2        Q  And with regard to Paragraph 16 in your

3    rebuttal report subparagraph B, you're talking

4    here about owner's payroll that Mr. Denney

5    included in his labor costs?

6        A  Yes.

7        Q  And you point -- as a deficiency you say:

8    "Mr. Denney provides no discussion as to how he

9    determined this amount nor does he provide any

10   support for the appropriateness or reasonableness

11   of the salary he deducts."

12           Do you see that?

13       A  Yes.

14       Q  Are you aware that Mr. Denney was asked

15   about this extensively at his deposition?

16       A  Yes.

17       Q  Did you consider his response at his

18   deposition when forming your opinion in your

19   rebuttal report or did you just choose to ignore

20   it?

21       A  No.  I think this is still an accurate

22   statement.  He doesn't provide any support.  He

23   talked to someone.  Somebody told him this.  He

24   doesn't have any data that says say if Mr. Walrath

25   had not been doing the installations this is what

Ex. A, p. 106 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    107

1    it would have cost to have someone in there doing

2    it.

3        Q  So for the cost of goods on the materials,

4    Mr. Denney should have talked to someone like Joe

5    Walrath, but for the cost of goods for labor, it

6    was inappropriate for Mr. Denney to talk to

7    Mr. Walrath?  That's your opinion?

8        A  No.  That is not what I said.

9        Q  Well, it seems like that is what you said.

10   I mean, we were talking about the cost of goods

11   and materials and you said it would have been easy

12   for Mr. Denney to pick up the phone and call Joe

13   Walrath, right?

14       MR. CAMACHO:  Objection.  Let me get a

15   quick objection if there, Mr. Harrington.

16       Objection.  Mischaracterizes and it's

17   argumentative.

18   BY THE WITNESS:

19       A  He could have called Mr. Walrath, and said

20   what does a roll of steel cost, give me the

21   information, okay, now give me some sample

22   invoices so I can look and confirm this data.

23       As I recall, Mr. Denney's data was I

24   talked to Joe and Joe talked to somebody and they

25   told me this.  That doesn't rise to the level of

Ex. A, p. 107 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    108

1    sufficient support.

2    BY MS. RANKS:

3        Q   Why not?

4        A   The Bureau of Labor Statistics produces

5    reams of data on salaries of a vast variety of

6    industries and level of employee and regional

7    data.  He could have certainly looked to that to

8    support this.

9        Q   So do you have data showing that he's

10   wrong?

11       A   Again, it's not my burden.  It's his.

12       Q   Oh, I understand it's not your burden.

13   I'm saying if you're claiming he's wrong, then

14   prove it.  You don't have that information, right?

15       MR. CAMACHO:  No, objection.

16   Argumentative.

17   BY THE WITNESS:

18       A   No discussion how he determined the amount

19   nor does he provide any support for the

20   appropriateness or reasonableness of the salary he

21   deducts.  I stand by that statement.  He hasn't

22   done that.

23   BY MS. RANKS:

24       Q   Okay.  And my question is if you're saying

25   that his labor numbers are unsupported, do you

Ex. A, p. 108 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    109

1    have evidence to show that his labor numbers are

2    wrong?  I understand that you're saying they're

3    unsupported.  What I'm asking is do you have

4    evidence that they're wrong or incorrect?

5        A  I think they're incorrect.

6        Q  The question is do you have any evidence

7    of them being incorrect or just your opinion?

8        A  You mean hard data, no, I haven't looked

9    at that yet.

10       Q  Okay.  Thank you.

11          MS. RANKS:  Why don't we go ahead and take

12   a ten-minute break.

13          MR. CAMACHO:  Sure.

14          (A recess was had.)

15   BY MS. RANKS:

16       Q  Mr. Harrington, since the deposition

17   started earlier today, have you talked to

18   Mr. Camacho?

19       A  No.

20       Q  Have you talked to anyone that is related

21   to TBH?

22       A  No.

23       Q  Turning to your work as a CPA and doing

24   damages work, what percentage of work would you

25   say with regard to intellectual property

Ex. A, p. 109 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    110

1    litigation is plaintiff side?

2         A   It's probably a 50/50 split.

3         Q   Between plaintiff and defendant?

4         A   Yes.

5         Q   Have you ever done work for Mr. Camacho's

6    current firm?

