# EXHIBIT 1



# Transcript of James Harrington

**Date:** November 8, 2024
**Case:** TB Holding Company, LLC -v- J&S Siding

**Planet Depos**
**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com
www.planetdepos.com
Michigan #8598 | Nevada #089F | New Mexico #566

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

**17**

1  which would, therefore, assign rights to any
2  future patent that stems from or issues from that
3  application, right?
4      MR. CAMACHO: Objection. Outside the
5  scope.
6  BY THE WITNESS:
7      A  It's possible. It's possible.
8  BY MS. RANKS:
9      Q  Turning to this case and your analysis of
10 the damages in this case, did you consider the
11 fact that J&S paid over $10,000 to TBH for the log
12 attachment?
13     MR. CAMACHO: Objection. Form, calls for
14 facts not in evidence.
15 BY THE WITNESS:
16     A  That is true. I was not -- I don't know
17 that I was aware of that, but it is not -- it's
18 not considered in my analysis.
19     MS. RANKS: I'm going to mark as Exhibit 3
20 a document labeled as J&S 0008. If you can just
21 let me know when you can see Exhibit 3.
22     (A certain document was marked Harrington
23     Deposition Exhibit 3 for identification,
24     as of 11/08/2024.)
25 BY THE WITNESS:

**18**

1      A  I have it.
2  BY MS. RANKS:
3      Q  So this is a receipt from Ted Baum to J&S
4  Siding for a total of $10,925 that J&S paid,
5  right? Do you see that?
6      A  I do.
7      Q  And that was for the TruLog kit, the
8  standard ButtKicker and training and mousing of
9  the kit, right?
10     MR. CAMACHO: Objection. Authentication,
11 Counsel is testifying.
12 BY THE WITNESS:
13     A  That's what it says on this invoice.
14 BY MS. RANKS:
15     Q  And prior to seeing this document today,
16 you've not seen this document before?
17     A  I don't recall the specific document.
18     Q  Are you saying that you didn't know that
19 J&S paid $10,925 for the attachment?
20     MR. CAMACHO: Objection.
21 Mischaracterizes.
22 BY THE WITNESS:
23     A  I don't recall specifically that I was
24 aware of this, however, I don't -- I don't see how
25 it would have a bearing on my analysis.

**19**

1  BY MS. RANKS:
2      Q  You see that it's dated as October 6,
3  2009, right?
4      A  Yes.
5      Q  And October 6, 2009 was prior to the
6  issuance of the '604 patent, right?
7      A  I'd have to look at the patent. I don't
8  recall the issue date off the top of my head.
9      Q  We can look. Exhibit 1 is the '604
10 patent.
11     A  Oh, okay. Yes, '604 patent issued
12 March 15, 2016.
13     Q  And while the application was filed on
14 December 5 of 2008, patent published until
15 June 10, 2010, right?
16     A  That's what's shown on the patent, yes.
17     Q  So when J&S purchased the log attachment
18 from Ted Baum, the '604 patent had been published,
19 right?
20     MR. CAMACHO: Objection. Calls for facts
21 not in evidence. There's no indication of
22 purchase.
23     MS. RANKS: I'm sorry. I misspoke. Let
24 me restate that question, Mr. Harrington.
25 BY MS. RANKS:

**20**

1      Q  We have -- in Exhibit 3 we have a receipt
2  of October 6, 2009, right?
3      A  Yes.
4      Q  And we have the patent in Exhibit 1 the
5  '604 patent as being published on June 10, 2010,
6  right?
7      A  Yes.
8      Q  So J&S paid Ted Baum over $10,000, the
9  '604 patent had not yet issued -- had not yet been
10 published, right?
11     MR. CAMACHO: Objection.
12 Mischaracterizes, form.
13 BY THE WITNESS:
14     A  That's how the dates follow, yes.
15 BY MS. RANKS:
16     Q  And it's your opinion that the fact that
17 J&S paid Ted Baum over $10,000 is not relevant to
18 your damages analysis in this case?
19     MR. CAMACHO: Objection.
20 Mischaracterizes.
21 BY THE WITNESS:
22     A  It has no influence in the conclusions I
23 present in my report.
24 BY MS. RANKS:
25     Q  Why not?

---

Page 61

1  still looking at patents that cover the product
2  sold by J&S, manufacturing or selling the product.
3     Q  So it's your opinion that the position of
4  the parties in 2009 were the same as they were in
5  2016?
6        MR. CAMACHO:  Objection.
7  Mischaracterizes.
8  BY THE WITNESS:
9     A  I think the considerations would be the
10 same in the hypotheticals which is in line with
11 what Mr. Denney has presented in his report.  He
12 stated the same.
13       (Reporter clarification).
14 BY MS. RANKS:
15    Q  Did you do any analysis of the
16 hypothetical negotiation or the GP factors
17 considering a 2016 or 2017 start date?
18    A  Again, I think the factors would be the
19 same regardless of the start date.
20       MS. RANKS:  Why don't we go ahead and go
21 off the record and take a short break.
22       (A recess was had.)
23       MS. RANKS:  We can go back on the record.
24 BY MS. RANKS:
25    Q  Mr. Harrington, if we can take a look at

