# EXHIBIT 4

## UNITED STATES DISTRICT COURT

## DISTRICT OF IDAHO

| | | |
|---|---|---|
| **TB HOLDING COMPANY, LLC** | § | |
| | § | |
| Plaintiff, | § | Case No. 4:22-CV-00307-BLW |
| | § | |
| **v.** | § | |
| | § | |
| **J&S Siding** | § | |
| | § | |
| Defendant. | § | |

**Expert Report on Damages**

of

**James J. Harrington CPA, CFF, CVA**

**Dated August 9, 2024**



## Table of Contents

INTRODUCTION.................................................................................................................... 3

SCOPE OF WORK.............................................................................................................. 3

INFORMATION CONSIDERED.......................................................................................... 3

SUMMARY OF OPINIONS................................................................................................. 4

BACKGROUND – PLAINTIFF ........................................................................................... 5

BACKGROUND – DEFENDANT........................................................................................ 5

BACKGROUND – PRIOR DEALINGS BETWEEN THE PARTIES .................................. 6

BACKGROUND – ACCUSED PRODUCTS ....................................................................... 6

BACKGROUND – PATENTS-IN-SUIT.............................................................................. 7

ASSUMED LIABILITY ...................................................................................................... 8

DAMAGES OVERVIEW .................................................................................................... 8

J&S SIDING'S PROFIT ON THE ACCUSED SALES........................................................ 9

REASONABLE ROYALTY................................................................................................ 11

## Attachments

| | |
|---|---|
| ATTACHMENT A | Resume and Testimony Listing |
| ATTACHMENT B | Documents and Information Considered |
| ATTACHMENT 100 | Summary of J&S Siding Infringing Sales Covered by the 'D612 Patent |
| ATTACHMENTS 150 – 152 | Summary of Reasonable Royalty Damages |
| ATTACHMENT 200 | Damages Matrix |
| ATTACHMENTS 300 – 302 | J&S Siding Revenue on Log Siding Jobs Accused of Infringing 'D612 Patent |
| ATTACHMENTS 400 – 401 | J&S Siding Revenue on Log Siding Jobs Accused of Infringing '529 Patent |
| ATTACHMENTS 500 – 502 | J&S Siding Revenue on Log Siding Jobs Accused of Infringing '604 Patent |
| ATTACHMENTS 600 – 601 | J&S Siding Revenue on Log Siding Jobs 2009 - 2023 |
| ATTACHMENTS 700 - 701 | Calculation of Compound Annual Growth On J&S Jobs Involving The Accused Siding |
| ATTACHMENTS 800 – 801 | TruLog Revenue |
| ATTACHMENT 900 | Timeline of Key Events |



## INTRODUCTION

1.  I am a Director with MDD Forensic Accountants ("MDD"). I have been providing forensic accounting services for over twenty-five years and am experienced in economic damages, financial and accounting matters related to the scope of my work in this matter. I have consulted on numerous intellectual property and commercial damages matters. I have analyzed and prepared claims related to lost profits, reasonable royalties, disgorgement of profits and other economic impacts including those issues under study in this Report. I am a Certified Public Accountant (CPA), licensed in Michigan and hold the CFF (Certified in Financial Forensics) credential granted by the American Institute of Certified Public Accountants (AICPA). I also hold the Certified Valuation Analyst (CVA) credential granted by the National Association of Certified Valuators and Analysts (NACVA).

2.  My curriculum vitae is attached as ATTACHMENT A to this report which describes more fully my education, training, industry experience and testimony experience.

3.  MDD's fees on this assignment are based upon hourly rates for myself and other professionals working under my supervision.  My current rate is $335 per hour and the fees for professional staff working under my supervision range from rates of $120 to $370 per hour.  MDD's compensation is not dependent on the outcome of this matter.

## SCOPE OF WORK

4.  MDD was retained on behalf of TB Holding Company, LLC to address damages issues related to the infringement of various patents in the TB Holding Company v. J&S Siding ("TBH v. J&S") matter.

## INFORMATION CONSIDERED

5.  ATTACHMENT B lists the various documents, data and information considered in forming the opinions outlined in this Report.



6.  I understand this Report may be supplemented by deposition and/or trial testimony. Pages of the documents, data and information considered may be used as exhibits to support my opinions.

7.  I may prepare exhibits to be used at trial to graphically illustrate my analysis and opinions based on the documents, data and information considered.

8.  The opinions in this Report are based on currently available data, documents and information. Further, my conclusions are dependent on such information being accurate and current in all material respects. Should TB Holding Company, LLC, J&S Siding, or other experts retained in this matter, provide additional documents, data or information, my opinions and this Report may be revised or supplemented.

## SUMMARY OF OPINIONS

9.  Should the trier-of-fact determine J&S Siding's sales of the accused siding infringes the 'D612 Patent and TB Holding Company, LLC is entitled to its remedy in the form of J&S Siding's profit on the accused sales, the accused sales base totals $769,620.[1]

10. If it is determined TB Holding Company, LLC is entitled to its remedy in the form of a reasonable royalty, the reasonable royalty is to be determined based on an upfront license fee of $16,500 and a running royalty of 16.5% on the accused sales.

11. The following Chart summarizes my concluded profit disgorgement and reasonable royalty amounts as detailed in this Report:[2]

---

[1] The accused sales total includes sales made by J&S Siding from October 2009 through October 2023 when the 'D612 Patent expired. Although this amount represents the total accused sales base, I understand that under the statute TB Holding's damages recovery is limited to six years prior to the date of the Complaint (July 21, 2022). If my understanding is incorrect, I reserve the right to update my Report to include the earlier accused sales amounts.

[2] As discussed later in this Report, the amounts indicated are not necessarily additive. Once the trier-of-fact makes the determination on specific patents and infringement, the relevant profit disgorgement and royalty base will be quantified.



| Patent / Damages Remedy Assumption | Damages On Accused Sales Limited To 6 Years Prior To Complaint | Damages On Accused Sales Limited To Those Using Fabricated Disks |
|---|---|---|
| 'D612 Patent (Disgorgement of Profits Remedy) | $        531,905 | $        119,327 |
| 'D612 Patent (Reasonable Royalty Remedy) | 104,264 | 36,189 |
| '529 Patent (Reasonable Royalty Remedy) | 87,950 | 24,670 |
| '604 Patent (Reasonable Royalty Remedy) | 106,424 | 36,189 |

## BACKGROUND – PLAINTIFF

### A.  TB Holding Company, LLC

12. The plaintiff in this matter is TB Holding Company, LLC ("TBH"). TBH owns all rights, title, and interest in and to the patents-in-suit in this matter.[3]

13. TBH is co-owned by Ted Baum, Jr. ("Mr. Baum") and his son, Ryan Reed-Baum ("Mr. Reed-Baum").

## BACKGROUND – DEFENDANT

### A.  J&S Siding

14. J&S Siding ("J&S") is the named defendant in this matter. J&S, located in Idaho Falls, Idaho, is a siding company that manufactures and installs siding and other exterior home improvement products (e.g., gutters, windows, doors, soffits, facia, and trim).