7         A   No.

8         Q   Have you ever done work for any of

9    Mr. Camacho's prior firms?

10        A   I'm not sure I know of Mr. Camacho's prior

11   firms.

12        Q   That's fair.  What is the rate that you

13   are charging for your work in this case?

14        A   $335 an hour.

15        Q   Is that the same for all of the work that

16   you do in the case?

17        A   Yes.

18        Q   Have you ever had any of your opinions

19   excluded in court?

20        A   No.

21        Q   Have you ever been subject to a Daubert

22   motion?

23        A   Quite often, yes.

24        Q   So you're not aware of any motion -- a

25   Daubert motion being granted?

Ex. A, p. 110 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    111

```
1        A   There have never been any.
2        Q   Have you ever had a client formally
3    complain about you or your work?
4        A   No.
5        Q   Have you ever had a complaint filed
6    against you with any regulatory body?
7        A   No.
8        Q   Have you ever been sued?
9        A   No.
10       Q   Have you ever sued someone?
11       A   No.
12       Q   Have you ever been disciplined at work for
13   the quality of your work or any other reason?
14       A   No.
15       Q   Have you ever won any awards or been
16   recognized in any way for your work as a CPA?
17       A   No.
18       Q   You graduated college I believe you said
19   in 1995; is that right?
20       A   Yes.
21       Q   Was your first job out of college at
22   Parker Wittus?
23       A   Yes, it was.
24       Q   What did you do there?
25       A   I was a staff accountant so I did typical
```

Ex. A, p. 111 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    112

1    staff accounting tasks, financial statements, tax

2    returns, compilations and audits.

3        Q  Were you there for about two years?

4        A  Yes.

5        Q  Why did you decide to move on to your next

6    job?

7        A  Public accounting was not what I wanted to

8    do.

9        Q  Your next position was at Shore & Azimov

10   and what was your position there?

11       A  Yes, it was.  I guess I was a staff

12   accountant there as well.

13       Q  That was from 1997 to 1998?

14       A  Roughly, yes.

15       Q  Your next position was at Tucker Allen,

16   Inc., is that right?

17       A  Yes.

18       Q  What did you do there?

19       A  That firm was a boutique litigation

20   support consulting company and I was a senior

21   consultant doing exclusively litigation work.

22       Q  Was that your first experience with patent

23   damages work?

24       A  Yes.

25       Q  And you were there from about 1992 to

Ex. A, p. 112 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    113

1    2004?

2         A   Yes.

3         Q   Why did you move on from that job?

4         A   Tucker Allen was acquired by Navigant

5    Consulting.

6         Q   And then you stayed at Navigant Consulting

7    until about 2009; is that right?

8         A   Yes.

9         Q   And how did your role change during the

10   time that you were employed either with Tucker

11   Allen or Navigant?

12        A   It evolves, taking on greater

13   responsibilities going from being more task

14   oriented, to leading the teams, assisting in

15   drafting reports, being a primary client contact.

16        Q   Was the majority of your work on

17   intellectual property matters?

18        A   Yes.

19        Q   And then you around 2009 you went to A&M?

20        A   Yes.

21        Q   And you were there from 2009 to about

22   2018?

23        A   Yes.

24        Q   What work did you do there?

25        A   The same.  In that firm we became a little

Ex. A, p. 113 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    114

1    bit more involved in other types of commercial

2    damages matters, but still at that point in that

3    role I was -- the primary focus of my office was

4    on intellectual property.

5        Q   Why did you move on from Navigant?

6        A   Navigant, the entire Detroit office of

7    Navigant moved over to Alvarez & Marcel.

8        Q   And then the move from A&M to where you

9    are now, MDD, that happened in with about 2018; is

10   that right?

11       A   Yes.

12       Q   What inspired that change?

13       A   The partner in this office and I had seen

14   each other.  We'd had worked together at Shore &

15   Azimov and we had run into each other regularly at

16   different functions and every time I saw her she

17   would ask me to join the firm and it eventually

18   got to the point where it was a good move for both

19   of us.

20       Q   You list on your CV that you have

21   professional experience including industry

22   experience in cannabis.

23           Can you describe that work?

24           MR. CAMACHO:  Objection.

25   BY THE WITNESS:

Ex. A, p. 114 (to the Camacho Decl.)