Page 62

1  your opening report, Exhibit 6, I want to look at
2  GP factor 1 and your analysis there which I
3  believe is on PDF Page 17.
4     A  Okay.
5     Q  And GP factor one is the royalties
6  received by the licensor for the licensing of the
7  patent-in-suit proving or tending to prove an
8  established royalty, right?
9     A  Yes.
10    Q  Are you aware that TBH licensed the
11 asserted patents to NAMC, right?
12    A  Yes.
13    Q  And that license was a royalty free
14 license, right?
15    A  I believe so, yes.
16    Q  Did you consider that royalty free license
17 in your analysis?
18    A  Not in this section, no.
19    Q  Did you consider this position?
20    A  I've considered the position of Mr. Baum
21 as the owner of NAMC in my royalty analysis.
22    Q  NAMC has never actually paid any money to
23 TBH, correct?
24    A  I don't know.
25    Q  You don't think that's relevant to your

Page 63

1  analysis?
2     A  Whether they paid them or not?
3     Q  Uh-huh.
4     A  Under the terms of the license it's
5  royalty fee?
6     Q  Why are the licenses that NAMC entered the
7  sublicenses relevant to TBH's position of the
8  hypothetical negotiation?
9     A  It's Mr. Baum's consideration in the
10 hypothetical negotiation.  He has a commonly owned
11 entity that sells the patented products and he
12 would be well aware of the impact of licensing
13 another competitor in the market and the impact to
14 the monies that that he would receive, or the
15 revenues that would be generated by a commonly
16 owned company.
17    Q  So essentially at the table at the
18 hypothetical negotiation in your mind it was sort
19 of TBH and NAMC sitting across from J&S?
20       MR. CAMACHO:  Objection.
21 Mischaracterizes.
22 BY THE WITNESS:
23    A  No.
24 BY MS. RANKS:
25    Q  Why not?

Page 64

1     A  NAMC is not party to this suit nor the
2  hypothetical negotiation.  It's Mr. Baum and
3  Mr. Reed-Baum.
4     Q  So is it really Mr. Baum and Mr. Reed-Baum
5  or is it the TBH Holdings Corporation?
6     A  It would be TBH Holdings which is owned by
7  Mr. Baum and Mr. Reed-Baum.
8     Q  And NAMC is also held by Mr. Baum and
9  Mr. Reed-Baum, right?
10    A  Correct.
11    Q  And you're saying in your analysis you
12 don't conflate the two?
13    A  I don't what?
14    Q  Conflate the two?
15    A  No.
16    Q  Does TBH have any input into NAMC's
17 sublicenses?
18       MR. CAMACHO:  Objection.  Calls for
19 speculation.
20 BY THE WITNESS:
21    A  NAMC sublicenses, I'm not aware of any.
22 BY MS. RANKS:
23    Q  If we look at your opening report,
24 Exhibit 6, Page 17 and 18, you list agreements
25 with five licensees and you say that their

**65**

1  agreement is with TBH but they're not, right?
2  They're actually agreements with NAMC?
3  　A　I don't believe NAMC existed until 2018
4  and these licenses were in 2009 and 2010.
5  　Q　Have you seen any of these license
6  agreements?
7  　A　I don't recall.
8  　Q　You don't cite them in your report.
9  　A　Well, these came from the filings by TB
10 Holdings and the list of the licensees.
11 　Q　Where are you seeing that?
12 　A　In footnote -- my Footnote 50.
13 　Q　You haven't actually seen the licenses
14 themselves, you've just seen representations made
15 by TBH?
16 　　　MR. CAMACHO:　Objection.
17 Mischaracterizes.
18 BY THE WITNESS:
19 　A　I don't recall specifically seeing the
20 licenses.　That doesn't mean I haven't seen them.
21 BY MS. RANKS:
22 　Q　They're not cited in your materials
23 considered list, though, so if you had seen them
24 they would be cited there?
25 　A　They would be, yes.

**66**

1  　Q　So you probably haven't seen them, right?
2  　A　If it's not on my list then I probably
3  don't have it, yes.
4  　Q　If you had seen them, I mean, they'd
5  probably be cited in this section of your report,
6  would you agree with that?
7  　A　Yes.
8  　Q　Even if we do assume that these are real
9  licenses, even though no one's seen them, how much
10 money have the licensees paid under the licenses?
11 　A　I don't believe it's a large amount.　I
12 believe as is indicated on my chart, the majority,
13 four out of the five there, are no longer active.
14 　Q　Do you know if any of these licensees paid
15 that up-front $10,000 licensing fee?
16 　A　My understanding is these licensees
17 accepted the rates, presumably they paid that, but
18 I haven't seen a document that would indicate
19 that.
20 　Q　And do you know how much money these
21 licensees paid per square or the royalty rates
22 that they paid under these alleged licenses?
23 　A　It was $25 a square.
24 　Q　Do you know how much money in total was
25 paid by these licensees?

**67**

1  　A　Not off the top of my head, no.
2  　Q　So that wasn't relevant to your
3  consideration of your damages analysis?
4  　A　These are licenses whether or not these
5  licensees were successful in their marketing
6  efforts is entirely different.
7  　Q　Explain that to me.
8  　A　Well, if you have a business and you're
9  seeking a license to install this and use this,
10 these patented products, you agree to it and
11 however your marketing efforts fail for whatever.
12 　Q　So you can sign a license and that you
13 assume under GP 1 that there is a license but even
14 if they made zero dollars under the license you
15 still consider that under GP 1?
16 　A　Certainly, if these are acceptable rates
17 in the market.　It's indicative of a rate that was
18 accepted by multiple entities that install siding
19 and wish to do the work that involved the
20 simulated log siding.
21 　Q　But you don't know if they ever actually
22 paid any amount, right, because you haven't seen
23 the licenses?
24 　A　Well, that would be two separate
25 considerations but my understanding of licenses is