15. J&S is owned by Joe and Stephanie Walrath who started J&S in the late 1970s.[4] Mr. Walrath handles certain business operations including providing customer estimates, supervising

---

[3] Amended Complaint for Damages and Equitable Relief, pp. 3, 28, and 33.
[4] Idahoseamlesssiding.com/about-us.



installers, and invoicing customers upon completion of the work.[5] Mrs. Walrath handles the bill paying and other various office duties for the business.[6]

## BACKGROUND – PRIOR DEALINGS BETWEEN THE PARTIES

16. In 2009, prior to the issuance of the patents-in-suit, J&S obtained a log siding machine attachment from Mr. Baum. Mr. Baum allowed Mr. Walrath to take possession of the attachment because Mr. Baum understood that Mr. Walrath would execute a lease agreement that Mr. Baum's attorney was preparing.[7] Mr. Walrath asked to be granted exclusive geographic rights to provide the simulated log siding in his service area.[8] Mr. Baum proposed including an exclusivity provision in the lease. The proposed lease would have provided rights under patents that might issue from Mr. Baum's patent applications covering the log siding and attachment.[9] J&S later refused to enter into the lease agreement.[10]

17. In late 2016, J&S had two sets of additional disks made for the original log-siding attachment.[11] The additional disks have been used by J&S to manufacture and install patented simulated log siding on multiple customer siding projects.[12]

## BACKGROUND – ACCUSED PRODUCTS

18. The accused products in this matter are simulated log siding panels manufactured and sold by J&S.

---

[5] Depositions of Joe and Stephanie Walrath dated February 20, 2024.
[6] Depositions of Joe and Stephanie Walrath dated February 20, 2024.
[7] Deposition of TB Holding Company, LLC by Ryan Reed-Baum, dated February 23, 2024, p. 96
[8] TB Holding's Statement of Material Facts, p. 4.
[9] TB Holding's Statement of Material Facts, p. 4.
[10] TB Holding's Statement of Material Facts, p. 4 and Deposition of Stephanie Walrath dated September 23, 2023, pp. 47-51.
[11] Deposition of Stephanie Walrath dated September 23, 2023, pp. 46-51.
[12] TB Holding's Statement of Material Facts, p. 9.



BACKGROUND – PATENTS-IN-SUIT

### A. Patents-In-Suit

19. TBH has asserted three patents in this matter. The following sections provide a brief description of each of the patents at issue.

     i. <u>US Patent 9,283,604</u>

20. US Patent 9,283,604 ("the '604 Patent") is titled *Metal Simulated Log Siding Panel with Hew Lines and Method of Making and Using Same.* The '604 Patent issued March 15, 2016, to Mr. Baum, the named sole inventor and the President of TBH. On June 28, 2018, Mr. Baum assigned the '604 Patent to TBH.[13]

21. I understand the '604 Patent generally relates to a metal simulated log siding panel used on the exterior of buildings as well as a method and apparatus for making such simulated log siding.[14]

     ii. <u>US Patent 9,732,529</u>

22. US Patent 9,732,529 ("the '529 Patent") is titled *Simulated Log Siding Panel with Hew Lines.* The '529 Patent issued August 15, 2017, to Mr. Baum, the named sole inventor. On June 28, 2018, Mr. Baum assigned the '529 Patent to TBH.[15]

23. I understand the '529 Patent generally relates to a metal simulated log siding panel used on the exterior of buildings having bends formed in the metal simulating hew lines creating a more realistic log siding appearance.[16]

24. I understand the '529 Patent expired in October 2023.[17]

     iii. <u>US Design Patent D602,612</u>

25. US Design Patent D602,612 ("the 'D612 Patent") is titled *Metal Simulated Log Siding Panel.* The 'D612 Patent issued October 20, 2009, to Mr. Baum, the named sole inventor. On June 28, 2018, Mr. Baum assigned the 'D612 Patent to TBH.[18]

---

[13] Amended Complaint for Damages and Equitable Relief, pp. 2-3.
[14] US Patent 9,283,604 B2.
[15] Amended Complaint for Damages and Equitable Relief, p. 28.
[16] US Patent 9,732,529 B2.
[17] If this is incorrect, I reserve the right to adjust my analyses and conclusions in accordance with a different date.
[18] Amended Complaint for Damages and Equitable Relief, p. 33.



26. I understand the 'D612 Patent generally relates to the ornamental design of a metal simulated log siding panel.[19]

27. I understand the 'D612 Patent expired in October 2023.[20]


## ASSUMED LIABILITY


28. The analysis in this Report is based on the presumption of validity and infringement of TBH's patents and that TBH is entitled to damages for J&S's infringement. I have no opinions on the legal issues related to infringement, validity, or enforceability issues in this matter. All references within this Report to accused sales, infringing sales, date of first infringement, or the like are simply a necessary predicate for this damages study. My opinions are directed to the damages issues as outlined in this Report.


## DAMAGES OVERVIEW


29. The infringement contentions in this matter include claims related to TBH's design patent ('D612 Patent) and utility patents ('604 Patent and '529 Patent). The following sections provide an overview of the remedies addressed in this Report.


### A. Patent Infringement Damages

30. I understand the relevant statutory authority for patent infringement damages is Section 289 of the U.S. Patent Act, 35 U.S.C. of the U.S. Code ("The Code"). The Code states that if a patent is found to be valid and infringed, the patentee is entitled to damages adequate to compensate for the infringement, but "in no event less than a reasonable royalty for the use made of the invention by the infringer."[21]

---

[19] US Design Patent D602,612 S.
[20] If this is incorrect, I reserve the right to adjust my analyses and conclusions in accordance with a different date.
[21] 35 USC § 284



31. Section 289 of The Code addresses a remedy available to patentees in a design patent infringement matter. Section 289 allows the patentee to recover the "total profit" earned by the infringer on its accused sales.

32. I have been asked to address TBH's recovery of J&S's total profit on accused sales of log siding assumed to infringe TBH's 'D612 Patent. In the alternative, I have been asked to determine a reasonable royalty on accused sales assumed to infringe any or all of the TBH patents asserted in this matter, including the 'D612 Patent.

33. Given the existence of multiple patents being asserted, multiple damages start dates, and the expiration of certain patents, the timing of the accused sales base varies. ATTACHMENT 200 provides a matrix of damages remedies and accused sales base timeframes considered in this Report.


### J&S SIDING'S PROFIT ON THE ACCUSED SALES


34. I understand that under a disgorgement of profit remedy in a design patent matter the patentee has the burden to present proof of the infringer's gross revenue on the infringing sales. Once that burden has been met, the defendant has the burden to identify and support costs to be deducted from the accused revenue to arrive at the profit earned from the infringing acts.

35.  The following sections discuss my quantification of the accused revenue to be considered in the damages analysis in this matter.


#### A.  J&S's Log Siding Sales Data Analysis

36. J&S produced sales data covering the years 2010 through 2023. It appears the data for the 2016 to 2023 timeframe was extracted from J&S's QuickBooks accounting program. For the 2010 through 2015 timeframe, J&S produced customer invoices related to sales and installation of the accused log siding. For the analysis of the J&S log siding revenue I have relied on the J&S QuickBooks data for 2016 through 2023 and supplemented that data with the invoice data for the earlier time periods.