1          A   Yes, I worked on different matters, a

2     breach of contract on a cannabis complaints,

3     shareholder disputes in cannabis growth facilities

4     and another case I'm not sure if it's a breach of

5     contract or breach of fiduciary duty involving a

6     cannabis grow and processing facility.

7     BY MS. RANKS:

8          Q   So that's current work that you do?

9          A   That last matter, yes, that's current,

10    currently active.

11         MS. RANKS:  I have no further questions

12    for you at this time, Mr. Harrington.  So I will

13    pass the witness.

14                  FURTHER EXAMINATION

15    BY MR. CAMACHO:

16         Q   Mr. Harrington, this is Jesse Camacho.

17    Are you an attorney?

18         A   I am not.

19         Q   Are you aware that in law school there is

20    at least one if not two courses dedicated to

21    contracts?

22         MS. RANKS:  Objection.  Leading.

23    BY THE WITNESS:

24         A   I was not aware of that, no.

25    BY MR. CAMACHO:

Ex. A, p. 115 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY

Transcript of James Harrington

Conducted on November 8, 2024       116

---

1     Q  Are you aware that in law school contracts

2  courses, students are taught on what it means to

3  make a contract?

4       MS. RANKS:  Objection.  Leading, form.

5  BY MR. CAMACHO:

6     Q  Were you aware of that?

7       MS. RANKS:  Same objection.

8  BY THE WITNESS:

9     A  It doesn't surprise me.  It doesn't

10  surprise me.

11  BY MR. CAMACHO:

12     Q  Are you aware that we study concepts such

13  as what a true offer really is?

14       MS. RANKS:  Objection.  Form.

15  BY THE WITNESS:

16     A  Again --

17       MS. RANKS:  Sorry, just one second.

18  Leading.

19  BY THE WITNESS:

20     A  That doesn't surprise me, either.

21  BY MR. CAMACHO:

22     Q  What about the concepts of acceptance,

23  what it really means to accept an offer.

24       Were you aware of that?

25       MS. RANKS:  Objection.  Leading.

Ex. A, p. 116 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    117

```
1    Objection.  Leading, form.
2    BY THE WITNESS:
3        A  None of those topics would surprise me for
4    an attorney in law school.
5    BY MR. CAMACHO:
6        Q  And similarly the concept of consideration
7    like what is necessary to support a contract, are
8    you aware of those legal nuances?
9            MS. RANKS:  Objection.  Leading, form.
10   BY THE WITNESS:
11       A  Again, I'm not surprised to know that.
12   BY MS. RANKS:
13       Q  Today you were asked lots of questions at
14   the beginning of the deposition about things like
15   whether -- whether you were aware something was a
16   purchase, whether something was a sale, whether
17   something was a lease.
18           Do you remember being asked these
19   questions?
20       A  I do.
21       Q  Are you aware that some of those issues
22   are being litigated by the attorneys in this case?
23       A  Specifically?  I wasn't aware of that.
24       Q  Okay.  Then when you gave your testimony
25   today, were you intending to offer any sort of a
```

Ex. A, p. 117 (to the Camacho Decl.)

```
1    professional opinion on whether anything was a

2    sale, was a lease, was a purchase, infringed or

3    any of those sorts of legal issues?

4         MS. RANKS:  Objection.  Leading.

5    BY THE WITNESS:

6        A  Absolutely not.  I assume liability

7    exists.

8    BY MR. CAMACHO:

9        Q  Were you trying to be for lack of a better

10   term a compliant witness?

11       A  Yes.

12        MS. RANKS:  Objection.  Leading, form.

13   BY MR. CAMACHO:

14       Q  So today I do think you were probably

15   asked -- I think you were presented with a

16   document that showed some numbers that was

17   portrayed to you as a receipt.

18        Do you remember seeing that?

19        MS. RANKS:  Objection.  Leading,

20   mischaracterizes the evidence.

21   BY THE WITNESS:

22       A  I do.

23   BY MR. CAMACHO:

24       Q  Do you remember seeing that document?

25       A  Yes.
```