**68**

1  laid out here.　It was from the discovery
2  responses and discussions with Mr. Reed-Baum?
3  　Q　This basically is describing the terms of
4  the license but you don't know whether anyone
5  actually complied with those terms, right?
6  　A　Well, complied is different than actually
7  generating sales related to the patented products.
8  　Q　Do you know if anyone generated sales
9  related to the patented products?
10 　A　My understanding is it wasn't significant.
11 　Q　And does that impact your damages
12 analysis?
13 　A　That they did not sell, no, not
14 necessarily.
15 　Q　Why not?
16 　A　Because it doesn't indicate the value of
17 the patented technology from their perspective.
18 They -- if they didn't -- if they weren't
19 successful in marketing and selling the products
20 is separate from the value of the underlying
21 technology they've licensed.　We see --
22 　Q　Sorry.
23 　A　We see what the popularity of the
24 products, through the sales of the siding by NAMC
25 and by J&S.

Transcript of James Harrington
Conducted on November 8, 2024

18 (69 to 72)

---

**Page 69**

1   Q  But couldn't the opposite be true, too,
2   that it has nothing to do with the patented
3   products and really up to the marketing of those
4   companies, you said it's the marketing why they
5   didn't sell, couldn't the opposite be true as
6   well?
7       A  That would generate the sales?  I don't --
8   Q  In my understanding, correct me if I'm
9   wrong, you said that the sales by these licensees
10  was not significant, right?
11      A  Correct.
12  Q  And you said that potentially could have
13  nothing to do with the patents, it's probably
14  related to like their marketing or, you know,
15  other things going on with the company, right?
16      A  Possibly, yes.
17  Q  And I'm asking isn't the like opposite of
18  that also potentially true is that if there are
19  sales, that it has nothing to do with the patented
20  product then it has more to do with the marketing
21  or the company's reputation?
22      A  In part, but in a study of a reasonable
23  royalty, the royalty is aimed at compensating a
24  patentee for the technology and however allowing
25  the patentholder -- the licensee to make a profit

**Page 70**

1   for their efforts in selling the patented
2   products.
3   Q  I'd like you to turn to Paragraph 67 of
4   your report which is on Page 19 and you say there:
5   "TBH's efforts to license the patents-in-suit were
6   terminated in 2010".
7       Do you see that?
8       A  Yes.
9   Q  What do you mean by that?
10      A  According to Mr. Reed-Baum they decided
11  that the better way to monetize their patented
12  technology was to set up a company to manufacture
13  and sell the siding covered by the patents.
14  Q  But weren't all the license agreements you
15  referred to in GP 1 agreed to in 2001 or 2010?
16      A  Somewhere in there, yes.
17  Q  So I don't understand how you can say
18  that -- those two things don't mesh in my mind.  I
19  don't understand it.  Can you explain that?
20      A  What is there not to understand?  I mean,
21  there are 12 months in a year.  You can be
22  licensing in January of 2010 and decide in
23  September of 2010 that we're not going to offer
24  licenses anymore.
25  Q  Oh, okay.  You're not saying that they

**Page 71**

1   revoked the licenses.  You're just saying they
2   decided not to move forward with additional new
3   licenses?
4       A  That's my understanding, yes.
5   Q  Okay.  Got it.  That's where I was
6   confused.
7       But the resulting license that TBH granted
8   to NAMC does allow NAMC to sublicense without
9   permission from TBH, right?
10      A  I don't know, I don't have the license in
11  front of me.
12      MR. CAMACHO:  Objection.
13  Mischaracterizes.
14  BY MS. RANKS:
15  Q  If you turn to Paragraph 69 of your
16  opening report?
17      A  Yes.
18  Q  Do you note that J&S is a direct
19  competitor with NAMC?
20      A  Yes.
21  Q  Again, why is that relevant?
22      A  Because from Mr. Baum's position licensing
23  J&S would have a direct impact on his economic
24  upside he receives from NAMC.  J&S --
25  Q  NAMC -- I'm sorry.  I apologize.

**Page 72**

1       A  J&S may be taking sales from NAMC and he
2   would be well aware of that possibility.
3   Q  But TBH doesn't financially benefit from
4   NAMC?
5       A  Mr. Baum does and Mr. Reed-Baum does.
6   Q  The corporation, the plaintiff, TBH does
7   not financially benefit from NAMC, correct?
8       A  Well, it's common ownership and at the
9   date of the hypothetical negotiation they would be
10  aware of any impact of licensing a third party.
11  Q  But TBH has not received any money from
12  NAMC, correct?
13      MR. CAMACHO:  Objection, asked and
14  answered, calls for facts not in evidence.
15  BY THE WITNESS:
16      A  I don't know if they have or they have
17  not.
18  BY MS. RANKS:
19  Q  You didn't review Mr. Reed-Baum's
20  testimony about that?
21      A  I don't have it committed to memory.  I'd
22  have to look at it.
23  Q  Assume that NAMC has not paid TBH any
24  money at all since formation, does that impact
25  your analysis?