37. The J&S QuickBooks and invoice data contain sufficient details to identify jobs including the sale and installation of the accused log siding panels. Accused sales were identified by J&S siding projects including references to "log siding" in the QuickBooks memo line.[22]

38. The sales data also provides a breakdown of job revenue into specific categories (i.e., siding, siding components, trim (soffits and facias), windows and doors, gutters, and other). In my analysis, I have further categorized the revenue into the following categories based on the descriptions contained in the J&S data:

    a.  Log siding

    b.  Siding trim and components

    c.  Windows & doors

    d.  Gutters

    e.  Other

39. ███████████████████████████████████

**B. Accused Log Siding Revenue**

40. I have been asked to quantify the accused log siding revenue that would be properly considered in the profit disgorgement analysis assuming J&S is found to infringe the 'D612 Patent with its sales of the accused log siding. Further, I have been asked to provide the quantification of accused sales under two timing assumptions. First, considering accused sales beginning on October 20, 2009 (the date the 'D612 Patent issued) and ending on October

---

[22] It should be noted that J&S also sells "Grizzly" log siding. I understand the Grizzly siding is not currently accused of infringement in this matter. As such, I have excluded sales of Grizzly siding from the accused sales analysis.



20, 2023 (the date the 'D612 Patent expired).[23] Second, beginning on July 21, 2016 (six years prior to the date of the initial Complaint) and ending on October 20, 2023 (the date the 'D612 Patent expired).[24]

41. I have also been asked to conduct an analysis that considers only those accused sales made by J&S for jobs identified as utilizing the unauthorized fabricated disks.[25]

42. 

43. As discussed earlier in this Report, under a claim for the infringer's profits in a design patent infringement matter, the plaintiff's burden is to present proof of the infringing sales. Having established the amount J&S sales accused of infringing the 'D612 Patent (as indicated above), the burden shifts to the defendant to identify and support costs to be deducted from the accused sales to arrive at the amount of profit to be disgorged. Should J&S not meet their burden, the measurement of profit to be disgorged is the entire amount of accused revenue as shown above.

## REASONABLE ROYALTY

44. If the patents-in-suit are found to be valid and infringed by J&S, TBH is entitled to damages adequate to compensate for the infringement, but "in no event less than a reasonable royalty

---

[23] See ATTACHMENT 300.
[24] See ATTACHMENT 301.
[25] See ATTACHMENT 302.



for the use made of the invention" by the J&S.[27] I have been asked to determine a reasonable

royalty amount on the accused sales in this matter.[28]

### A. Framework And Considerations In Determining A Reasonable Royalty

45. One way to determine a reasonable royalty is the consideration of a "hypothetical negotiation" as described in the *Georgia-Pacific Corp. v. U.S. Plywood Corp.* matter.[29] The hypothetical negotiation framework envisions a licensing negotiation taking place between a "willing licensor" (the intellectual property owner) and a "willing licensee" (the accused infringer) on the date of first infringement. In the hypothetical negotiation, both parties are assumed to be knowledgeable of pertinent facts ("like cards dealt face up, are for all to see")[30] including facts and data occurring after the hypothetical negotiation date.[31]

46. Applying the hypothetical negotiation framework, the parties must arrive at an agreed upon license. The hypothetical negotiation concludes to a reasonable royalty that is an:

> …*amount that a licensor* (such as TBH) *and a licensee* (such as J&S) *would have agreed upon (at the time infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee – who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent licensor, who was willing to grant a license.*[32]

47. The *Georgia-Pacific* decision also provides fifteen factors to consider in a reasonable royalty determination. My discussion on the *Georgia-Pacific* factors follows below.

48. The first step in determining a reasonable royalty under a hypothetical negotiation is identifying the hypothetical negotiation date. Under the hypothetical negotiation framework,

---

[27] 35 USC § 284

[28] My reasonable royalty study includes the 'D612 Patent. As the statute states, the patent owner is entitled to damages adequate to compensate for the infringement but "in no event less than a reasonable royalty for the use made of the invention." Accordingly, a reasonable royalty determination on the 'D612 Patent establishes a floor on damages in the event that J&S is able to properly identify and support deductible costs that would result in a disgorgement amount that is lower than a reasonable royalty on the 'D612 Patent.

[29] *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970).

[30] *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970).

[31] *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1575-76 (Fed. Cir. 1988)

[32] *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970).



the date of the hypothetical negotiation is assumed to occur on the date of first infringement. I have assumed the hypothetical negotiation takes place in October 2009 when the first of the patents-in-suit (the 'D612 Patent) issued. The hypothetical negotiation would result in a license to manufacture, sell, and install the accused log siding. As such, the hypothetical negotiation would include a reasonable royalty determination for the 'D612 Patent and include a license under the other two patents-in-suit that issued subsequent to the 'D612 Patent.[33]

**B.  Reasonable Royalty Analysis**

49.  I have considered the *Georgia-Pacific* factors and other relevant data and information having a bearing on the hypothetical negotiation in this matter. The following sections discuss these important considerations in determining a reasonable royalty in this matter. The following sections first address the other relevant influences and considerations, followed by my analysis of the *Georgia-Pacific* factors.

**1)  TBH's Considerations**

50.  At the date of the hypothetical negotiation, TBH would understand that granting a license to J&S would likely negatively impact the sales of patented siding made by a TBH authorized licensee, North American Machines of Colorado, Inc. ("NAMC").[34]

51.  As with TBH, NAMC is co-owned by Mr. Baum and Mr. Reed-Baum. As such, TBH would be motivated to protect NAMC's sales from competitors. TBH would understand that it was agreeing to license a company that would take sales away from NAMC if it were to license J&S.[35] This likelihood is further supported by the overlap of customer service areas between NAMC and J&S. According to Mr. Reed-Baum, NAMC sells to customers in several states in the U.S. Mountain region, including Idaho, Wyoming, and Montana. J&S has sold the accused

---

[33] I recognize that the patents-in-suit issued over an eight year period. In my opinion, using different hypothetical negotiation dates would not materially affect the royalty determination in this matter.

[34] TBH00878-891. NAMC operates under the d/b/a name of TruLog selling a multitude of steel siding (including the patented log siding). (Deposition of TB Holding Company, LLC by Ryan Reed-Baum, dated February 23, 2024, pp. 143-144).

[35] In discussions with Mr. Reed-Baum, he identified at least one specific customer that sought out NAMC for the purchase of the patented log siding. The customer, Peter Aspesi, informed NAMC that his purchase decision was between NAMC and J&S for the siding. Ultimately, the customer purchased the accused siding from J&S (see ATTACHMENT 600, line 59).



siding to customers in these same states, thereby competing directly with NAMC for sales of the patented log siding.

52. TBH would be aware that J&S prices the patented log siding at the same per square foot price as non-log siding jobs.[36] By doing so, J&S strips the value of the patented products from the sale, thereby competing with NAMC on price. TBH would seek a royalty rate high enough that J&S would be faced with passing the royalty on to the customer via a price increase over the standard, non-log siding pricing. In doing so, the ability for J&S to compete with NAMC with lower pricing would be reduced.