Ex. A, p. 118 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    119

```
 1        Q  Do you remember that it was represented to
 2    you as reflecting a sale of something?
 3            MS. RANKS:  Objection.  Leading.
 4    BY THE WITNESS:
 5        A  Yes.
 6    BY MR. CAMACHO:
 7        Q  Do you remember that at other times it was
 8    represented to you that it might have been -- that
 9    it reflected a purchase, for instance, a purchase
10    of a piece of equipment?
11            MS. RANKS:  Objection.  Leading.
12    BY THE WITNESS:
13        A  Yes.
14    BY MR. CAMACHO:
15        Q  Now, there were times where you were
16    asked:  Do you agree that this shows a purchase
17    and I think you had said yes, but when you were
18    giving those sort of answers, were you offering
19    your opinion as an expert as to whether something
20    really was a true purchase?
21            MS. RANKS:  Objection.  Leading, form.
22    BY THE WITNESS:
23        A  No, I'm not an attorney and that is not my
24    area.
25    BY MR. CAMACHO:
```

Ex. A, p. 119 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    120

1        Q  For example, I think you were asked

2    questions roughly about a $10,000 conveyance or

3    whatever the amount on that receipt was in the

4    2009 timeframe.

5           Do you remember that?

6        A  Yes.

7        Q  And do you have full context for whatever

8    that transaction was between Joe Walrath and Ted

9    Baum?

10          MS. RANKS:  Objection.  Leading.

11   BY THE WITNESS:

12       A  No.

13   BY MR. CAMACHO:

14       Q  Do you know whether Ted Baum had asked

15   him, asked Joe Walrath, whether you want to enter

16   into a lease and receive back a down payment, for

17   example?

18          MS. RANKS:  Objection.  Leading, calls for

19   hearsay.

20   BY THE WITNESS:

21       A  No, I was not.

22   BY MR. CAMACHO:

23       Q  Do you know whether the amount that was

24   paid that was reflected on that lease reflected a

25   purchase versus a down payment?

Ex. A, p. 120 (to the Camacho Decl.)

J and S Designated Information Redacted

```
 1        MS. RANKS:  Objection.  Leading, calls for

 2   speculation.

 3   BY THE WITNESS:

 4        A  No.

 5   BY MR. CAMACHO:

 6        Q  I think you made a statement at one time

 7   that said something along the lines of the

 8   following, it was referencing the Ley letter -- if

 9   I refer to the Ley letter, do you know what I'm

10   talking about?

11        A  I do.

12        Q  I think you may have said something like:

13   If you take this letter at face value, there is no

14   infringement.

15        Do you remember making that comment along

16   those lines?

17        A  Yes.

18        Q  Do you have a -- do you understand -- I

19   know you're a damages expert but do you understand

20   the legal nuances of what patent infringement

21   entails?

22        A  At a high level.

23        Q  But what about at a low level?

24        MS. RANKS:  Objection.  Form.

25   BY MR. CAMACHO:
```

Ex. A, p. 121 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    122

```
1        Q   Sorry, go ahead.  At a low level do you
2   understand like what needs to be proved for patent
3   infringement, the burden of proof, the standard of
4   proof, defenses to an infringement, whether
5   something is patent infringement or not?  Do you
6   understand those things?
7        MS. RANKS:  Objection leading, form.
8   BY THE WITNESS:
9        A   No.
10  BY MR. CAMACHO:
11       Q   So when you made that statement that if
12  you take this letter at face value there's no
13  infringement, were you making an opinion as to
14  whether there would or would not be infringement
15  based on that letter?
16       A   No.
17       MS. RANKS:  Objection.  Leading, form.
18  BY MR. CAMACHO:
19       Q   Can you clarify your answer?  I mean, can
20  you restate?  I think you might have talked over
21  Ms. Ranks.  What was your answer?
22       A   No.  It was more of looking at the letter
23  and sort of that would be an appearance but in
24  terms of the legality or the proof of
25  infringement, no.
```

Ex. A, p. 122 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    123

```
 1      Q  You were asked questions today about

 2   whether one could license a patent application.

 3         Do you remember being asked that?

 4      A  Yes.

 5      Q  Do you truly know whether somebody can

 6   license a patent application and what that would

 7   entail?

 8      A  I've seen licenses that say you're

 9   licensed on this patent and any other patents that

10   would obtain that relate to this product so it's

11   almost a global piece sort of licensing agreement

12   but in terms of licensing a patent application, I

13   don't know that I've ever seen that in my career.

14      Q  Throughout your testimony today, at any

15   time did you intend to offer any substantive

16   opinions on whether something was a sale, a

17   purchase, whether or not non-issued patents could

18   be licensed, infringement, non infringement or a

19   lease?

20         MS. RANKS:  Objection.  Leading, form.

21   BY THE WITNESS:

22      A  No.

23   BY MR. CAMACHO:

24      Q  Did you say no?

25      A  I said no.
```

Ex. A, p. 123 (to the Camacho Decl.)