85

1  ▮▮▮
2  ▮▮▮
3  products.  If a customer decides that they want
4  log siding and they don't have that option with
5  J&S, they go elsewhere and J&S loses not only the
6  siding sales but the ancillary product sales.
7      Q  But J&S could replace that sale a
8  conventional siding sale because they have more
9  work than they can handle, right?
10     A  Maybe they could.
11     Q  What evidence have you seen that J&S
12 bundles sales of log siding with ancillary
13 products?
14     A  It's not a bundling.  It's an additional
15 sales of products that customers demand along with
16 the install of the siding.  I haven't seen
17 anything in the record that would say that J&S
18 just exclusively goes out and sells doors and
19 soffits and all these other products unless
20 they're also doing siding work.
21     Q  Turning to Paragraph 85 of your opening
22 report on Page 23, you state that it's your
23 opinion the parties would include a reasonable
24 royalty in the form of an upfront license fee in
25 the amount of 16,500 plus a running royalty of

86

1  16.5 percent on accused sales.  These rates
2  represent a 65 percent increase over the
3  historical licensing rates offered by TBH, right?
4      A  Yes.
5      Q  These historical licensing rates offered
6  by TBH, that is limited to the NAMC sublicenses,
7  right?
8      A  No.
9      Q  It includes the free license to NAMC?
10     A  No.  I guess you need to explain to me
11 what you mean when you say the NAMC sublicenses
12 because I'm not aware of any.  The licenses that
13 are listed in my report the five entities that
14 licensed historically that's what we're referring
15 to here in the $10,000 up front fee plus
16 10 percent based on calculating the $25 a square
17 rate that was included in those licenses.
18     Q  Those licenses that you haven't actually
19 seen?
20     A  Correct.
21     Q  So including those licenses, that's what
22 you're saying is a 65 percent increase over --
23 that's the historical licensing rate you're
24 referring to?
25     A  Yes.

87

1      Q  You're not including in that historical
2  licensing rate the zero dollar license royalty
3  free license that TBH gave to NAMC?
4      A  Correct.
5      Q  And you're not including any consideration
6  of J&S's $10,000 payment to TBH for the purchase
7  of the attachment?
8      A  The treatment of that so-called purchase
9  would be left to the court how it's treated or if
10 it's implied -- an implied license of some sort I
11 guess.
12     Q  Why do you say so-called purchase?  Are
13 you saying that it wasn't a purchase?
14     A  Well, I think it's been throughout this
15 deposition that you call it a purchase.  I see
16 there's a receipt.  I don't know that it was a
17 purchase or what that represents.  For the
18 purposes of this discussion, I've accepted that
19 that's what that shows.
20     Q  Well, and we looked at an exhibit that you
21 cite in your report that the plaintiff filed in
22 this case that describes that 2009 transaction as
23 a purchase of the attachment, right?
24     A  Yes.
25     Q  So what basis do you have to say that it's

88

1  not a purchase?
2      A  I didn't say it wasn't a purchase.  Maybe
3  so-called wasn't the correct term, but if we were
4  to accept that that was a purchase then the court
5  can rule how that's properly treated.
6      Q  Okay.  Understood.  I just wanted to be
7  clear on that.  Thank you.
8         Turning back to Paragraph 85 of your
9  opening report, why is it your opinion that it's
10 reasonable for the royalty to have a 65 percent
11 increase over the historical rate?
12     A  Well, there's a significant upside to
13 selling the patented product that J&S realizes
14 through the sales of additional products and
15 components that wouldn't be available to them
16 without the patented product.
17     Q  When you came -- oh, I'm sorry.  Go ahead.
18     A  That upward influences the 65 percent
19 influence in this royalty rate.
20     Q  When you came to this opinion, did you
21 consider the fact that at some point J&S is going
22 to be priced out of the log siding market and
23 instead of being able to sell the simulated log
24 siding if they have it to pay a high royalty
25 customers would instead just purchase actual log

133

1  Q  And that's an assumption which is
2  essentially a guess, right?
3  A  It's not a guess. It's an assumption.
4  Q  You don't know what Pages 2 through 8 of
5  the license agreement allegedly on Pages 12 and 13
6  of Exhibit 8 actually says, correct?
7  A  I have not seen those.
8  Q  In fact, you don't even know what this
9  person's name is, right?
10 A  Mr. Borkholder, I just cannot read his
11 signature.
12 Q  If we look at the list of licensees in
13 your report, Exhibit 1, on Page 18, which license
14 is that?
15 A  It appears to be a company in Montana so I
16 would assume that it's D&M Siding.
17 Q  Another assumption. I'm sorry. Is that
18 another assumption you're making?
19 A  Yes.
20 Q  And if we look at Page 1 of Exhibit 8,
21 this draft user license agreement is dated in
22 2010, right?
23 A  Yes.
24 Q  Supposedly to be filled out in 2010. And
25 if we look at the list of licensees that you have

134

1  listed in your report, allegedly there was a
2  license entered into in 2009, right?
3  A  That's my understanding, yes.
4  Q  So you don't have that license for sure?
5    MR. CAMACHO:  Objection.
6  Mischaracterizes.
7  BY THE WITNESS:
8  A  I don't know. It may be it was one dated
9  in 2009.
10 BY MS. RANKS:
11 Q  What were dated in 2009?
12 A  The Kent Moller Exteriors license.
13 Q  You haven't seen it, you don't know?
14 A  Let me look. See if it's here I don't
15 have one that's signed by Kent Moller.
16 Q  Who do you have licenses signed by?
17 A  Dale, it's hard to read, some gentleman
18 last name starts with an S, first name is Kale,
19 Dale, gentleman with a last name that starts with
20 a P and Mr. Brookholder or Borkholder.
21 Q  If we look at Exhibit 1 your report and
22 look at Page 18, you claim that these are the
23 licenses for which of these entities?
24 A  I would have to dig into that a little bit
25 to correlate to the specific licensees on this