53. TBH would be aware of the popularity of the patented siding with customers. As shown on ATTACHMENT 800, NAMC's sales of the patented siding have grown considerably from approximately $1.8 million in 2017 to approximately $8.7 million in 2023, representing a compound annual growth rate of nearly 30%.

### 2) J&S's Considerations

54. ███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
████████████████████████████

55. Should those customers decide to forgo the purchase of the patented siding or buy an alternative siding from other suppliers, J&S would lose the sale and associated profits on the patented siding, as well as the revenue and profit on the ancillary products that J&S has historically sold along with the accused products.

---

[36] Depositions of Joe and Stephanie Walrath dated February 20, 2024, pp. 133-134.
[37] ATTACHMENT 600.
[38] e.g., window and doors, gutters, trim, soffits, and facia product sales installed along with the accused siding (see ATTACHMENT 600).



56. J&S would also be aware of the popularity of the accused log siding with customers. As shown on ATTACHMENT 701, J&S sales of the accused siding grew from 2010 to 2021 at a compound annual growth rate of over 16%.[39]

57. 



**3) Royalty Base**

58. As discussed earlier in this Report, there are multiple iterations in the quantification of accused sales in this matter depending on the infringement determination made by the trier-

---

[39] There appeared to be a significant decrease in accused sales in 2022 coinciding with the date of the Complaint in this matter. It is reasonable to assume the existence of the infringement allegations impacted the sales of the accused products by J&S beginning in 2022. As such, I have eliminated 2022 and 2023 in determining the annual growth rate.



of-fact. The following sections detail the royalty base properly considered depending on the infringement finding on the patents-in-suit.

    a.   The 'D612 Patent royalty base:

        i.   Assuming all log siding sales infringe the 'D612 Patent beginning at the 'D612 Patent issue date (October 20, 2009) through the patent expiration date (October 20, 2023) - $769,620.[40]

        ii.   Limiting the royalty base to log siding sales beginning six years prior to the date of the Complaint (July 21, 2016) through the patent expiration date (October 20, 2023) - $531,905.[41]

        iii.   Assuming the only log siding sales that infringe the 'D612 Patent are those sales made using the fabricated disks - $119,327.[42]

    b.   The '529 Patent royalty base:

        i.   Assuming all log siding sales infringe the '529 Patent beginning at the '529 Patent issue date (August 15, 2017) through the patent expiration date (October 20, 2023) - $433,028.[43]

        ii.   Limiting the royalty base to log siding sales beginning six years prior to the date of the Complaint (July 21, 2016) through the patent expiration date (October 20, 2023) - $433,028.[44]

        iii.   Assuming the only log siding sales that infringe the '529 Patent are those sales made using the fabricated disks beginning at the '529 Patent issue date

---

[40] ATTACHMENT 300.
[41] ATTACHMENT 301.
[42] ATTACHMENT 302. It should be noted that these sales all took place between July 21, 2016, and October 20, 2023.
[43] ATTACHMENT 400.
[44] ATTACHMENT 400.



(August 15, 2017) through the patent expiration date (October 20, 2023) - $49,513.[45]

    c.   The '604 Patent royalty base:

        i.   Assuming all log siding sales infringe the '604 Patent beginning at the '604 Patent issue date (March 15, 2016) through December 31, 2023 - $582,920.[46]

        ii.   Limiting the royalty base to log siding sales beginning six years prior to the date of the Complaint (July 21, 2016) through December 31, 2023 - $544,995.[47]

        iii.   Assuming the only log siding sales that infringe the '604 Patent are those sales made using the fabricated disks - $119,327.[48]

    **4)  Georgia-Pacific Factors**

**Factor 1: The royalties received by the licensor for the licensing of the patent in suit, proving or tending to prove an established royalty.**

59.  This factor considers TBH's licensing history of the patents-in-suit.

60.  In the 2009/2010 timeframe TBH began an effort to license the proprietary log siding and log siding attachment in an attempt to monetize the inventions. During this time, TBH entered into such agreements with five entities.[49] The licensed entities are detailed in the following Chart:[50,51]

---

[45] ATTACHMENT 401.

[46] ATTACHMENT 500. The '604 Patent does not expire until December 2026. As such, the sales accused of infringing this patent will be updated prior to trial.

[47] ATTACHMENT 501. The '604 Patent does not expire until December 2026. As such, the sales accused of infringing this patent will be updated prior to trial.

[48] ATTACHMENT 502. It should be noted that these sales all took place between July 21, 2016, and December 31, 2023.

[49] It is possible this number is technically greater by a small amount, by entities who ended up not meaningfully using the attachment. If so, that would not alter my analysis.

[50] TB Holding's Responses to J&S's 2nd and 3rd Discovery Requests, pp. 2-3.

[51] Kent Mohler's license might still be in effect, but they do not appear to be actively using it.



| Licensee | Location | Date Of Agreement | Still Active? |
|---|---|---|---|
| Kent Mohler Exteriors | Kearney, MO | Mid 2009 | No |
| D&N Siding | Hamilton, MT | Early 2010 | No |
| C&T Siding | Roberts, WI | Mid 2010 | No |
| Xsiding Xteriors | Horace, ND | Mid 2010 | No |
| Cody Seamless | Cody, WY | Late 2010 | Yes |

61. The license for each of the licensees granted non-exclusive rights under the patents-in-suit as well as TBH's "TruLog" trademark. The license called for an upfront $10,000 licensing fee and a running royalty of $25 per "square" of siding sold and installed.[52] Mr. Reed-Baum explained to me that the TBH licensees readily accepted the proposed royalty rate as reasonable and acceptable.

62. According to Mr. Reed-Baum, the $25 royalty rate was determined based on what at the time was the current selling price of a square of siding - $250.[53] As such, the initial licensing rate for use of TBH's patented products was an implied running royalty rate of 10% of sales.[54]

63. This factor provides a starting point on a reasonable royalty determination in this matter based on an upfront fee of $10,000 and a running royalty of 10% on accused sales.[55]

**Factor 2: The rates paid by the licensee for the use of other patents comparable to the patent in suit.**

---

[52] A square is 100 square feet of siding.

[53] Discussion with Ryan Reed-Baum.

[54] $25 royalty / $250 selling price = 10%.

[55] It is worth noting that the existing TBH license agreements provide a starting point in the hypothetical negotiation royalty determination. There is no basis to contend that J&S would now be somehow entitled to the rates offered to the existing licensees. As noted earlier, when J&S was offered the existing license rates in 2010, they declined, choosing to allegedly infringe rather than take a license. Providing J&S with a license under the historical rates now would effectively reward J&S's decision to infringe rather than license. Such an outcome would reward J&S's "nothing to lose and everything to gain" approach to licensing the patented siding (*Panduit Corp. v. Stahlin Brothers Fibre Works, Inc. 575 F.2d 1152, 1160-62, 197 USPQ 726, 734-35 (6th Cir. 1978)*).