J and S Designated Information Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    124

```
1        Q  You were asked some hypotheticals today,
2   you were asked about Lowes, someone went to Lowes
3   and bought an oven and I think the question was if
4   you bought an oven could someone -- could Lowes
5   come back and sue you for infringement later.
6            Do you remember that line of questioning?
7        A  I do.
8        Q  The answers you gave -- I can't remember
9   exactly what they were but were they informed
10  legal answers or were you attempting to -- or was
11  there something else going on?  Do you really know
12  the answer to those type of questions?
13           MS. RANKS:  Objection.  Leading, form.
14  BY THE WITNESS:
15       A  Is it possible, I'm sure it is but it may
16  be but in terms of what -- I guess, again, on face
17  value.  It didn't strike me as something that
18  would occur but that's not me stating a legal
19  position.  It's just attempting to be -- move the
20  conversation along if you will.
21       Q  Noncombative?
22       A  Noncombative.
23           MS. RANKS:  Objection.
24  BY MR. CAMACHO:
25       Q  For example, say the oven at Lowes was
```

Ex. A, p. 124 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                              125

1    purchased by a credit card but the person never

2    paid their credit card bill, do you know whether

3    Lowes might have an infringement claim?

4         A  I don't.  I don't know.

5         Q  And do you understand that -- in your

6    everyday parlance when you interact with people,

7    say they say they bought a car, have you ever

8    heard someone say:  "I bought a car?"

9         A  Yes.

10        Q  Do you at that point -- if it turned out

11   that they technically leased a car, would it come

12   to mind if someone it making a distinction between

13   buying versus leasing or are they just saying, you

14   know, I got a car, I paid for it.

15        MS. RANKS:  Objection.  Outside the scope

16   of my testimony or my questioning, sorry.

17   BY THE WITNESS:

18        A  There is a distinction between a lease and

19   a purchase, yes.

20   BY MR. CAMACHO:

21        Q  Sometimes if someone turned out to a lease

22   a car could you envision them saying I bought a

23   car today, but they didn't mean they actually

24   purchased it as much as they leased it?  Can you

25   see that?

Ex. A, p. 125 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    126

```
1        A  Yes.

2           MS. RANKS:  Objection.  Leading.

3    BY MR. CAMACHO:

4        Q  I think at one time you were crisply asked

5    something along the lines do you agree that it's

6    an established fact that in 2009 J&S purchased a

7    log siding attachment, and I think your answer was

8    yes.  If it was yes, did you mean to opine that

9    what the conveyance was actually purchased versus

10   a lease?

11          MS. RANKS:  Objection.  Leading.

12   BY THE WITNESS:

13       A  Oh, no. That distinction it wasn't readily

14   apparent in my mind.

15   BY MR. CAMACHO:

16       Q  At one point you caught yourself even

17   before my redirect examination occurred you

18   referred to it as a so-called purchase.

19          Do you remember that?

20          MS. RANKS:  Objection.  Leading.

21   BY THE WITNESS:

22       A  Yes.

23   BY MR. CAMACHO:

24       Q  Is that why you used that term a so-called

25   purchase because you weren't sure?
```

Ex. A, p. 126 (to the Camacho Decl.)

```
1           MS. RANKS:  Objection.  Leading.
2    BY THE WITNESS:
3        A  Yes.
4    BY MR. CAMACHO:
5        Q  You were asked about sublicenses from NAMC
6    to others.
7           Do you remember being asked about those?
8        A  Yes.
9        Q  I'm going to attempt to add what I think
10   will be Exhibit 8.
11          (A certain document was marked Harrington
12          Deposition Exhibit 8 for identification,
13          as of 11/08/2024.)
14   BY MR. CAMACHO:
15       Q  Did you get Exhibit 8?
16       A  No, not yet.
17       Q  Okay.  Hold on.  How about now?  How about
18   now?
19       A  Oh, there it is.
20       Q  Can you download that and open that?
21       A  Okay.
22       Q  This might be tricky, but can you go to
23   your report, your first report and go down to the
24   materials considered?
25       A  Okay.
```