135

1  list.
2  Q  How would you do that?
3  A  We could do some internet searching and
4  look up the different companies and see if any of
5  their names that show up on these those sites are
6  matching the names that are signing on the
7  acceptance line.
8  Q  The names that we can't read.
9  A  Well, you can read first name, first
10 initial.
11 Q  And Exhibit 8 we agree that the first
12 Pages 1 through 9 are just a blank license
13 agreement like a draft maybe that you would
14 provide to someone, right?
15 A  I don't know if this is a draft or if it's
16 a copy of one that hasn't been filled out on the
17 top by the licensee or signed.
18 Q  It was not filled out, we agree on that?
19 A  Yes.
20 Q  And then Pages 10 and 11 are simply signed
21 pages that are numbered No. 9 but we have no way
22 to confirm whether or not what license this
23 actually is or if it's the same as the license
24 that is provided above, right?
25 A  As I noted there's -- we could confirm it.

136

1  Q  By searching for the names we can't read
2  on the internet?
3  A  Well, I think that we could probably make
4  a reasonable association given the data that's on
5  a website.
6  Q  But we can't actually read the contract,
7  right? We can't say, okay, the guy that signed
8  Page 10 we know exactly what contract he signed,
9  right?
10   MR. CAMACHO:  Objection.
11 Mischaracterizes.
12 BY THE WITNESS:
13 A  We don't have the earlier pages with the
14 signed copies.
15 BY MS. RANKS:
16 Q  And that's true for the signed page on
17 Page 11 as well, right?
18 A  Yes.
19 Q  And then with regard to the customer in
20 Montana, we have the first page and the last page
21 but we don't actually have Pages 2 through 8,
22 correct?
23 A  In this file, yes.
24 Q  Okay. You can put that aside. I want to
25 talk to you a little bit about your experience

# EXHIBIT B



**User License Agreement**

This User License Agreement ("Agreement") is effective on the ___ day of _____, 2010 (hereinafter "Effective Date"), by and between:

North American Machine of Colorado, Inc., a Colorado Corporation having an address of 3543 S. County Road 5, Loveland, Colorado 80537 (hereinafter "Licensor"); and

_____, an individual/partnership/corporation/limited liability company organized under the laws of the state of _____ having an address of _____ (hereinafter "Licensee").

Basis for this Agreement

A.  Licensor owns and/or controls certain equipment for manufacturing metal simulated log siding panels which are attached to the exterior of the building or other structure to create an appearance which simulates actual wooden log construction. Application 12/329,336 for a United States patent has been filed for the equipment for manufacturing the metal simulated log siding panels, and such application was published on June 10, 2010 as US patent application 2010/0139080. Licensor also owns and/or controls United States Design Patent D602,612, granted October 20, 2009 and titled "Metal Simulated Log Siding Panel" which covers the design configuration and appearance of the metal simulated metal log siding panels. The legal rights under US Design Patented D602, 612 and under US patent application 2010/10139080 and any US patents that might be granted on this patent application are collectively referred to hereinafter as "Patent Rights."

B.  Licensor owns and/or controls United States Trademark Registration 3,758,691 for use of the trademark "Tru Log" for a metal forming machine for making simulated log siding metal panels. Licensor also owns and/or controls United States trademark application 77/590,442, for use of the trademark "Tru Log" for "simulated log siding metal panels." Trademark application 77/590,442 has been approved for registration by the United States Patent and Trademark Office, pending submission of proof of use of the "Tru Log" trademark on simulated log siding metal panels. The above-identified US trademark registration and pending US trademark registration, as well as the "Tru Log" trademark itself and the goodwill associated therewith, are collectively referred to hereinafter as "Tru Log Trademarks."

C.  Licensor has undertaken a licensing program to grant licenses in certain geographic locations for the exclusive use of certain equipment to make metal simulated log siding panels which fall within the scope of US Design Patent D602,612 (hereinafter "Licensed Equipment"). The Licensed Equipment is also described in the US patent application 12/329,336. As a part of this licensing program, Licensor also grants a nonexclusive right to use the Tru Log Trademarks in connection with the use, advertising and promotion of the Licensed Equipment.

000010 TB HOLDING

D. Licensee has requested that Licensor grant Licensee a license for use of the Licensed Equipment and the Tru Log Trademarks, under the terms and conditions set forth below.

E. Licensor is willing to grant Licensee a license under the terms and conditions set forth below.

Now, therefore, in consideration of the mutual promises, covenants and conditions set forth below, which consideration is hereby acknowledged as good and sufficient, Licensor and Licensee have entered into the following

**Agreement**.

1. <u>Use License</u>.  Licensor hereby grants Licensee an exclusive right and license, under the Patent Rights, to use the Licensed Equipment to make metal simulated log siding panels solely for the purpose of installation by the Licensee on structures only within the limits of the geographic area defined in Exhibit A attached hereto.  The geographic area defined in Exhibit A is hereinafter referred to as the "Licensed Area."

2. <u>Trademark License</u>.  Licensor hereby grants Licensee a nonexclusive right and license to use the Tru Log Trademarks to advertise and promote Licensee's exclusive right to make and install metal simulated log siding panels within the Licensed Area as set forth in paragraph 1.1.  Licensee shall use the Tru Log Trademarks in connection with all simulated log siding panels manufactured using the Licensed Forming Equipment.

3. <u>License Fee</u>.  Upon execution of this Agreement, Licensee shall pay Licensor a non-refundable Licensing Fee of Ten Thousand Five Hundred Dollars ($10,500), as nonrefundable payment for entering into this Agreement.