64. Factor 2 considers royalty amounts paid by J&S to license comparable patents. I am not aware of any comparable licenses entered into by J&S. Accordingly, this factor is neutral in the determination of a reasonable royalty in this matter.

**Factor 3: The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product can be sold.**

65. In the hypothetical negotiation, TBH would retain the right to use the asserted patents and provide J&S with a non-exclusive license for the accused sales made in the U.S. All things being equal, a non-exclusive license is of lesser value than an exclusive license.

66. Factor 3 has a slight downward influence on the determination of a reasonable royalty in this matter.

**Factor 4: The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.**

67. This factor considers TBH's policy regarding the licensing of the patents. As noted earlier in this Report, TBH's efforts to license the patents-in-suit were terminated in 2010 when it was decided to utilize the patents in a monopolistic fashion and turn to manufacturing and selling the patented siding directly to customers rather than offer to license others.

68. The resulting license granted to NAMC allowed NAMC to manufacture, distribute, and sell the patented log siding. Given the common ownership between TBH and NAMC, TBH would rationally prefer to maintain the monopolistic position of NAMC and not introduce a direct competitor into the market. This factor has a significant upward influence on the reasonable royalty rate in this matter.

**Factor 5: The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.**



69. As noted in Factor 4, J&S is a direct competitor with NAMC in the states served by J&S. Such commercial relationship between J&S and NAMC would have upward influence on the reasonable royalty rate in this matter.

**Factor 6: The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative products.**

70. ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████.

71. This factor provides a significant upward influence on the reasonable royalty rate in this matter.

**Factor 7: The duration of the patent and the term of the license.**

72. At the date of the hypothetical negotiation, the patents-in-suit have significant remaining life. Although the 'D612 Patent and '529 Patent were set to expire in October 2023, the '604 Patent would not expire until December 2026. Without a license, at the date of the hypothetical negotiation, J&S would be unable use patented machines to make the siding for over 15 years, thereby foregoing the opportunity to generate additional sales and profits through the sale of the accused siding and other ancillary products. This factor has a strong upward influence on the reasonable royalty determination.

**Factor 8: The established profitability of the product made under the patent; its commercial success; and its current popularity.**

73. The patented products as sold under the patents by TBH and J&S have been commercially successful.

74. As noted earlier, both parties have enjoyed significant year over year growth in sales of the patented siding. From 2017 to 2023, TBH experienced compound annual sales growth of



approximately 30%.[56] Likewise, J&S has experienced strong annual growth in its accused siding sales at a compound annual growth rate of over 16%.[57]

75. This factor provides an upward influence on the reasonable royalty rate determination in the hypothetical negotiation.

**Factor 9: The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.**

*and*

**Factor 10: The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.**

76. The patented siding provides customers desiring a log sided home without the expensive routine maintenance that goes along with an actual log sided home.

77. The patented log siding provides a homeowner with the "quaint, authentic look"[58] of log siding without the demands of annual maintenance that goes with actual log siding. I understand the patented siding is considered maintenance-free, never requiring re-painting or re-staining. Further, the siding eliminates concerns over fungus or insect infestations that comes with actual log siding.[59]

78. These factors provide an upward influence on the reasonable royalty rate determination in this matter.

79. **Factor 11: The extent to which the J&S has made use of the invention; and any evidence probative of the value of that use.**

---

[56] ATTACHMENT 800.
[57] ATTACHMENT 700.
[58] www.trulogsiding.com.
[59] www.trulogsiding.com.



80. The extent of J&S's use of the patented invention is evident in the accused revenue generated by J&S on the accused siding. As shown on ATTACHMENT 600, from 2010 through 2023, J&S generated approximately $783,000 in accused sales.

**Factor 12: The portion of profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.**

81. As discussed in Factor 1 above, TBH's licensing efforts in 2010 provided license rates of approximately 10% of sales along with an upfront license fee of $10,000. I am not aware of any other licenses considered to be comparable to the hypothetical negotiation license.

82. This factor directs attention to a starting point based on a running royalty of 10% and a $10,000 upfront license fee.

**Factor 13: The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the J&S.**

83. The earlier TBH licenses help demonstrate the portion of profit attributable to the patented inventions, adjusted for the additional profit opportunity to the licensee through the sales of ancillary products typically sold with the accused siding. As such, this factor directs attention to reasonable royalty rates based on the historical license framework.

**Factor 14: The opinion testimony of qualified experts.**

84. My opinions are outlined in this Report.

**Factor 15: The amount that a licensor (such as TBH) and a licensee (such as the J&S) would have agreed upon (at the time infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee – who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent licensor, who was willing to grant a license.**



85. In my opinion, the parties would conclude to a reasonable royalty in the form of an upfront license fee in the amount of $16,500 plus a running royalty of 16.5% on accused sales. These rates represent a 65% increase over the historical licensing rates offered by TBH.

86. My conclusion is based on the starting points found in the historical license agreements ($10,000 upfront fee and a 10% running royalty on sales of the patented siding) adjusted to consider the significant additional revenue and profit opportunity realized by the licensee through sales of ancillary products. As previously discussed, J&S typically earns an additional 65% of revenue on accused siding jobs related to the ancillary sales. Recognizing the considerable economic upside a license would provide to a TBH direct competitor, would demand a premium reasonable royalty rate. Accordingly, the concluded reasonable royalty rate represents a 65% increase over the historical license rates.

87. ATTACHMENTS 150-152 provide the reasonable royalty amounts by patent and timeframe.[60] The following Charts summarize the reasonable royalty amounts by patent:

| Assuming Infringement of 'D612 Patent | | | |
|---|---|---|---|
| | Total Sales | Sales Through 7/16 - 10/23 | Sales Using Fabricated Disks |
| Accused Sales | $ 769,620 | $ 531,905 | $ 119,327 |
| Royalty Rate | 16.5% | 16.5% | 16.5% |
| Running Royalty | $ 126,987 | $ 87,764 | $ 19,689 |
| License Fee | 16,500 | 16,500 | 16,500 |
| Total Reasonable Royalty | $ 143,487 | $ 104,264 | $ 36,189 |

---

[60] It should be noted that the reasonable royalty amounts indicated are not necessarily additive. Given the fact that this matter involves multiple patents with multiple issue and expiration dates, an infringement determination on the patents-in-suit is needed before an exact royalty base can be quantified. The analysis included in the ATTACHMENTS of this Report provides the necessary detail to quantify the proper royalty base once the infringement determination is made by the trier-of-fact.



| Assuming Infringement of '529 Patent | | |
|---|---|---|
| | Total Sales | Sales Using Fabricated Disks |
| Accused Sales | $ 433,028 | $ 49,513 |
| Royalty Rate | 16.5% | 16.5% |
| Running Royalty | $ 71,450 | $ 8,170 |
| License Fee | 16,500 | 16,500 |
| Total Reasonable Royalty | $ 87,950 | $ 24,670 |

| Assuming Infringement of '604 Patent | | | |
|---|---|---|---|
| | Total Sales | Sales Through 7/16 - 12/23 | Sales Using Fabricated Disks |
| Accused Sales | $ 582,920 | $ 544,995 | $ 119,327 |
| Royalty Rate | 16.5% | 16.5% | 16.5% |
| Running Royalty | $ 96,182 | $ 89,924 | $ 19,689 |
| License Fee | 16,500 | 16,500 | 16,500 |
| Total Reasonable Royalty | $ 112,682 | $ 106,424 | $ 36,189 |