Ex. A, p. 127 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    128

```
 1           MS. RANKS:  What page of the materials
 2    considered?
 3    BY THE WITNESS:
 4         A  29.
 5    BY MR. CAMACHO:
 6         Q  PDF Page 29.
 7           Do you see where there's some Bates ranges
 8    listed?
 9         A  Yes.
10         Q  Do you see you list a Bates range the very
11    first one says J&S essentially 01 and the ending
12    Bates range is J&S 0178?
13           Do you see that?
14         A  I do.
15         Q  That's information you considered?
16         A  Yes.
17         Q  Can you go back to Exhibit 8, please.
18         A  Okay.
19         Q  You see the Bates labeled in the bottom
20    right-hand corner of that?
21         A  Yes.
22         Q  Can you see that that Bates label is 001
23    TB Holding?
24         A  Yes.
25         Q  And scroll to the end, can you see that
```

Ex. A, p. 128 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024      129

1  the final Bates range is 0022 TB Holding?

2       A   Yes.

3       Q   And then going back to your materials

4  considered back on your opening report, PDF

5  Page 29, it's Attachment B Page 102 just to the

6  right of the one you and I just discussed do you

7  see that there's a beginning Bates range and an

8  ending Bates range of 010 TB Holding to 0138 TB

9  Holding?

10      A   Yes.

11      Q   Looking at the documents here in

12 Exhibit 8, does this refresh your recollection

13 that you have seen these documents?

14      A   Yes, I have.

15      Q   And then if you scroll through them,

16 please, if these are the licensing agreements that

17 are between NAMC and the people that NAMC

18 licensed, then earlier if you would have said I

19 don't think I saw them, does this change your

20 answer?

21      A   Yes.   I've seen these, then.

22      Q   And I think it might have been the case

23 that you were asked and maybe it was presented to

24 you as though these license agreements that you've

25 never seen and I think the reference was that

Ex. A, p. 129 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    130

1    those -- the license agreements that you've never

2    seen are, in fact, these actual license

3    agreements, if that's the case, would you change

4    your testimony?

5         MS. RANKS:  Objection.  Leading.

6    BY THE WITNESS:

7       A  Yes, I have seen these.

8    BY MR. CAMACHO:

9       Q  I think you might have made a statement

10   that you weren't sure NAMC existed until 2018.

11        If that turns out to be incorrect and it

12   existed earlier, would that shock your conscience

13   or could you have been mistaken as to when NAMC

14   existed?

15      A  I --

16        MS. RANKS:  Objection.  Leading.

17   Mr. Harrington, if you could let me get my

18   objections in, it will help the court reporter

19   have a clean record.  Thank you.

20   BY MR. CAMACHO:

21      Q  Go ahead.  You can answer the question

22   now, Mr. Harrington?

23      A  Could you reask it?

24      Q  Yeah.  Could you have been mistaken as to

25   when NAMC came into existence?

Ex. A, p. 130 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    131

1        A   Yes.

2        Q   And then all throughout the day's

3   testimony, you offered up some comments and you

4   may have commented about your report or what was

5   in your report or your rebuttal report.

6            If there was something that is in the

7   report and it conflicts with your recollection and

8   testimony today, which of those should control?

9            MS. RANKS:   Objection.   Leading.

10  BY THE WITNESS:

11       A   My report controls.

12           MR. CAMACHO:   I have nothing.

13                    FURTHER EXAMINATION

14  BY MS. RANKS:

15       Q   Mr. Harrington, looking at Exhibit 8 if

16  you look at the first page, it says that it's a

17  User License Agreement effective of blank day of

18  blank month in 2010, right?

19       A   Yes.

20       Q   It says that it's between North American

21  Machine of Colorado, Inc., which we've been

22  referring to as NAMC, right?

23       A   Yes.

24       Q   And then it says and blank, right?

25       A   Yes.

Ex. A, p. 131 (to the Camacho Decl.)

1    Q  An individual partnership corporation

2  limited liability company organized under the laws

3  of the state of blank having an address of blank,

4  right?

5    A  Yes.

6    Q  And in your opinion, this is the basis for

7  the license agreement that you've reviewed?