4. <u>Use Fee</u>.  In addition to the License Fee and not as a credit toward the License Fee described in paragraph 3, Licensee shall pay Licensor Twenty-Five Dollars ($25.00) per Square of metal simulated log siding panels made and installed using the Licensed Equipment within the Licensed Area.  A "Square" is 100 square feet of surface area which is covered by the simulated log siding panels made and installed in accordance with this Agreement.

5. <u>Calendar Quarter Reports</u>.  For each Calendar Quarter (ending March 31, June 30, September 30 and December 31), commencing with the first full Calendar Quarter after the Effective Date of this Agreement, Licensee shall submit a Report to Licensor in writing which states (a) the total number of Squares of metal simulated log panel siding manufactured and installed using of the Licensed Equipment during that Calendar Quarter, (b) the address or location of each structure upon which the metal simulated log panel siding was installed during that Calendar Quarter, and (c) the

000011 TB HOLDING

number of Squares of metal simulated log panel siding manufactured and installed on each structure for which an address or location is provided in the Report.  Each Report shall be accompanied by full payment of the applicable Use Fee for that Calendar Quarter.  Each Report shall be delivered to Licensor no later than one month following the end of the applicable Calendar Quarter.  Licensee shall keep accurate and sufficient books and records showing the manufacturing and installation of the metal simulated log panel siding in this Agreement, and such books and records shall be in such detail to enable an independent certified public accountant to calculate the accuracy and sufficiency of the Reports made under this Agreement.  Licensee shall maintain such books and records for a period of no less than three years after making the Report applicable to each Calendar Quarter.

       6.    <u>Maintenance of Exclusivity</u>.  Beginning with the fifth Calendar Quarter after the Effective Date of this Agreement, Licensee shall use the Licensed Equipment sufficiently within the Licensed Area, or pay Use Fees as if Licensee had used the License Equipment sufficiently within the Licensed Area, to result in the following of a Minimum Use Fees in total for the designated Calendar Quarters.

| Calendar Quarters | Minimum Use Fee |
|---|---|
| fifth through eighth | _____ |
| ninth through 12th | _____ |
| 13th through 16th | _____ |
| 17th through 20th | _____ |

Payment of the Minimum Use Fees as provided in this paragraph shall be regarded as fully satisfying Licensee's obligation to exploit the exclusive rights within the Licensed Area under this Agreement.

       7.    <u>Advertising</u>.  Licensee shall use the Tru Log Trademarks in advertising and promotion which is intended to have a principal impact within the Licensed Area.  It is acknowledged that the geographical scope of modern day advertising and promotion cannot be confined easily to specific geographical areas, so the use of the Tru Log Trademarks by third parties within the Licensed Area is not prohibited under this Agreement.  Licensee acknowledges that the right to use the Tru Log Trademarks is not exclusive in the Licensed Area.

       8.    <u>Quality Control</u>.  Licensee shall use the Tru Log Trademarks only in connection with metal simulated log siding panels manufactured using the Licensed Equipment.  With each Calendar Quarter Report which Licensee submits to Licensor, Licensee shall send one sample piece of a metal simulated log siding panel which accurately represents the quality of the metal simulated log siding panels manufactured and installed by the Licensee during that Calendar Quarter.  Licensor shall inspect the sample piece supplied with each Calendar Quarter Report to determine whether the quality of the metal simulated log siding panels meet the standards for continued use of the Tru Log Trademarks.  Upon determining any deterioration in quality, Licensor shall

notify Licensee and Licensee shall immediately undertake all reasonable actions to elevate the quality to an acceptable standards established by the Licensor.  For purposes of establishing acceptable standards of quality, an acceptable standard of quality is the quality of a metal simulated log siding panel manufactured using the Licensed Equipment after initial installation of the Licensed Equipment.

      9.    <u>Attribution</u>.  All use of the trademark "Tru Log" by the Licensee shall indicate that such trademark is registered, and shall attribute the ownership of that trademark to Licensor.

      10.    <u>No Conflicting Trademarks</u>.  Licensee shall not use any trademarks, words, symbols or other means of product identification which are confusingly similar to the "Tru Log" trademark during the term of this Agreement.

      11.    <u>No Competing Products</u>.  Licensee will not manufacture, have manufactured, use, sell, offer to sell, or distribute products or processes which are or are intended to compete with the metal simulated log siding panels made with the Licensed Equipment and/or falling within the scope of the Patent Rights.  Licensee will not assist a third-party in manufacturing, having manufactured, using, having used, selling, offering to sell, importing, having imported or distributing products are processes which are or are intended to compete with the metal simulated log siding panels made with the Licensed Equipment and/or falling within the scope of the Patent Rights.

      12.    <u>Limitation on Rights</u>.  Licensee acknowledges that Licensee is not authorized under this Agreement to manufacture, to sell or to import Licensed Equipment in any geographic area of the United States, including the Licensed Area.  Licensee further acknowledges that the rights of Licensee to manufacture and install simulated log siding panels using the Licensed Equipment are restricted only to the Licensed Area, and that any manufacture and/or installation of metal simulated log siding panels outside of the Licensed Area are in violation of this Agreement.

      13.    <u>No Box Siding</u>.  Licensee shall not manufacture metal simulated log siding panels using the Licensed Equipment which are not intended to be installed on a project within the Licensed Area.