## James J. Harrington | CPA, CFF, CVA | Director

**T** 248.283.0222 • **M** 586.764.2595 • **E** jharrington@mdd.com • 3155 W. Big Beaver, Suite 205 • Troy, MI 48084

### Position

Matson, Driscoll & Damico, LLP – (2018 – Present)
Alvarez & Marsal – (2009 - 2018)
Navigant Consulting – (2004 – 2009)
Tucker Alan, Inc. – (1998 – 2004)
Shore & Azimov – (1997 – 1998)
Parker Wittus – (1995 – 1997)

### Professional Experience

> Professional concentration in matters related to intellectual property disputes, licensing disputes, fraud investigations, mutual fund analysis and securities disputes, claims for increased costs, business interruption loss, breach of contract, accounting investigations and other commercial disputes. Provided expert testimony in matters pending in state court, federal court and arbitration forums.

> Industry experience in agriculture, automotive, cannabis, chemicals, computers, construction, consumer products, electronics, food service, manufacturing, mining, retail, securities, software, surgical/medical equipment and telecommunications.

### Intellectual Property Matters

> Extensive experience on intellectual property assignments including patent infringement matters, trademark infringement, trade secrets and other intellectual property claims involving lost profits, price erosion, reasonable royalty, unjust enrichment, disgorgement of profits, and pre-judgment and post judgment interest calculations.

> Prepared expert reports on damages issues in connection with intellectual property matters. Deposition and trial testimony also provided.

### Patent Infringement Matters

> Analysis performed on numerous lost profit claims associated with lost unit sales, lost convoyed sales, price erosion, market share erosion, lost head start and other claims of lost profits. Calculated and analyzed the incremental profit for patented products and processes, as well as accused products and processes. Addressed market share issues to evaluate the appropriateness of lost profit claims based on a market share approach. Developed detailed knowledge of leading cases relevant to lost profit damages including Panduit, Rite-Hite, Grain Processing, State Industries v. Mor-Flo and others. Provided expert trial testimony addressing claims of lost profit.

> Retained as the testifying expert on behalf of the patentee in a design patent infringement matter. Patent related to the design of a cell phone charger. Prepared an expert report addressing the amount of profit earned by the defendants on the accused sales. Provided expert deposition testimony on the damages issues.

> Performed reasonable royalty analysis on numerous patent infringement matters. Reasonable royalty analysis included consideration of the Georgia Pacific factors as they relate to the hypothetical negotiation. Reasonable royalty analysis has included consideration and analysis of existing licenses and their comparability to the hypothetical negotiation, established license rates, analytical methods, cost savings, profit improvement, apportionment issues and other considerations. Considered the appropriateness of the entire market value rule in determining the appropriate royalty base. Developed detailed knowledge of leading cases related to reasonable royalty determinations including Georgia Pacific, Panduit, Cornell v. Hewlett Packard, Lucent v. Gateway, Uniloc v. Microsoft, and others. Expert trial testimony included reasonable royalty analysis and reasonable royalty rate determinations.



## James J. Harrington | CPA, CFF, CVA | Director

**T** 248.283.0222 • **F** 734.939.0173 • **E** jharrington@mdd.com • 3155 W. Big Beaver, Suite 205 • Troy, MI 48084

### Licensing Disputes

> Analyzed consideration received from licensors on multiple licenses to determine whether more favorable terms were granted to one licensee. Net present value analysis of avoided royalties was applied to calculate possible value of cross-licensing terms.

> Performed royalty audit on behalf of a licensor. Audit included analysis and verification of royalty reports. Analysis included testing of reported sales values included in the royalty base and identification of omitted sales subject to royalties.

### Trademark Matters

> Analyzed actual damages claim related to the use of an alleged infringing trademark. Analysis included the apportionment of the defendant's revenues and profits between infringing and non-infringing sales. Analyzed reasonable royalty considerations related to the asserted trademarks.

### Trade Secrets Matters

> Analyzed actual damages assertions including lost profits and lost value of alleged trade secrets. Considered and analyzed the possible unjust enrichment to the defendant for trade secret disclosure including cost savings and shortened time to market. Also examined reasonable royalty for use of trade secrets.

### Copyright Matters

> Addressed claims of unjust enrichment and disgorgement of profit. Analyzed costs properly considered in determining amount of profit earned on infringing sales. Also addressed claims related to profits on non-infringing sales. Provided expert deposition testimony addressing these issues.

### Forensic Accounting Investigations

> Assisted in a forensic accounting investigation as part of a team supporting the examiner's financial advisor in the bankruptcy proceedings of a major multinational casino operating company. Engagement involved investigating and reporting on several highly complex pre-petition transactions completed by the debtor.

> Analyzed donations received by our client, a charitable organization assisting underprivileged children in Iraq, to determine whether donations made to a related church were being commingled with the charity's funds. Analysis included donations of over $1.2 million covering a five-year period. Reported findings to the charity's management team and members of the board of directors.

> Analyzed historical revenues and expenses of a large apartment complex to assess whether the property manager was improperly using partnership assets for personal gain. Analysis involved review of reported monthly rental revenue and expenditures over a seven-year period in order to identify unusual trends or questionable expenditures.

> Assisted in a fraud investigation relating to alleged excessive/improper reporting of travel and entertainment expenses by the officer of a large not-for-profit organization. Analysis included the review and compilation of expenses reported over a three-year period to evaluate the appropriateness of the expenditures.

### Other Commercial Disputes and Damages Studies

> Analyzed historical sales and financial performance of terminated OEM dealerships to be considered in arbitration proceedings addressing the dealership's claims of improper termination. Provided expert testimony on behalf of the OEM at arbitration.



## James J. Harrington | CPA, CFF, CVA | Director

**T** 248.283.0222 • **F** 734.939.0173 • **E** jharrington@mdd.com • 3155 W. Big Beaver, Suite 205 • Troy, MI 48084

> Prepared analysis quantifying claimed lost profits experienced by our client, a Tier 2 automotive supplier, resulting from a claimed breach of a requirements contract by its customer, a Tier 1 supplier. Analysis included determining the amount of lost sales over a forty-two month period and identifying and calculating incremental costs associated with the claimed lost sales. Issued an expert report presenting the analysis and lost profit conclusion and provided deposition testimony.

> Analyzed alleged improper commercial construction loan draws made by the general contractor retained by our client to manage the construction of a local fast-food restaurant. Analysis included determining whether the incurred cost amounts reflected in the sworn statements submitted by the contractor had actually been incurred for work completed by the contractor and subcontractors. Provided a report of our findings and provided expert testimony at arbitration.

> Retained to analyze lost profits claim on behalf of our client, a provider of banking and payment services to medical and recreational cannabis dispensaries and suppliers. Analysis included the determination of existing cannabis wholesale and retail markets in Michigan and Illinois and long-term potential growth trends to support and quantify future lost profit damages.