8    A  Well, it would be this, the disclosures

9  and the filings and the signed pages at the end

10  that appear to be the returned copies from the

11  licensees to Mr. Baum with the exception of it

12  looks like the final -- the final license between

13  NAMC and Dennis Borkholder.

14    Q  That final one you're referring to Pages

15  12 and 13 of Exhibit 8?

16    A  Yes.

17    Q  But none of these include a full license

18  agreement, you would agree with that, correct?

19    A  Well, I would say that the last one is

20  just the very first page with the blanks filled in

21  and the signature page.

22    Q  You but you don't know what Pages 2

23  through 8 actually say, right?

24    A  My assumption is that it's the same as 2

25  through 8 in the initial several pages.

Ex. A, p. 132 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    133

1        Q   And that's an assumption which is

2    essentially a guess, right?

3        A   It's not a guess.  It's an assumption.

4        Q   You don't know what Pages 2 through 8 of

5    the license agreement allegedly on Pages 12 and 13

6    of Exhibit 8 actually says, correct?

7        A   I have not seen those.

8        Q   In fact, you don't even know what this

9    person's name is, right?

10       A   Mr. Borkholder, I just cannot read his

11   signature.

12       Q   If we look at the list of licensees in

13   your report, Exhibit 1, on Page 18, which license

14   is that?

15       A   It appears to be a company in Montana so I

16   would assume that it's D&M Siding.

17       Q   Another assumption.  I'm sorry.  Is that

18   another assumption you're making?

19       A   Yes.

20       Q   And if we look at Page 1 of Exhibit 8,

21   this draft user license agreement is dated in

22   2010, right?

23       A   Yes.

24       Q   Supposedly to be filled out in 2010.  And

25   if we look at the list of licensees that you have

Ex. A, p. 133 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    134

1    listed in your report, allegedly there was a

2    license entered into in 2009, right?

3        A   That's my understanding, yes.

4        Q   So you don't have that license for sure?

5            MR. CAMACHO:   Objection.

6    Mischaracterizes.

7    BY THE WITNESS:

8        A   I don't know.  It may be it was one dated

9    in 2009.

10   BY MS. RANKS:

11       Q   What were dated in 2009?

12       A   The Kent Moller Exteriors license.

13       Q   You haven't seen it, you don't know?

14       A   Let me look.  See if it's here I don't

15   have one that's signed by Kent Moller.

16       Q   Who do you have licenses signed by?

17       A   Dale, it's hard to read, some gentleman

18   last name starts with an S, first name is Kale,

19   Dale, gentleman with a last name that starts with

20   a P and Mr. Brookholder or Borkholder.

21       Q   If we look at Exhibit 1 your report and

22   look at Page 18, you claim that these are the

23   licenses for which of these entities?

24       A   I would have to dig into that a little bit

25   to correlate to the specific licensees on this

Ex. A, p. 134 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                          135

```
1    list.
2         Q   How would you do that?
3         A   We could do some internet searching and
4    look up the different companies and see if any of
5    their names that show up on these those sites are
6    matching the names that are signing on the
7    acceptance line.
8         Q   The names that we can't read.
9         A   Well, you can read first name, first
10   initial.
11        Q   And Exhibit 8 we agree that the first
12   Pages 1 through 9 are just a blank license
13   agreement like a draft maybe that you would
14   provide to someone, right?
15        A   I don't know if this is a draft or if it's
16   a copy of one that hasn't been filled out on the
17   top by the licensee or signed.
18        Q   It was not filled out, we agree on that?
19        A   Yes.
20        Q   And then Pages 10 and 11 are simply signed
21   pages that are numbered No. 9 but we have no way
22   to confirm whether or not what license this
23   actually is or if it's the same as the license
24   that is provided above, right?
25        A   As I noted there's -- we could confirm it.
```

Ex. A, p. 135 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                                    136

1          Q   By searching for the names we can't read

2      on the internet?

3          A   Well, I think that we could probably make

4      a reasonable association given the data that's on

5      a website.

6          Q   But we can't actually read the contract,

7      right?  We can't say, okay, the guy that signed

8      Page 10 we know exactly what contract he signed,

9      right?

10             MR. CAMACHO:  Objection.

11     Mischaracterizes.

12     BY THE WITNESS:

13         A   We don't have the earlier pages with the

14     signed copies.