      14.    <u>Case-By-Case Outside Use</u>.  Licensee shall have the right to bid or propose installation of metal simulated log siding panels on specific singular structures outside of the Licensed Area, and to use Licensed Equipment to make metal simulated log siding panels and install such panels solely on that structure, provided that (1) that Licensor has not granted exclusive rights to a third party in the geographic area of that structure, (2) Licensee requests permission in advance in writing before bidding or otherwise proposing the installation of metal simulated log siding panels on such structure, and (3) Licensee pays Use Fees to Licensor with respect to such structure.

000013 TB HOLDING

15. <u>Delivery of Licensed Equipment</u>. Licensor will provide the Licensed Equipment to Licensee at no additional cost to Licensee. The Licensed Equipment. which is only suitable for attachment to a North American seamless siding machine model NAM 020, or to an Edge seamless siding machine model 030. Licensee must be the owner or leasee of a the North American seamless siding machine, model NAM 020, or the Edge seamless siding machine, model 030, to which the Licensed Equipment is installed as provided herein.

16. <u>Installation of Licensed Equipment</u>. At a mutually agreeable time not later than one month after the Effective Date of this Agreement, Licensor shall install the Licensed Equipment on the seamless siding machine owned or leased by Licensee. At that time, Licensor shall adjust the seamless siding machine and the Licensed Equipment for operation together. Such installation and adjustment shall be at no additional cost to Licensee if performed at the premises of the Licensor. If Licensee desires Licensor to install the Licensed Equipment on the seamless siding machine at a location other than at the premises of the Licensor, Licensee shall pay the reasonable travel expenses of the Licensor to and from such a mutually agreeable location and a fee of $750 per whole or part day consumed in traveling to and from the location selected by the Licensee.

17. <u>Demonstration of Equipment</u>. After installation and adjustment, Licensor shall demonstrate and instruct the use of the Licensed Equipment in making metal simulated log siding panels on the seamless siding machine of the Licensee. Such demonstrations and instructions shall be sufficient to provide Licensee with a reasonable understanding of the proper use of the Licensed Equipment, but in no event shall such demonstrations extend beyond one eight hour day.

18. <u>Additional Assistance</u>. Licensor will provide additional instruction and consultation to Licensee on the use of the Licensed Equipment, at the request of Licensee, at a mutually agreeable time and at a mutually agreeable location, upon the payment by Licensee to Licensor of $750 per whole or part day (eight working hours) plus travel expenses to and from the site of such additional instruction and consultation.

19. <u>Ownership of Licensed Equipment</u>. Licensee hereby acknowledges that the License Equipment provided to Licensee and installed on the seamless siding machine of the Licensee is and shall remain the property of Licensor. Licensee has the right to use such attachment as provided in this Agreement. Should this Agreement terminate for any reason whatsoever, Licensee shall immediately cease all use of the Licensed Equipment and deliver the Licensed Equipment to Licensor at the address set forth above at a time no later two weeks after the date of termination.

20. <u>Maintenance of Licensed Equipment</u>. Licensee shall maintain the Licensed Equipment in good working order, including but not limited to purchasing from Licensor, replacement and repair parts for those components of the License Equipment which become worn or defective through use. Licensor's prices for such replacement

000014 TB HOLDING

part shall be reasonable under the circumstances, and in no event shall such prices exceed Licensor's cost of procurement or manufacture plus 100%.

21. <u>Possession of Licensed Equipment</u>.  The License Equipment provided to Licensee under this Agreement shall remain in the possession of Licensee for the duration of this Agreement.  Licensee shall remove the Licensed Equipment from Licensees seamless siding machine and return the Licensed Equipment to Licensor before relinquishes control or ownership over the seamless siding machine or before scrapping the seamless siding machine.  Licensee shall have the right to reinstall the Licensed Equipment on any replacement North American seamless siding machine, model NAM 020, or any replacement Edge seamless siding machine, model 030.

22. <u>Additional Licensed Equipment</u>.  Licensee shall have the right to obtain additional items of the Licensed Equipment for use in the Licensed Area , subject to the terms of this Agreement and upon payment of an Additional License Fee of Nine Thousand Dollars ($9000) for each additional one item of Licensed Equipment.  Licensor shall not be obligated to install or instruct Licensee with respect to the such additional items of Licensed Equipment.

23. <u>No Duplication</u>.  Licensee shall not provide access, assistance or encouragement to any third party whom the Licensee knows or suspects is attempting to duplicate or copy the Licensed Equipment.  Furthermore, Licensee shall not duplicate or copy or construct the Licensed Equipment for itself.

24. <u>Term of Agreement</u>.  This agreement shall continue until expiration of the next Calendar Quarter five (5) years after the Effective Date.

25. <u>Termination by Licensee</u>.  This Agreement may be terminated at any time by Licensee upon giving written notice to Licensor specifying a termination date no less than three months after the date of the termination notice given to Licensor.

26. <u>Termination by Licensor</u>.  This Agreement may be terminated by Licensor for breach by Licensee at any time upon giving written notice to Licensee specifying the cause for termination and a termination date no less than one month after the date of the termination notice given to Licensee.

27. <u>Opportunity to Cure Default</u>.  Should either party believe that the other party has committed a default or breach of the terms of this Agreement, the party claiming the default shall give written notice to the other party specifying the nature of the default.  The party receiving the notice of default shall have one month after receipt of the written notice to take reasonable action which will lead to a remedy of the default.  If the party claiming the default believes that the action taken by the other party has not led to curing the default, the party claiming the default may thereafter terminate this Agreement upon written notice of termination to the other party, and such notice of termination shall have effect no earlier than one month after the date of such notice.