> Reviewed and analyzed claims of increased costs by our client, a national pizza chain, related to the cancellation of a planned national advertising program based on a "scratch and win" game. Analysis included identifying and calculating additional costs incurred as a direct result of the game cancellation as well as costs incurred in development of the game which resulted in no direct economic benefit to our client.

> In an antitrust matter, performed analysis to rebut claims of below cost pricing on sales made to a major home improvement retail chain. Analysis included the examination of contract selling prices and incremental costs on the accused products and an allocation of one-time rebates and advertising allowances provided to the retailer.

## Mutual Funds and Securities Disputes

> Prepared analysis on trading activities by a mutual fund company executive accused of market timing and other improper trading activity in international and small cap mutual funds. Analysis was performed using daily transactional data for a five-year period on several accounts controlled by the executive. The data was analyzed to identify trading patterns, holding days in equity funds and trading gains and losses realized through longer term holding periods.

> Analyzed a hedge fund company's investment experience in detail to determine the historical return achieved from its investments in mutual funds. Reviewed and analyzed daily trading positions for the hedge fund between money market accounts and equity-oriented mutual funds, confirmed and reconstructed historical trading data, computed daily, monthly and annual returns for the hedge fund from its mutual fund investments and compared the hedge fund's returns to market indexes. We also identified and summarized academic studies addressing excess returns available from actively trading no-load mutual funds based upon movements in the domestic market and other variables.

## Certifications & Memberships

American Institute of Certified Public Accountants
Michigan Association of Certified Public Accountants
National Association of Certified Valuators and Analysts

## Speaking Engagements

Michigan Association of Certified Public Accountants Litigation and Business Valuation Conference, June 2004, *"Damages Issues in Patent Infringement Matters"*.

## Education

1995 Bachelor of Science, Accounting – Oakland University - Rochester, MI

**Summary of Expert Testimony**

> <u>Lynch Road Industrial, LLC v. Axle of Dearborn, Inc. d/b/a, Detroit Axle</u>, State of Michigan, 3rd Judicial Circuit Court (Expert Report and Deposition testimony), 2024

> <u>Flipsi, Ltd. v. TOMY International, Inc.</u>, U.S. District Court, Northern District of Illinois, Eastern Division (Expert Reports and Deposition testimony), 2024

> <u>Michael Patrick Parrent v. Jeffrey Marvin Roggenbuck, et.al.</u>, State of Michigan, Circuit Court for the County of Wayne (Expert Report and Deposition testimony), 2024

> <u>Richard Sarfoh v. Harold Sullivan</u>, American Arbitration Association, Case No. 01-22-0005-2288 (Expert Report and Arbitration testimony), 2023

> <u>Encompass Pet Group, LLC d/b/a SmartPetLove and Snuggle Pet Products, LLC v. Allstar Products Group, LLC, and Allstar Marketing Group, LLC</u>, U.S. District Court, Eastern District of Michigan, Southern Division (Expert Reports and Deposition testimony), 2023

> <u>Triage Logic Management & Consulting, LLC v. PQCTech, LLC, et. al.</u>, U.S. District Court, Western District of Missouri, Western Division (Expert Report and Deposition testimony), 2023

> <u>Stephanie Campbell v. Gannett Company, Inc., et.al.</u>, U.S. District Court, Western District of Missouri, (Expert Report and Deposition testimony), 2022

> <u>Sportspower, Ltd. v. Crowntec Fitness Mfg. Ltd.</u>, U.S. District Court, Eastern District of Texas, Sherman Division (Expert Report and Deposition testimony), 2021

> <u>Assessment Technologies Institute, LLC v. Cathy Parkes</u>, U.S. District Court, District of Kansas (Expert Report and Deposition testimony), 2021

> <u>955 S. Monroe, LLC and Anthony E. Porter v. D&R Maintenance Management, Inc. and Jason M. D'Herin</u>, 38th Circuit Court, Monroe, MI (Expert Report and Arbitration testimony), 2020

> <u>Sportspower, Ltd. v. Crowntec Fitness Mfg. Ltd.</u>, U.S. District Court, Central District of California (Expert Report and Deposition testimony), 2019

> <u>Hain Blueprint, Inc., v. Blueprint Coffee, LLC</u>, U.S. District Court, Eastern District of Missouri, Eastern Division (Expert Report and Deposition testimony), 2018

> <u>Star Chrysler, Inc. (d/b/a Bill Kay's Naperville Chrysler) v. Chrysler Group LLC</u>, AAA No. 51-532-000113-10 (Arbitration testimony), 2010

> <u>Ogden Chrysler, Inc. (d/b/a Bill Kay's Chrysler of Downers Grove) v. Chrysler Group LLC</u>, AAA No. 51-532-000114-10 (Arbitration testimony), 2010

> <u>Magnadyne Corporation v. Best Buy Co., Inc. and Ever Win International Corporation</u>, U.S. District Court, Central District of California (Expert Report and Deposition testimony), 2010

> <u>Martin Gubb v. P&M Services, Inc.</u>, U.S. District Court, Eastern District of Michigan, Southern Division (Expert Report, Deposition and Trial testimony), 2007

> <u>Q.C. Onics Ventures, LP v. Johnson Controls, Inc.</u>, U.S. District Court, Northern District of Indiana, Fort Wayne Division (Expert report and Deposition testimony), 2005

ATTACHMENT B
Page 1 Of 2

**TB Holding Company LLC v. J&S Siding**
**Documents and Information Considered**

| Beginning Bates | | Ending Bates | | Beginning Bates | | Ending Bates | |
|---|---|---|---|---|---|---|---|
| J and S | 000001 | J and S | 000178 | 000010 | TB HOLDING | 000308 | TB HOLDING |
| J and S | 000200 | J and S | 002029 | TBH | 000500 | TBH | 000918 |

**Documents Not Bearing Batestamping**

**Court documents**
1  ECF 001 - Complaint for Damages and Equitable Relief with Exhibits
2  ECF 029 - Stipulated Protective Order
3  ECF 042-01 Memorandum in Support of TB Holding's Motion for Partial Summary Judgement
4  ECF 042-02 TB Holding's Statement of Material Facts
5  ECF 086 - Memorandum in Support of J and S's Motion to Reconsider
6  ECF 090 - Memorandum Decision and Order
7  Defendant's Second Supplemental Responses to Plaintiff's First Discovery Requests
8  Defendant's Fourth Supplemental Responses to Plaintiff's First Discovery Requests
9  Plaintiff's First Request to Inspect the Premises, Operations, and Take Samples Pursuant to Rule 34
10  Plaintiff's First Request for Production of Documents and ESI from Defendant
11  Plaintiff's First Set of Interrogatories to Defendant
12  Defendant's Responses to Plaintiff's First Set of Interrogatories
13  Plaintiff's Second Set of Discovery Requests
14  Defendant's Responses to Plaintiff's Second Discovery Requests
15  Plaintiff's Third Set of Discovery Requests
16  Defendant's Supplemental Responses to Plaintiff's First and Second Discovery Requests
17  Defendant's Responses to Plaintiff's Third Discovery Requests
18  Plaintiff's Fourth Set of Discovery Requests
19  Defendant's Responses to Plaintiff's Fifth Discovery Requests
20  Plaintiff's Fifth Set of Discovery Requests
21  Defendant's Responses to Plaintiff's Fourth Discovery Requests
22  Defendant's Fourth Supplemental Responses to Plaintiff's First Discovery Requests
23  Disclosures under Rule 26(a)(1) and Local Rule 26.2
24  Plaintiff's Supplemental Disclosures Under Rule 26€ and Local Rule 26.2