15     BY MS. RANKS:

16         Q   And that's true for the signed page on

17     Page 11 as well, right?

18         A   Yes.

19         Q   And then with regard to the customer in

20     Montana, we have the first page and the last page

21     but we don't actually have Pages 2 through 8,

22     correct?

23         A   In this file, yes.

24         Q   Okay.  You can put that aside.  I want to

25     talk to you a little bit about your experience

Ex. A, p. 136 (to the Camacho Decl.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    137

1    with patent licensing.

2          Do you remember Mr. Camacho raising that

3    with you?

4        A   Yes.

5        Q   Are you familiar with when a party is

6    licensing a long list of patents, let's say they

7    attach it as an exhibit to the end of a license.

8          Have you seen that before?

9        A   Yes.

10       Q   And you're saying in your experience

11   you're not sure if you've ever seen a patent

12   application in that list?

13         MR. CAMACHO:  Objection.

14   Mischaracterizes.

15   BY THE WITNESS:

16       A   Specific examples of that don't come to

17   mind, but I also have seen licenses that say any

18   subsequent patents that we acquire are included in

19   this license agreement if it covers the product at

20   issue.

21   BY MS. RANKS:

22       Q   In fact, it's relatively common for a

23   company if it's going to license it's patent

24   portfolio to another company to include actual

25   issued patents as well as patents that are

Ex. A, p. 137 (to the Camacho Decl.)

1    pending, patent applications, right?

2        A   Sometimes.

3        Q   So you do agree that it is possible to

4    license a patent application, correct?

5            MR. CAMACHO:  Objection.  Speculation,

6    calls for legal conclusion.

7    BY THE WITNESS:

8        A   I don't know if licensing the application

9    or if it's a license to any patents that are

10   issued from that application.

11   BY MS. RANKS:

12       Q   Do you see a difference there?

13           MR. CAMACHO:  Objection.  Calls for

14   speculation, legal conclusion.

15   BY THE WITNESS:

16       A   Yeah.  It is a legal question, but if the

17   patent doesn't issue, there's nothing to license

18   so how you would correlate that to your license

19   under an application, but the patent doesn't issue

20   so...

21   BY MS. RANKS:

22       Q   So it's basically a worthless license,

23   right, which is not uncommon?

24           MR. CAMACHO:  Objection.

25   BY THE WITNESS:

Ex. A, p. 138 (to the Camacho Decl.)

J and S Designated Information Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYS ONLY
Transcript of James Harrington
Conducted on November 8, 2024                    139

```
 1        A   Well, at least for that item.

 2   BY MS. RANKS:

 3        Q   I just want to make sure that the record

 4   is clear with regard to this.

 5            So in your 25 years of experience you're

 6   saying that you don't ever recall seeing a company

 7   include in a license a patent application?

 8        A   I do not recall that right now.

 9        Q   You wouldn't be surprised if that was the

10   case?

11        A   As I said earlier, parties can agree to

12   whatever they'd like to agree to in a license, do

13   I specifically recall patent applications being

14   listed, no.

15            MS. RANKS:  No further questions.  I'll

16   pass the witness.

17            MR. CAMACHO:  Nothing further from me.

18   Mr. Harrington, you can log off.

19            MS. RANKS:  Thank you for your time today.

20            (Deposition concluded at 1:37 p.m. CST.)

21

22

23

24

25
```

Ex. A, p. 139 (to the Camacho Decl.)

```
 1        CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

 2

 3        I, Theresa A. Vorkapic, Certified

 4   Shorthand Reporter No. 084-2589, CSR, RMR, CRR,

 5   RPR, and a Notary Public in and for the County of

 6   Kane, State of Illinois, the officer before whom

 7   the foregoing deposition was taken, do hereby

 8   certify that the foregoing transcript is a true

 9   and correct record of the testimony given; that

10   said testimony was taken by me and thereafter

11   reduced to typewriting under my direction; that

12   reading and signing was not requested; and that I

13   am neither counsel for, related to, nor employed

14   by any of the parties to this case and have no

15   interest, financial or otherwise, in its outcome.

16        IN WITNESS WHEREOF, I have hereunto set my

17   hand and affixed my notarial seal this 24th day of

18   November, 2024.

19   My commission expires November 6, 2027.

20

21   _____

22        THERESA A. VORKAPIC

23        NOTARY PUBLIC IN AND FOR ILLINOIS

24

25
```

Ex. A, p. 140 (to the Camacho Decl.)