000015 TB HOLDING

28.     <u>Remedy for Unauthorized Use in Licensed Area</u>.  Licensor represents and warrants that it will not grant a license to a third party permitting use of Licensed Equipment in the Licensed Area of Licensee, during the term of this Agreement.  If however, a third party licensee of Licensor should manufacture and install metal simulated log siding panels in the Licensed Area of Licensee, in conflict with the terms of an agreement between the third-party licensee and Licensor, the sole and only remedy available to Licensee is to receive a payment from Licensor equal to the use fee that the third party licensee of Licensor paid to Licensor for the manufacture and installation of metal simulated log siding panels in the Licensed Area of Licensee.  In addition, Licensor shall also give written notice to the third party licensee of a default under the agreement between the third party licensee and Licensor.  In no event shall the manufacture and installation of metal simulated log siding panels in the Licensed Area of Licensee by an unauthorized third party be grounds for the claiming monetary damages for the breach of this Agreement for by Licensor.

29.     <u>Suspected Infringement of Patent Rights</u>.  Should Licensee gain information of any actual or suspected infringement of the Patent Rights in or outside of the Licensed Area, Licensee shall immediately notify Licensor of such actual or suspected infringement, and shall provide to Licensor all information which Licensee may lawfully divulge which supports Licensee's belief of an actual or suspected infringement.

30.     <u>Assertion of Claims</u>.  Licensor shall have the exclusive right to enforce the Patent Rights against infringers in the Licensed Area.  Licensee shall make no assertion to any actual or suspected infringer of infringement, misappropriation, misuse, breach of contract or other violation of any other legal rights relative to the Patent Rights.

31.     <u>Initiation of Action</u>.  Upon the discovery of any actual infringement of the Patent Rights in the Licensed Area, as confirmed by a competent opinion of patent counsel, Licensor shall take reasonable and lawful steps which are reasonably calculated to lead to the termination such infringement.  Licensor shall take such action beginning reasonably promptly after the opinion of counsel.  If necessary, Licensee consents to the use of its name in any legal action brought by Licensor against actual or suspected infringers of the Patent Rights.

32.     <u>Failure to Terminate Infringement</u>.  If the action taken by the Licensor has not resulted in termination of infringement within one year from the date of the opinion of counsel, Licensee shall have the right to terminate this Agreement, provided that Licensor has not filed a lawsuit seeking to stop infringing activities or instituted other proceedings such as arbitration with the alleged infringer regarding the alleged infringement.

33.     <u>Assistance and Information</u>.  Licensor shall keep Licensee fully informed of the status and progress of any actions and/or arbitration brought or taken to

000016 TB HOLDING

terminate the actual or suspected infringement in the Licensed Area, including actions taken which do not involve lawsuits.

      34.    <u>Notices</u>.  All notices and other communications under this Agreement shall be in writing and shall be given to the appropriate party at its address given above, or at such other address for such party as shall have been specified by notice given in compliance with this paragraph, by any of the following methods: (i) personal delivery, (ii) registered or certified mail, first-class postage prepaid, return receipt requested, or (iii) an overnight delivery service that obtains a signature from the recipient.  Such notice or communication shall be effective upon the earliest of actual receipt thereof by the addressee or actual delivery thereof to the appropriate address.

      35.    <u>Confidentiality of Agreement</u>.  The terms of this Agreement shall not be disclosed to a third party unless Licensor or Licensee is required to do so by law or court order, or the written consent of the other party has been obtained.  However, each party shall be entitled to disclose the existence of this Agreement and the identity of the parties to this Agreement.

      36.    <u>Sublicensing and Assignment</u>.  The rights granted to Licensee under this Agreement are personal and shall not be sublicensed or assigned to any third party, without the prior written approval of Licensor, which Licensor may extend or deny in Licensor's sole discretion.  This Agreement shall be freely assignable by Licensor.

      37.    <u>Benefit</u>.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective permitted successors and assigns.

      38.    <u>Amendment</u>.  This Agreement may be amended only by a written document signed by the parties hereto.

      39.    <u>Waiver</u>.  No action or inaction under this Agreement shall constitute or be construed as a waiver, laches or forbearance unless such waiver or forbearance is made in writing, duly executed by the party against whom such waiver, laches or forbearance is sought to be enforced, and no such waiver or forbearance in any one instance shall be construed as applying to any other instance unless specifically stated in such writing or another writing duly executed by such party.

      40.    <u>Choice of Law</u>.  The validity, construction and performance of this Agreement shall be governed in accordance with the laws of the State of Colorado and of the United States of America.

      41.    <u>Venue</u>.  Any dispute under this Agreement shall be resolved in the Courts of the State of Colorado in Larimer County, or in the United States District Court for the District of Colorado, or by arbitration held in Larimer County Colorado.

000017 TB HOLDING

42. <u>No Relationship</u>.  Neither this Agreement nor the performance of any part hereof shall be construed to establish a partnership, joint venture or any other relationship between Licensor and Licensee.

43. <u>Entire Agreement</u>.  This Agreement constitutes the entire understanding between Licensor and Licensee and supercedes any prior understandings, both oral and written, relating to the subject matter of this Agreement.

WHEREFORE, Licensor and Licensee have acknowledged this Agreement by the signature of their authorized representatives as set forth below.

| | |
|---|---|
| North American Machine<br>of Colorado, Inc.<br>Licensor | _____<br>Licensee |
| _____<br>Ted Baum<br>President | _____<br>Name: _____<br>Authorized representative |

000018 TB HOLDING