**Discussions**
1  Discussion with Ryan Reed-Baum


**Depositions**
1  Deposition of Joe Walrath dated 09.23.23
2  Deposition of Stephanie Walrath dated 09.23.23
3  Deposition of Joe and Stephanie Walrath dated 02.20.24
4  Deposition of Joe Walrath dated 02.20.24
5  Deposition of TB Holding Company LLC by Ryan Reed-Baum dated 02.23.24 and exhibits
6  Deposition of Theodore Baum dated 02.23.24 and exhibits
7  Deposition of TB Holding Company LLC by Ryan Reed-Baum dated 06.19.24 and exhibits


**Websites and Public Documents**
1  Idahoseamlesssiding.com
2  trulogsiding.com



**TB Holding Company LLC v. J&S Siding**
**Documents and Information Considered**

**<u>Other</u>**

1  J & S Siding Balance Sheet 12.11.23
2  J & S Siding Employee Contact List
3  J & S Siding General Ledger 01/01/16 - 12/11/23
4  J & S Siding Journal 01/01/16 - 12/11/23
5  J & S Siding Profit and Loss Statement 01/01/16 - 12/11/23
6  J & S Siding Trial Balance 12.11.23
7  J & S Siding Vendor Contact List
8  J & S Siding Invoice 774
9  J & S Siding Invoice 808
10 J & S Siding Invoice 683
11 Terminal Disclaimer to Obviate a Double Patenting Rejection Over a "Prior" Patent
12 IFW 529 - Report on the Filing or Determination of an Action Regarding a Patent or Trademark - Patent Number 9,732,529
13 IFW 604 - Report on the Filing or Determination of an Action Regarding a Patent or Trademark - Patent Number 9,283,604
14 United States Patent No.: 9,283,604 B2 Dated March 15, 2016
15 United States Patent No.: 9,732,529 B2 Dated August 15, 2017
16 United States Patent No.: D602,612 S Dated October 20, 2009





ATTACHMENT 100

**TB Holding Company LLC v. J&S Siding**
**Summary of J&S Siding Infringing Sales**
**Covered by the 'D612 Patent**

| Total Sales | Sales Through 7/16 - 10/23 | Sales Using Fabricated Disks |
|---|---|---|
| $ 769,620 | $ 531,905 | $ 119,327 |

Sources: Attachments 300 - 302



ATTACHMENT 150

**TB Holding Company LLC v. J&S Siding**
**Summary of Reasonable Royalty Damages**
**Assuming Infringement of 'D612 Patent**

|  |  | Total Sales | Sales Through 7/16 - 10/23 | Sales Using Fabricated Disks |
|---|---|---|---|---|
| Accused Sales | A | $ 769,620 | $ 531,905 | $ 119,327 |
| Royalty Rate | B | 16.5% | 16.5% | 16.5% |
| Running Royalty | C = A x B | $ 126,987 | $ 87,764 | $ 19,689 |
| License Fee | D | 16,500 | 16,500 | 16,500 |
| Total Reasonable Royalty | E = C + D | $ 143,487 | $ 104,264 | $ 36,189 |

Sources: Attachments 300 - 302.



ATTACHMENT 151

**TB Holding Company LLC v. J&S Siding**
**Summary of Reasonable Royalty Damages**
**Assuming Infringement of '529 Patent**

| | | Total Sales | Sales Through 7/16 - 10/23 | Sales Using Fabricated Disks |
|---|---|---|---|---|
| Accused Sales | A | $ 433,028 | $ 433,028 | $ 49,513 |
| Royalty Rate | B | 16.5% | 16.5% | 16.5% |
| Running Royalty | C = A x B | $ 71,450 | $ 71,450 | $ 8,170 |
| License Fee | D | 16,500 | 16,500 | 16,500 |
| Total Reasonable Royalty | E = C + D | $ 87,950 | $ 87,950 | $ 24,670 |

Sources: Attachments 400 - 401.



ATTACHMENT 152

**TB Holding Company LLC v. J&S Siding**
**Summary of Reasonable Royalty Damages**
**Assuming Infringement of '604 Patent**

|  |  | Total Sales | Sales Through 7/16 - 10/23 | Sales Using Fabricated Disks |
|---|---|---|---|---|
| Accused Sales | A | $ 582,920 | $ 544,995 | $ 119,327 |
| Royalty Rate | B | 16.5% | 16.5% | 16.5% |
| Running Royalty | C = A x B | $ 96,182 | $ 89,924 | $ 19,689 |
| License Fee | D | 16,500 | 16,500 | 16,500 |
| Total Reasonable Roy | E = C + D | $ 112,682 | $ 106,424 | $ 36,189 |

Sources: Attachments 500 - 502.



ATTACHMENT 200

**TB Holding Company LLC v. J&S Siding**
**Damages Matrix**

| Asserted Patent | Damages Period Start Date | End Date | Accused Sales | Attachment | Damages Remedy Addressed Reasonable Royalty | J&S Profits | Comment |
|---|---|---|---|---|---|---|---|
| 'D612 Patent (Siding design) | 10/20/09 | 10/20/23 | All siding | 300 | X | X | |
| 'D612 Patent (Siding design) | 07/21/16 | 10/20/23 | All siding after 7/21/16 | 301 | X | X | Start date 6 years prior to Complaint date |
| 'D612 Patent (Siding design) | 07/21/16 | 10/20/23 | Jobs Using Fabricated Disks | 302 | X | X | Start date 6 years prior to Complaint date |
| '529 Patent (Siding) | 08/15/17 | 10/20/23 | All siding | 400 | X | | |
| '529 Patent (Siding) | 08/15/17 | 10/20/23 | Jobs Using Fabricated Disks after 8/15/17 | 401 | X | | Fab Disks were made in late 2016 (Note 1) |
| '604 Patent (Components/Disks) | 03/15/16 | Current | All siding | 500 | X | | |
| '604 Patent (Components/Disks) | 07/21/16 | Current | All siding after 7/21/16 | 501 | X | | Start date 6 years prior to Complaint date |
| '604 Patent (Components/Disks) | 07/21/16 | Current | Jobs Using Fabricated Disks | 502 | X | | |

Notes:
1) Date from deposition of Stephanie Walrath dated 9/23/23. pp. 49-50.



ATTACHMENT 300

ATTACHMENT 400

ATTACHMENT 500

ATTACHMENT 502











ATTACHMENT 800

ATTACHMENT 801







# Timeline of Key Events: 2009 - 2024

